No. 15-1823

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
Plaintiff – Appellee,
v.
PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD
CORPORATION),
Defendant – Appellee;

SARAH COLE, FADHAL MOORE, ARJINI KUMARI NAWAL, ITZEL
VASQUEZ-RODRIGUEZ, KEYANNA WIGGLESWORTH, M.B., K.C., Y.D.,
G.E., A.G., I.G., R.H., J.L., R.S.,
Movants – Appellants.
_____

On Appeal from the United States District Court
for the District of Massachusetts
_____

## JOINT APPENDIX
_____

Lawrence E. Culleen
Nancy L. Perkins
ARNOLD & PORTER, LLP
555 12th Street, NW
Washington, D.C. 20004
Tel: (202) 942-5000

Jon M. Greenbaum
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Tel: (202) 662-8600

Steven L. Mayer
ARNOLD & PORTER, LLP
10th Floor, Three Embarcadero Center
San Francisco, CA 94111
Tel: (415) 471-3100

Iván Espinoza-Madrigal
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND ECONOMIC
JUSTICE
294 Washington Street, Suite 443
Boston, MA 02108
Tel: (617) 988-0624

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

District Court Docket Sheet ...................................................................................1

Complaint by Students for Fair Admissions, Inc. (DE 1) .......................................18

Declaration of Edward J. Blum (DE 1-1) ...............................................................138

Answer by President and Fellows of Harvard College (Harvard Corporation) (DE 17)......... 143

Motion to Intervene in Defense of Harvard's Admissions Policy (DE 30)............................208

Exhibits in Support of Proposed Defendant-Intervenors' Motion to Intervene (DE 31-1) .....211

Proposed Answer of Proposed Defendant-Intervenors (DE 31-2) .........................................262

Scheduling Order (DE 35) ...................................................................................329

Notice of Appeal (DE 60)....................................................................................331

Reply Memorandum in Support of Harvard's Motion to Stay (DE 78) ..................................333

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:14–cv–14176–ADB

Students for Fair Admissions, Inc. v. President and Fellows of Harvard College et al
Assigned to: Judge Allison D. Burroughs
Case in other court:  USCA – First Circuit, 15–01823
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 11/17/2014
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Students for Fair Admissions, Inc.**

represented by **John Michael Connolly**
Consovoy McCarthy Park PLLC
3033 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243–9423
Email: mike@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul M Sanford**
Burns & Levinson LLP
One Citizens Plaza
Suite 1100
Providence, RI 02903
401–831–8330
Fax: 401–831–8359
Email: psanford@burnslev.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas R. McCarthy**
Consovoy McCarthy PLLC
3033 Wilson Boulevard
Suite 700
Arlington, VA 22201
703–243–9423
Email: tom@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William S. Consovoy**
Consovoy McCarthy Park PLLC
3033 Wilson Blvd.
Suite 700
Arlington, VA 22201
703–243–4923
Email: will@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin C. Caldwell**
Burns & Levinson LLP
One Citizens Plaza
Suite 1100
Providence, RI 02903
401–831–8330
Email: bcaldwell@burnslev.com

*ATTORNEY TO BE NOTICED*

**Patrick Strawbridge**
Consovoy McCarthy Park PLLC
8th Floor, South, PMB #706
Ten Post Office Square
Boston, MA 002109
617–227–0548
Email: patrick@consovoymccarthy.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**President and Fellows of Harvard**          represented by   **Debo P. Adegbile**
**College**                                                    Wilmer Cutler Pickering Hale and Dorr
                                                               LLP
                                                               7 World Trade Center
                                                               250 Greenwich St.
                                                               New York, NY 10007
                                                               212–295–6717
                                                               Email: Debo.Adegbile@wilmerhale.com
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Paul R.Q. Wolfson**
                                                               Wilmer, Cutler, Pickering, Hale and Dorr
                                                               LLP
                                                               1875 Pennsylvania Avenue, NW
                                                               Washington, DC 20006
                                                               202–663–6000
                                                               Fax: 202–663–6363
                                                               Email: paul.wolfson@wilmerhale.com
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Seth P. Waxman**
                                                               Wilmer Cutler Pickering Hale and Dorr
                                                               LLP
                                                               1875 Pennsylvania Avenue, NW
                                                               Washington, DC 20006
                                                               202–663–6800
                                                               Email: seth.waxman@wilmerhale.com
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Felicia H. Ellsworth**
                                                               Wilmer Cutler Pickering Hale and Dorr
                                                               LLP (Bos)
                                                               60 State Street
                                                               Boston, MA 02109
                                                               617–526–6000
                                                               Fax: 617–526–5000
                                                               Email: felicia.ellsworth@wilmerhale.com
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**The Honorable and Reverend The**
**Board of Overseers**
*TERMINATED: 01/12/2015*

JA 2

**Intervenor Defendant**

**Sarah Cole**                                  represented by  **Lawrence Culleen**
                                                Arnold & Porter LLP
                                                555 Twelfth Street, NW
                                                Washington, DC 20004
                                                202–942–5477
                                                *LEAD ATTORNEY*
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **Nancy L. Perkins**
                                                Arnold & Porter LLP
                                                555 Twelfth Street, NW
                                                Washington, DC 20004
                                                202–942–5065
                                                *LEAD ATTORNEY*
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **Rahsaan D. Hall**
                                                Lawyers' Committee for Civil Rights
                                                Under Law
                                                294 Washington Street
                                                Suite 443
                                                Boston, MA 02108
                                                617–988–0608
                                                Fax: 617–482–4392
                                                Email: rhall@lawyerscom.org
                                                *LEAD ATTORNEY*

                                                **Steven L. Mayer**
                                                Arnold & Porter LLP
                                                Three Embarcadero Center
                                                10th Floor
                                                San Francisco, CA 94111–4024
                                                415–471–3163
                                                Email: steven.mayer@aporter.com
                                                *LEAD ATTORNEY*
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **Priya A. Lane**
                                                Lawyers' Committee for Civil Rights
                                                Under Law
                                                294 Washington Street, Suite 443
                                                Boston, MA 02108
                                                617–988–0610
                                                Email: plane@lawyerscom.org
                                                *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Fadhal Moore**                                represented by  **Jon M. Greenbaum**
                                                Lawyers' Committee for Civil Rights
                                                Under Law
                                                1401 New York Avenue, NW
                                                Suite 400
                                                Washington, DC 20005
                                                (202) 662–8315
                                                Email: jgreenbaum@lawyerscommittee.org
                                                *LEAD ATTORNEY*
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

JA 3

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Arjini Kumari Nawal**                    represented by **Jon M. Greenbaum**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Itzel Vasquez–Rodriguez**                represented by **Jon M. Greenbaum**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *PRO HAC VICE*

JA 4

*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Keyanna Wigglesworth**                    represented by    **Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**M. B.**                    represented by    **Jon M. Greenbaum**
(See above for address)

JA 5

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**K. C.**                                          represented by   **Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

JA 6

**Y. D.**                                    represented by   **Jon M. Greenbaum**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lawrence Culleen**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Nancy L. Perkins**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Rahsaan D. Hall**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*

                                                             **Steven L. Mayer**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Priya A. Lane**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**G. E.**                                    represented by   **Jon M. Greenbaum**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lawrence Culleen**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Nancy L. Perkins**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Rahsaan D. Hall**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*

                                                             **Steven L. Mayer**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Priya A. Lane**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**A. G.**                                    represented by    **Jon M. Greenbaum**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lawrence Culleen**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Nancy L. Perkins**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Rahsaan D. Hall**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

                                                              **Steven L. Mayer**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Priya A. Lane**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**I. G.**                                    represented by    **Jon M. Greenbaum**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lawrence Culleen**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Nancy L. Perkins**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Rahsaan D. Hall**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

                                                              **Steven L. Mayer**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Priya A. Lane**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**R. H.**                                    represented by    **Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**J. L.**                                    represented by    **Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**R. S.**                                    represented by   **Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2014 | 1 | COMPLAINT against All Defendants Filing fee: $ 400, receipt number 0101−5281571 (Fee Status: Filing Fee paid), filed by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Category Form)(Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 2 | NOTICE of Appearance by Paul M Sanford on behalf of Students for Fair Admissions, Inc. (Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 3 | NOTICE of Appearance by Benjamin C. Caldwell on behalf of Students for Fair Admissions, Inc. (Caldwell, Benjamin) (Entered: 11/17/2014) |
| 11/17/2014 | 4 | CORPORATE DISCLOSURE STATEMENT by Students for Fair Admissions, Inc.. (Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of William S. Consovoy, Thomas R. McCarthy and J. Michael Connolly Filing fee: $ 300, receipt number 0101−5281670 by Students for Fair Admissions, Inc.. (Attachments: # 1 Cert. of Attorney Consovoy, # 2 Cert. of Attorney McCarthy, # 3 Cert. of Attorney Connolly, # 4 Text of Proposed Order)(Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 6 | ELECTRONIC NOTICE of Case Assignment. Judge Denise J. Casper assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Abaid, Kimberly) (Entered: 11/17/2014) |

| 11/17/2014 | 7 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Abaid, Kimberly) (Entered: 11/17/2014) |
|---|---|---|
| 11/18/2014 | 8 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added William S. Consovoy, Thomas R. McCarthy and John Michael Connolly. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Maynard, Timothy) (Entered: 11/18/2014) |
| 12/04/2014 | 9 | WAIVER OF SERVICE Returned Executed by Students for Fair Admissions, Inc.. President and Fellows of Harvard College waiver sent on 11/20/2014, answer due 1/19/2015. (Sanford, Paul) (Entered: 12/04/2014) |
| 12/19/2014 | 10 | NOTICE of Appearance by Felicia H. Ellsworth on behalf of President and Fellows of Harvard College (Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/19/2014 | 11 | CORPORATE DISCLOSURE STATEMENT by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/19/2014 | 12 | Assented to MOTION for Extension of Time to February 18, 2015 to Respond to the Complaint by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/19/2014 | 13 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Seth P. Waxman, Paul R.Q. Wolfson, and Debo P. Adegbile Filing fee: $ 300, receipt number 0101−5332406 by President and Fellows of Harvard College. (Attachments: # 1 Certification of Seth P. Waxman, # 2 Certification of Paul R.Q. Wolfson, # 3 Certification of Debo P. Adegbile)(Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/22/2014 | 14 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 12 Motion for Extension of Time to Answer to 2/18/15 by President and Fellows of Harvard College (Hourihan, Lisa) (Entered: 12/22/2014) |
| 12/23/2014 | 15 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Debo P. Adegbile. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Maynard, Timothy) (Entered: 12/23/2014) |
| 01/09/2015 | 16 | STIPULATION *of Dismissal as to Defendant The Board of Overseers of Harvard College Only* by Students for Fair Admissions, Inc.. (Sanford, Paul) (Entered: 01/09/2015) |
| 02/18/2015 | 17 | ANSWER to 1 Complaint, by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 02/18/2015) |
| 02/19/2015 | 18 | NOTICE of Scheduling Conference Scheduling Conference set for 3/23/2015 02:30 PM in Courtroom 11 before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 02/19/2015) |
| 02/19/2015 | 19 | Judge Denise J. Casper: ORDER entered. Standing Order Re: Courtroom Opportunities for Relatively Inexperienced Attorneys(Hourihan, Lisa) (Entered: 02/19/2015) |
| 03/02/2015 | 20 | MOTION to Continue Rule 16 Initial Scheduling Conference *(UNOPPOSED)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 03/02/2015) |
| 03/03/2015 | 21 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 20 Motion to Continue Scheduling Conference set for 4/13/2015 02:00 PM in Courtroom 11 before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 03/03/2015) |

| 03/12/2015 | 22 | ELECTRONIC NOTICE of Reassignment. Judge Allison D. Burroughs added. Judge Denise J. Casper no longer assigned to case. (Abaid, Kimberly) (Entered: 03/12/2015) |
|---|---|---|
| 03/13/2015 | 23 | ELECTRONIC NOTICE OF RESCHEDULING Scheduling Conference RESET for 4/23/2015 10:30 AM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 03/13/2015) |
| 03/16/2015 | 24 | Assented to MOTION to Continue Intial Scheduling Conference to 04/30/2015 by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 03/16/2015) |
| 03/18/2015 | 25 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 24 Motion to Continue. Scheduling Conference reset for 4/30/2015 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 03/18/2015) |
| 04/23/2015 | 26 | JOINT STATEMENT of counsel *pursuant to Federal Rule 26(f) and Local Rule 16.1(d)*. (Sanford, Paul) (Entered: 04/23/2015) |
| 04/23/2015 | 27 | CERTIFICATION pursuant to Local Rule 16.1 *(d)(3)*. (Ellsworth, Felicia) (Entered: 04/23/2015) |
| 04/23/2015 | 28 | CERTIFICATION pursuant to Local Rule 16.1 . (Sanford, Paul) (Entered: 04/23/2015) |
| 04/29/2015 | 29 | ELECTRONIC NOTICE OF RESCHEDULING Scheduling Conference reset for 4/30/2015 02:00 PM in Courtroom 4 before Judge Allison D. Burroughs. NOTICE IS FOR COURTROOM LOCATION CHANGE ONLY.(Folan, Karen) (Entered: 04/29/2015) |
| 04/29/2015 | 30 | MOTION to Intervene *In Defense of Harvard's Admission Policy* by Sarah Cole, Fadhal Moore, Arjini Kumari Nawal, Itzel Vasquez–Rodriguez, Keyanna Wigglesworth, M. B., K. C., Y. D., G. E., A. G., I. G., R. H., J. L., R. S..(Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/29/2015 | 31 | MEMORANDUM in Support re 30 MOTION to Intervene *In Defense of Harvard's Admission Policy* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Declarations of Proposed Defendant–Intervenors, # 2 Exhibit Proposed Answer)(Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/29/2015 | 32 | MOTION for Leave to Appear Pro Hac Vice for admission of Jon M. Greenbaum Filing fee: $ 100, receipt number 0101–5535156 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit A – Certificate of Good Standing, # 2 Exhibit B – Affidavit)(Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/29/2015 | 33 | NOTICE of Appearance by Rahsaan D. Hall on behalf of M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth (Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/30/2015 | 34 | ELECTRONIC Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Scheduling Conference held on 4/30/2015. Colloquy re: motion to intervene. Responses will be filed within 2 weeks. Colloquy re: applications. Colloquy re: discovery schedule. Scheduling order to issue. (Court Reporter: James Gibbons at jmsgibbons@yahoo.com.)(Attorneys present: Sanford, Consovoy, Caldwell, Waxman, Ellsworth) (Folan, Karen) (Entered: 04/30/2015) |
| 05/04/2015 | 35 | Judge Allison D. Burroughs: ORDER entered. SCHEDULING ORDER: Status Conference set for 7/9/2015 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. Amended Pleadings due by 9/25/2015. Discovery to be completed by 4/1/2016 Motions due by 10/13/2016(Folan, Karen) (Entered: 05/04/2015) |
| 05/13/2015 | 36 | NOTICE of Appearance by Patrick Strawbridge on behalf of Students for Fair Admissions, Inc. (Strawbridge, Patrick) (Entered: 05/13/2015) |
| 05/13/2015 | 37 | MEMORANDUM in Opposition re 30 MOTION to Intervene *In Defense of Harvard's Admission Policy* filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Entered: 05/13/2015) |

| 05/13/2015 | 38 | RESPONSE to Motion re 30 MOTION to Intervene *In Defense of Harvard's Admission Policy* filed by President and Fellows of Harvard College. (Waxman, Seth) (Entered: 05/13/2015) |
|---|---|---|
| 05/15/2015 | 39 | MOTION for Leave to File *REPLY MEMORANDUM IN SUPPORT OF THE MOTION TO INTERVENE* by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Proposed Reply)(Hall, Rahsaan) (Entered: 05/15/2015) |
| 05/15/2015 | 40 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 39 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 05/15/2015) |
| 05/18/2015 | 41 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Students for Fair Admissions, Inc. re 36 Notice of Appearance *of Patrick Strawbridge*. (Strawbridge, Patrick) (Entered: 05/18/2015) |
| 05/18/2015 | 42 | REPLY to Response to 39 MOTION for Leave to File *REPLY MEMORANDUM IN SUPPORT OF THE MOTION TO INTERVENE* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Hall, Rahsaan) (Entered: 05/18/2015) |
| 05/19/2015 | 43 | Transcript of Status Conference held on April 30, 2015, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: James Gibbons at jmsgibbons@yahoo.com Redaction Request due 6/9/2015. Redacted Transcript Deadline set for 6/19/2015. Release of Transcript Restriction set for 8/17/2015. (Scalfani, Deborah) (Entered: 05/19/2015) |
| 05/19/2015 | 44 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 05/19/2015) |
| 05/26/2015 | 45 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 32 Motion for Leave to Appear Pro Hac Vice Added Jon M. Greenbaum. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/26/2015) |
| 05/26/2015 | 46 | MOTION for Leave to Appear Pro Hac Vice for admission of Lawrence Culleen Filing fee: $ 100, receipt number 0101–5572007 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit)(Hall, Rahsaan) (Entered: 05/26/2015) |
| 05/26/2015 | 47 | MOTION for Leave to Appear Pro Hac Vice for admission of Nancy L. Perkins Filing fee: $ 100, receipt number 0101–5572061 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Af)(Hall, Rahsaan) (Entered: 05/26/2015) |
| 05/26/2015 | 48 | MOTION for Leave to Appear Pro Hac Vice for admission of Steven L. Mayer Filing fee: $ 100, receipt number 0101–5572070 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit)(Hall, Rahsaan) (Entered: 05/26/2015) |

| 05/27/2015 | 49 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>46</u> Motion for Leave to Appear Pro Hac Vice Added Lawrence Culleen. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/27/2015) |
|---|---|---|
| 05/27/2015 | 50 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>47</u> Motion for Leave to Appear Pro Hac Vice Added Nancy L. Perkins. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/28/2015) |
| 05/27/2015 | 51 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>48</u> Motion for Leave to Appear Pro Hac Vice Added Steven L. Mayer. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/28/2015) |
| 06/15/2015 | <u>52</u> | Judge Allison D. Burroughs: ORDER enteredMEMORANDUM AND ORDER ON PROPOSED DEFENDANT–INTERVENORS' MOTION TO INTERVENE the Proposed Intervenors Motion to Intervene <u>30</u> is DENIED; however, the Proposed Intervenors are granted leave to participate in this action as amici curiae. (Montes, Mariliz) (Entered: 06/15/2015) |
| 06/25/2015 | <u>53</u> | Joint MOTION for Protective Order *(Stipulated)* by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 06/25/2015) |
| 06/25/2015 | 54 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered The parties' Joint Motion for Protective Order <u>53</u> is hereby ALLOWED, and the parties' Stipulated Protective Order is approved. However, given the lack of specificity in Paragraphs 10 and 13 regarding the use of protected documents during public proceedings, the Court reserves the right to allow, after notice to the parties, the disclosure of any document or information covered by the Protective Order or to modify the Protective Order at any time in the interests of justice and to ensure that any proceeding before this Court is fair, efficient, and consistent with the public interest. (Montes, Mariliz) (Entered: 06/25/2015) |
| 06/25/2015 | <u>55</u> | Judge Allison D. Burroughs: ORDER entered. STIPULATION PROTECTIVE ORDER REGARDING DISCLOSURE AND USE OF DISCOVERY MATERIALS(Montes, Mariliz) (Entered: 06/25/2015) |
| 06/30/2015 | <u>56</u> | MOTION to Continue Status Conference *(UNOPPOSED)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 06/30/2015) |
| 07/01/2015 | 57 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>56</u> Motion to Continue. Status Conference reset for 7/21/2015 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 07/01/2015) |
| 07/06/2015 | <u>58</u> | MOTION to Stay by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 07/06/2015) |

| 07/06/2015 | 59 | MEMORANDUM in Support re 58 MOTION to Stay filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A)(Waxman, Seth) (Entered: 07/06/2015) |
|---|---|---|
| 07/13/2015 | 60 | NOTICE OF APPEAL as to 52 Order on Motion to Intervene, by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth Filing fee: $ 505, receipt number 0101–5656193 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 8/3/2015. (Hall, Rahsaan) (Entered: 07/13/2015)** |
| 07/14/2015 | 61 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 60 Notice of Appeal. (Paine, Matthew) (Entered: 07/14/2015) |
| 07/14/2015 | 62 | USCA Case Number 15–1823 for 60 Notice of Appeal filed by G. E., K. C., R. S., Keyanna Wigglesworth, Sarah Cole, Itzel Vasquez–Rodriguez, Fadhal Moore, M. B., Y. D., Arjini Kumari Nawal, I. G., R. H., A. G., J. L.. (Paine, Matthew) (Entered: 07/14/2015) |
| 07/15/2015 | 63 | NOTICE TO COUNSEL: The clerk's office has received a request to video record this hearing as part of the "Cameras in the Courtroom" project. Counsel are directed to the district court web site at http://www.mad.uscourts.gov/general/cameras.html to determine if they wish to consent to video recording. Responses are due July 20, 2015. A RESPONSE FROM EACH PARTY IS REQUIRED. (Hurley, Virginia) (Entered: 07/15/2015) |
| 07/16/2015 | 64 | MOTION to Compel *Production* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 07/16/2015) |
| 07/16/2015 | 65 | MEMORANDUM in Support re 64 MOTION to Compel *Production* filed by Students for Fair Admissions, Inc.. (Caldwell, Benjamin) (Entered: 07/16/2015) |
| 07/16/2015 | 66 | DECLARATION re 65 Memorandum in Support of Motion *to Compel Production* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Caldwell, Benjamin) (Entered: 07/16/2015) |
| 07/17/2015 | 67 | MOTION to Seal *Exhibit and Unredacted Memorandum of Law Associated with Motion to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 07/17/2015) |
| 07/17/2015 | 70 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 67 Motion to Seal (Montes, Mariliz) (Entered: 07/17/2015) |
| 07/20/2015 | 71 | Opposition re 58 MOTION to Stay filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 07/20/2015) |
| 07/21/2015 | 72 | MOTION to Seal by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 07/21/2015) |
| 07/21/2015 | 73 | MOTION for Leave to File *Reply Memorandum In Support Of Motion To Stay* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ellsworth, Felicia) (Entered: 07/21/2015) |
| 07/21/2015 | 74 | ELECTRONIC NOTICE OF RESCHEDULING Status Conference set for 7/21/2015 02:00 PM in Courtroom 16 before Judge Allison D. Burroughs. NOTICE IS FOR COURTROOM LOCATION CHANGE ONLY.(Folan, Karen) (Entered: 07/21/2015) |
| 07/21/2015 | 75 | NOTICE of Withdrawal of Appearance by Rahsaan D. Hall (Hall, Rahsaan) (Entered: 07/21/2015) |
| 07/21/2015 | 76 | NOTICE of Appearance by Priya A. Lane on behalf of M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth (Lane, Priya) (Entered: 07/21/2015) |

| 07/21/2015 | 77 | ELECTRONIC Clerk's Notes for proceedings held before Judge Allison D. Burroughs: granting 72 Motion to Seal; granting 73 Motion for Leave to File Document ; Status Conference held on 7/21/2015; (Court Reporter: Carol Scott at carollynnscott@cs.com.)(Attorneys present: Sanford, Consovoy, Strawbridge, Waxman, Ellsworth, Gershengorn) (Folan, Karen) (Entered: 07/23/2015) |
| 07/23/2015 | 78 | REPLY to Response to 58 MOTION to Stay filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 07/23/2015) |
| 07/23/2015 | 79 | DECLARATION re 78 Reply to Response to Motion *to Stay* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ellsworth, Felicia) (Entered: 07/23/2015) |
| 07/28/2015 | 82 | NOTICE by President and Fellows of Harvard College re 58 MOTION to Stay − *Supplemental Submission* (Ellsworth, Felicia) (Entered: 07/28/2015) |
| 07/28/2015 | 83 | Supplemental Opposition re 58 MOTION to Stay filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 07/28/2015) |
| 07/30/2015 | 84 | Transcript of Status Conference held on July 21, 2015, before Judge Allison D. Burroughs. COA Case No. 15−1823. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Carol Scott at carollynnscott@cs.com Redaction Request due 8/20/2015. Redacted Transcript Deadline set for 8/31/2015. Release of Transcript Restriction set for 10/28/2015. (Scalfani, Deborah) (Entered: 07/30/2015) |
| 07/30/2015 | 85 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 07/30/2015) |
| 07/30/2015 | 86 | MEMORANDUM in Opposition re 64 MOTION to Compel *Production* filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 07/30/2015) |
| 07/30/2015 | 87 | DECLARATION re 86 Memorandum in Opposition to Motion *to Compel (McCrary)* by President and Fellows of Harvard College. (Ellsworth, Felicia) (Main Document 87 replaced on 7/31/2015) (Montes, Mariliz). (Additional attachment(s) added on 7/31/2015: # 1 Addendum) (Montes, Mariliz). (Entered: 07/30/2015) |
| 07/30/2015 | 88 | DECLARATION re 86 Memorandum in Opposition to Motion *to Compel (McGrath)* by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 07/30/2015) |
| 07/31/2015 | 89 | Notice of correction to docket made by Court staff. Correction: Docket 87 corrected by detaching Addendum from Declaration and re−filing it as an attachment. (Montes, Mariliz) (Entered: 07/31/2015) |
| 08/05/2015 | 90 | MOTION to Stay *Proceedings Pending Appeal* by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez−Rodriguez, Keyanna Wigglesworth.(Lane, Priya) (Entered: 08/05/2015) |
| 08/05/2015 | 91 | MEMORANDUM in Support re 90 MOTION to Stay *Proceedings Pending Appeal* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez−Rodriguez, Keyanna Wigglesworth. (Lane, Priya) (Entered: 08/05/2015) |
| 08/06/2015 | 92 | MOTION for Leave to File *Reply Memorandum in Support of Motion to Compel* by Students for Fair Admissions, Inc.. (Attachments: # 1 Proposed Reply Memo, # 2 Declaration of Patrick Strawbridge)(Caldwell, Benjamin) (Entered: 08/06/2015) |
| 08/07/2015 | 93 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 92 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (Montes, Mariliz) (Entered: 08/07/2015) |

| 08/07/2015 | 94 | REPLY to Response to 64 MOTION to Compel *Production* filed by Students for Fair Admissions, Inc.. (Caldwell, Benjamin) (Entered: 08/07/2015) |
| 08/07/2015 | 95 | DECLARATION re 94 Reply to Response to Motion *to Compel* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Caldwell, Benjamin) (Entered: 08/07/2015) |
| 08/07/2015 | 96 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Students for Fair Admissions, Inc. re 95 Declaration *re 94 Reply to Response to Motion to Compel by Students for Fair Admissions, Inc...* (Caldwell, Benjamin) (Entered: 08/07/2015) |
| 08/14/2015 | 97 | MOTION for Leave to File *A Sur−Reply Memorandum In Opposition to SFFA's Motion to Compel* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A)(Ellsworth, Felicia) (Entered: 08/14/2015) |
| 08/14/2015 | 98 | Opposition re 90 MOTION to Stay *Proceedings Pending Appeal* filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 08/14/2015) |
| 08/17/2015 | 99 | RESPONSE to Motion re 90 MOTION to Stay *Proceedings Pending Appeal* filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 08/17/2015) |
| 08/18/2015 | 100 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 97 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 08/18/2015) |
| 08/18/2015 | 101 | SUR−REPLY to Motion re 64 MOTION to Compel *Production* filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 08/18/2015) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); and THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS, | **COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Students for Fair Admissions, Inc. brings this action to obtain, among other relief, a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendant President and Fellows of Harvard College ("Harvard Corporation") and The Honorable and Reverend the Board of Overseers ("Board of Overseers" and together with Harvard Corporation, "Defendants" or "Harvard") have employed and are employing racially and ethnically discriminatory policies and procedures in administering the undergraduate admissions program at Harvard College in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI").  Harvard's undergraduate admissions policies and procedures have injured and continue to injure Plaintiff's members by intentionally and improperly discriminating against them on the basis of their race and ethnicity in violation of Title VI.

## I.    **INTRODUCTION**

1.    This is an action brought under Title VI of the Civil Rights Act of 1964 to prohibit Harvard from engaging in intentional discrimination on the basis of race and ethnicity.  "Classifications of citizens solely on the basis of race are by their very nature

odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations and quotations omitted). As a consequence, racial classifications are highly disfavored and have been permitted only when there is a compelling government interest that cannot be met through race-neutral means. In the educational setting, "diversity" is the only interest the Supreme Court has found compelling. Even then, the Supreme Court has mandated strict judicial scrutiny to ensure that an academic institution is actually pursuing that interest and that it is absolutely necessary to employ racial preferences in order to achieve a diverse student body.

2.      Yet the Supreme Court has always had misgivings about its decision to permit *any* use of racial preferences in university admissions. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518 (1989) (Kennedy, J., concurring in part and concurring in the judgment). The Supreme Court was nevertheless convinced to permit racial preferences in pursuit of diversity for two reasons. First, based mainly on an *amicus* brief that Harvard submitted, the Supreme Court was led to believe that schools only would "take account of race as one, nonpredominant factor in a system designed to consider each applicant as an individual." *Grutter v. Bollinger*, 539 U.S. 306, 387 (2003) (Kennedy, J., dissenting) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-91 (1978)). Second, the Supreme Court believed that the "strict scrutiny standard [would] operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort."

JA 19

*Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

3.    The Supreme Court was misled.  The admissions plan Harvard advocated for in *Bakke* (the "Harvard Plan") that promised to treat each applicant as an individual has always been an elaborate mechanism for hiding Harvard's systematic campaign of racial and ethnic discrimination against certain disfavored classes of applicants.  Indeed, the Harvard Plan was created for the specific purpose of discriminating against Jewish applicants.  Put simply, *Bakke* "legitimated an admissions process that is *inherently capable* of gross abuse and that … *has in fact been deliberately* manipulated for the specific purpose of perpetuating religious and ethnic discrimination in college admissions."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979). Today it is used to hide intentional discrimination against Asian Americans. Harvard is using the same "holistic" code words to discriminate for the same invidious reasons and it is relying on the same pretextual excuses to justify its disparate treatment of another high-achieving racial and ethnic minority group.

4.    In any event, even if the Harvard Plan at some point outgrew its discriminatory roots, Harvard has long since abandoned an admissions policy that purported to merely use race contextually to fill the last few seats in the entering freshman class.  Harvard now labels every applicant by race on the claim that it is pursuing the so-called "critical mass" diversity objective.  That creates two problems for Harvard.  First, as it has abandoned the very "plan" that led the Supreme Court to permit the use of racial admissions preferences, Harvard has deprived the Court of any

JA 20

continuing "authority to approve the use of race in pursuit of student diversity." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). Second, Harvard's new diversity interest—critical mass—should never have been endorsed and should be outlawed once and for all. "[T]he concept of critical mass is a delusion used … to mask [an] attempt to make race an automatic factor in most instances and to achieve numerical goals indistinguishable from quotas." *Id.* at 389.

5.    Worse still, Harvard is not even pursuing its claimed "critical mass" interest. Rather, even under governing Supreme Court precedent, Harvard is violating Title VI for at least four reasons. First, Harvard is using racial classifications to engage in the same brand of invidious discrimination against Asian Americans that it formerly used to limit the number of Jewish students in its student body. Statistical evidence reveals that Harvard uses "holistic" admissions to disguise the fact that it holds Asian Americans to a far higher standard than other students and essentially forces them to compete against each other for admission. There is nothing high-minded about this campaign of invidious discrimination. It is "illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493.

6.    Second, Harvard is engaging in racial balancing. Over an extended period, Harvard's admission and enrollment figures for each racial category have shown almost no change. Each year, Harvard admits and enrolls essentially the same percentage of African Americans, Hispanics, whites, and Asian Americans even though the application rates and qualifications for each racial group have undergone significant changes over time. This is not the coincidental byproduct of an admissions system that treats each applicant as an individual; indeed, the statistical evidence shows that Harvard

4

modulates its racial admissions preference whenever there is an unanticipated change in the yield rate of a particular racial group in the prior year.  Harvard's remarkably stable admissions and enrollment figures over time are the deliberate result of systemwide intentional racial discrimination designed to achieve a predetermined racial balance of its student body.

7.     Third, Harvard is failing to use race merely as a "plus factor" in admissions decisions.   Rather, Harvard's racial preference for each student (which equates to a penalty imposed upon Asian-American applicants) is so large that race becomes the "defining feature of his or her application." *Grutter*, 539 U.S. at 337.  Only using race or ethnicity as a dominant factor in admissions decisions could, for example, account for the remarkably low admission rate for high-achieving Asian-American applicants.  Harvard's admissions decisions simply are not explainable on grounds other than race.  High-achieving Asian-American applicants are as broadly diverse and eclectic in their abilities and interests as any other group seeking admission to Harvard.  They compete in interscholastic sports, are members of the school band, work part-time jobs after school, travel, and engage in volunteer work just like everyone else.  It is not a lack of non-academic achievement that is keeping them from securing admission.   It is Harvard's dominant use of racial preferences to their detriment.

8.     Fourth, and last, Harvard is using race in admissions decisions when race-neutral alternatives can achieve diversity.   As other elite universities have shown, increased utilization of non-race-based criteria, such as socioeconomic preferences, can promote diversity about as well as racial preferences.  This approach is particularly effective when combined with increased use of financial aid, scholarships, and

JA 22

recruitment to attract and enroll minority applicants and the elimination of admissions policies and practices, such as legacy preferences and early admission, which operate to the disadvantage of minority applicants.   Further, eliminating racial preferences at Harvard will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preferences, the Harvard community, and society as a whole.  Racial preferences are a dangerous tool and may only be used as a last resort.  There is now overwhelming evidence that race-neutral alternatives render reliance on racial preferences unnecessary.   It is incumbent on Harvard to take full advantage of these preferred alternatives.

9.      Accordingly, there is no doubt that Harvard is in violation of Title VI. The only question is the proper judicial response.  Given what is occurring at Harvard and at other schools, the proper response is the outright prohibition of racial preferences in university admissions—period.  Allowing this issue to be litigated in case after case will only "perpetuate the hostilities that proper consideration of race is designed to avoid."  *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting).  Harvard and other academic institutions cannot and should not be trusted with the awesome and historically dangerous tool of racial classification.  As in the past, they will use any leeway the Supreme Court grants them to use racial preferences in college admissions—under whatever rubric—to engage in racial stereotyping, discrimination against disfavored minorities, and quota-setting to advance their social-engineering agenda.  Strict scrutiny has proven to be no match for concerted discrimination hidden behind the veil of "holistic" admissions. There may be times when social problems can be solved democratically.  But massive resistance to racial equality is not one of them.  *See Brown v. Bd. of Educ. of Topeka,*

*Kan.*, 349 U.S. 294 (1955).  "The moral imperative of racial neutrality is the driving force of the Equal Protection Clause ….   Structural protections may be necessities if moral imperatives are to be obeyed."  *Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment).

## II.     JURISDICTION AND VENUE

10.     This action arises under 42 U.S.C. § 2000d *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the District of Massachusetts.

## III.     THE PARTIES

### A.     <u>Plaintiff</u>

12.     Plaintiff, Students for Fair Admissions, Inc. ("SFFA") is an Internal Revenue Code Section 501(c)(3) organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means.   More specifically, SFFA seeks to promote and protect the right of the public to be free from discrimination on the basis of race in higher education admissions.

13.     SFFA is a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their parents, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions.  SFFA has members throughout the country.

7

14.     Edward Blum is the President of SFFA.  *See **Exhibit A***, Declaration of Edward Blum ("Blum Dec.") ¶ 2.

15.     SFFA has at least one member ("Applicant") who applied for and was denied admission to Harvard's 2014 entering class.  Blum Dec. ¶ 4.

16.     Applicant is Asian American.  Blum Dec. ¶ 5.

17.     Applicant's parents are first-generation immigrants to the United States from China.  Blum Dec. ¶ 6.

18.     Applicant graduated from high school ranked 1 out of 460 students by weighted and un-weighted grade point average. Blum Dec. ¶ 7.

19.     U.S. News and World Report ranks Applicant's high school in the top 5 percent of all high schools in the United States.  Blum Dec. ¶ 8.

20.     Applicant achieved a perfect score of 36 on the ACT.  Applicant achieved a perfect score of 800 for SAT II History and a perfect score of 800 for SAT II Math. Among other academic achievements, Applicant was named an AP Scholar with distinction, a National Scholar, and a National Merit Scholarship semifinalist.  Blum Dec. ¶¶ 9-10.

21.     While in high school, Applicant participated in numerous extracurricular and volunteer activities.  Among other things, Applicant was captain of the varsity tennis team, volunteered at a community tennis camp, volunteered for the high school's student peer tutoring program, was a volunteer fundraiser for National Public Radio, and traveled to China as part of a program organized by the United States Consulate General and Chinese American Students Education and Exchange to assist students in learning English writing and presentation skills.  Blum Dec. ¶ 11.

JA 25

22.     Applicant was denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  Blum Dec. ¶ 12.

23.     Applicant was accepted to and has enrolled at a university that is ranked in the Top 20 in the nation by U.S. News and World Report.  That university does not grant an admissions preference on the basis of race or ethnicity.  Blum Dec. ¶ 13.

24.     Applicant is ready, able, and intends to seek to transfer to Harvard when it ceases the use of race or ethnicity as an admissions preference and ceases its intentional discrimination against Asian Americans.  Blum Dec. ¶ 14.

25.     SFFA has members who are currently in high school and intend to apply for admission to Harvard ("Future Applicants").  Some of these Future Applicants are Asian American.  Blum Dec. ¶ 15.

26.     Future Applicants will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Future Applicants may be denied admission to Harvard because of these discriminatory policies.  Blum Dec. ¶ 16.

27.     SFFA has members whose children intend to apply for admission to Harvard ("Parents").  Some of these Parents are Asian Americans.  Blum Dec. ¶ 17.

28.     Parents' children will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Parents' children may be denied admission to Harvard because of these discriminatory policies.  Blum Dec. ¶ 18.

JA 26

**B.** **Defendants**

29.     Defendants, the Harvard Corporation and Harvard Board of Overseers govern Harvard University.

30.     Harvard University is a private educational institution based in Cambridge, Massachusetts.

31.     Harvard College is a component of Harvard University that offers undergraduate, graduate, professional, and research programs in the fields of arts, science, medicine, business, design, and public health.

32.     Despite having an endowment of approximately $36.4 billion, Harvard accepts substantial direct financial assistance from the Federal government through, among other things, grants and loans.  In 2010, Harvard accepted more than $6.6 million in federal funds.  In 2011, Harvard accepted more than $11.9 million in federal funds.  In 2012, Harvard accepted more than $20.9 million in federal funds.  In 2013, Harvard accepted more than $13.4 million in federal funds.  Harvard also has received and will further receive substantial direct financial assistance from the Federal government in 2014.

33.     Harvard also accepts substantial indirect Federal financial assistance by, among other things, enrolling students who pay, in part, with Federal financial aid directly distributed to those students.

34.     As a recipient of Federal financial assistance, Harvard University, and all of its programs and activities, which includes Harvard College, are subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq.*

JA 27

## IV.   HARVARD HAS A LONG HISTORY OF INTENTIONAL DISCRIMINATION ON THE BASIS OF RACE OR ETHNICITY AGAINST DISFAVORED MINORITY APPLICANTS.

35.     Discrimination on the basis of race or ethnicity is longstanding at Harvard. The "Harvard Plan" itself—and the concept of an admissions system based on a "holistic" review of applicants instead of admission based on academic qualifications— was formulated for the specific purpose of discriminating against disfavored minority groups.  "Indeed, the historical evidence points inexorably to the conclusion that the current Harvard College admissions system was *born* out of one of the most shameful episodes in the history of American higher education in general, and of Harvard college in particular."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

### A.     1900s to 1920s: Before "Selective Admissions"

36.     Until the early 1920s, Harvard, like all other Ivy League schools, selected its students by admitting applicants who passed a required examination.

37.     Because Harvard's entrance examination was not especially demanding, an applicant for undergraduate admission with average intelligence from a prominent school could usually pass with ease.

38.     Though the performance of some students placed them in a gray zone from which they could be admitted "with conditions," most applicants were admitted based solely on objective academic criteria.

39.     Under this system, the number of students entering Harvard fluctuated, sometimes quite widely, from year to year.

JA 28

40.     Harvard's student body during this time period was fairly homogenous in terms of class, race, religion, and ethnicity.  Students during this time period were overwhelmingly from affluent backgrounds, almost exclusively white, and composed largely of graduates of elite private secondary schools.

41.     Harvard was considered somewhat open to African Americans, immigrants, and foreigners, though the numerical presence of each of these groups of students on campus was relatively small.

**B.      1920s to 1930s: Harvard's "Jewish Problem"**

42.     Ivy League schools began to reevaluate their admissions systems when students deemed socially "undesirable"—most prominently, Jewish applicants—started to pass the examinations and enroll in greatly increasing numbers.

43.     In or around the late 1910s, the number of Jewish students enrolling at Harvard began to increase, and Harvard administrator determined that the college had a "Jewish problem" that it needed to address.

44.     By 1918, Harvard's freshman class was 20 percent Jewish, three times the percentage at Yale and six times that at Princeton.

45.     The President of Harvard, A. Lawrence Lowell, was deeply troubled by this rising Jewish population.

46.     President Lowell feared that the enrollment of too many Jewish students would cause students from Protestant upper and upper-middle class families to choose other elite colleges over Harvard.

JA 29

47.    In 1920, in a letter to William Hocking, a Harvard philosophy professor, President Lowell wrote that the increasing number of Jewish students enrolling at Harvard would ultimately "ruin the college."

48.    To combat this "Jewish problem," President Lowell sought to institute a cap on Jewish enrollment in each entering class.

49.    In his letter to Hocking, President Lowell stated that the best approach would be "to state frankly that we thought we could do the most good by not admitting more than a certain proportion of men in a group that did not intermingle with the rest, and give our reasons for it to the public."  According to Lowell, "[e]xperience seems to place that proportion at about 15%."

50.    Yet President Lowell knew that such overt discrimination would meet resistance. He believed that the faculty, and probably the governing boards, would prefer to make a rule whose motive was less obvious on its face, such as giving to the Committee on Admission authority to refuse admittance to persons who possessed particular qualities believed to be characteristic of Jewish applicants.

51.    If such a system was instituted, however, President Lowell wished to ensure that the faculty knew "perfectly well what they are doing, and that any vote passed with the intent of limiting the number of Jews should not be supposed by anyone to be passed as a measurement of character really applicable to Jews and Gentiles alike."

52.    By the spring of 1922, the proportion of Jewish students had reached 21.5 percent. President Lowell warned that unless immediate measures were taken "the danger would seem to be imminent."

JA 30

53.     President Lowell made clear that absent the rise in Jewish enrollment, no change in Harvard's admissions policies would be needed. The problem was not with the academic method of selection *per se*, but with its results: it was now yielding too many Jewish students at Harvard.

54.     In a 1922 letter President Lowell wrote: "We can reduce the number of Jews by talking about other qualifications than those of admission examinations.  If the object is simply to diminish the Jews, this is merely an indirect method of avoiding a problem in American life which is really important.  This is the feeling of the most thoughtful people here, both gentile and Jew.  On the other hand, we are in no present danger of having more students in college than we can well take care of; nor, apart from the Jews, is there any real problem of selection, the present method of examination giving us, for the Gentile, a satisfactory result."

55.     In May 1922, Professor Ropes proposed that the Committee on Admission "take into account the proportionate size of racial and national groups in the membership of Harvard College," declaring that "it is not desirable that the number of students in any group which is not easily assimilated into the common life of the College should exceed 15 percent of the whole college."

56.     As one Harvard alumnus noted, "I am fully prepared to accept the judgment of the Harvard authorities that a concentration of Jews in excess of fifteen percent will produce a segregation of culture rather than a fusion."

57.     President Lowell's plans received pushback.  One petition, signed by 31 faculty members, described the "action of the Faculty relating to controlling the percentage of the Jews in Harvard College" as "a radical departure from the spirit and

JA 31

practice of the College" and declared "that racial consideration should not influence the Committee on Admission before a careful and deliberate study of the whole question of the Jews shall be made by the Faculty."

58.     At the same time, Harvard was beginning to gather the information that would permit it to identify which applicants were Jewish.

59.     Starting in the fall of 1922, applicants were required to answer questions on "Race and Color," "Religious Preference," "Maiden Name of Mother," and "Birthplace of Father," as well as the question, "What change, if any, has been made since birth in your own name or that of your father? (Explain fully.)"

60.     In addition, Harvard asked high school principals and private school headmasters to fill out a form indicating "by a check [the applicant's] religious preference so far as known . . . Protestant . . . Roman Catholic . . . Hebrew . . . Unknown."

61.     Harvard also created a committee tasked with counting the number of Jewish students at Harvard.

62.     After analyzing all the student information it could obtain, the committee began classifying each Harvard student into one of four categories: "J1," "J2," "J3," and "other."  A "J1" was assigned "when the evidence pointed conclusively to the fact that the student was Jewish;" a "J2" was assigned when a "preponderance of evidence" suggested the student was Jewish; and a "J3" was assigned when "the evidence suggested the possibility that the student might be Jewish."

63.     During this time period, Harvard also adopted a "one-seventh plan," which purported to target "a new group of men from the West and South" who were in the top

JA 32

seventh of their graduating class.  In reality, however, it was a "thinly disguised attempt to lower the Jewish proportion of the student body by bringing in boys—some of them academically ill equipped for Harvard—from regions of the country where there were few Jews."

64.     After President Lowell's intentions of imposing a Jewish cap became known to the public, opponents began mobilizing opposition.

65.     In 1923, Harvard's Committee on Methods of Sifting Candidates for Admission defeated President Lowell's requests for a cap on Jewish enrollment.  In doing so, the committee issued a statement indicating its opposition to "an arbitrary limitation of the number of students to be admitted" and specifying that "if the size of our Freshman class is to be reduced, the reduction can best be accomplished by raising the standard for admission."

66.     Despite this defeat, President Lowell pressed forward.  In June 1923, he commissioned a study to determine "whether it might be wise to limit the number of students admitted to the Freshman class to one thousand."

67.     President Lowell realized that a ceiling on the size of the class was the necessary precondition for addressing the "Jewish problem," for as long as Harvard had an absolute standard of admission, discretionary selection policy using nonacademic as well as academic criteria would not be possible.

68.     Lowell's proposal "signaled the beginning of a new, more subtle campaign to restrict Jewish enrollment."

69.     By the end of 1923, President Lowell's committee issued a report recommending a limit of 1,000 on the size of the freshman class and additional changes

JA 33

in the criteria for admission.   Instead of making decisions based on academic achievement, the committee proposed using letters from teachers and personal interviews to shed light on the candidates' "aptitude and character."   However, no changes were made in 1923.

70.    By 1924, Harvard's Jewish enrollment had risen to 25 percent.

71.    According to President Lowell, Harvard's "reputation of having so many Jews" was hurting its ability to "attract applicants from western cities and the great preparatory schools."

72.    By 1925, the dean's office reported that the proportion of known Jewish freshmen (the J1s and J2s) had risen to 27.6 percent, with an additional 3.6 percent in the J3 category.

73.    As President Lowell was contemplating these figures, he was receiving letters from alumni castigating the school for being overrun by Jewish students.  Among these letters was one from W.F. Williams '01, who had attended a recent Harvard-Yale football game.  Williams recommended using the school's admissions program to discretely limit the number of Jewish students enrolling at Harvard: "Naturally, after twenty-five years, one expects to find many changes but to find that one's University had become so Hebrewized was a fearful shock. There were Jews to the right of me, Jews to the left of me, in fact they were so obviously everywhere that instead of leaving the Yard with pleasant memories of the past I left with a feeling of utter disgust of the present and grave doubts about the future of my Alma Mater . . . . The Jew is undoubtedly of high mental order, desires the best education he can get CHEAPEST, and is more persistent than other races in his endeavors to get what he wants.  It is self evident, therefore, that

17

by raising the standard of marks he can't be eliminated from Harvard, whereas by the same process of raising the standard 'White' boys ARE eliminated. And is this to go on? Why the Psychology Test if not to bar those not wanted? Are the Overseers so lacking in genius that they can't devise a way to bring Harvard back to the position it always held as a 'white man's' college?"

74.    President Lowell agreed with Williams' assessment, responding that he "had foreseen the peril of having too large of a number of an alien race and had tried to prevent it," but that "not one of the alumni ventured to defend the policy publicly." President Lowell was "glad to see from your letter, as I have from many other signs, that the alumni are beginning to appreciate that I was not wholly wrong three years ago in trying to limit the proportion of Jews."

75.    Despite increasing alumni approval, President Lowell still faced significant obstacles to his plan. He needed Harvard's "Special Committee on the Limitation of the Size of the Freshman Class" to approve his new admissions plan.

76.    In a letter to the chairman of the committee, President Lowell wrote that "questions of race," though "delicate and disagreeable," were not solved by ignoring them. The solution was a new admissions system giving the school wide discretion to limit the admission of Jewish applicants: "To prevent a dangerous increase in the proportion of Jews, I know at present only one way which is at the same time straightforward and effective, and that is a selection by a personal estimate of character on the part of the Admissions authorities, based upon the probable value to the candidate, to the college and to the community of his admission. Now a selection of this kind can be carried out only in case the numbers are limited. If there is no limit, it is impossible to

reject a candidate who passes the admissions examinations without proof of defective character, which practically cannot be obtained.  The only way to make a selection is to limit the numbers, accepting those who appear to be the best."

77.     Anticipating pushback, President Lowell insisted that he was not proposing to discriminate against Jewish applicants.  Instead, he sought "discrimination among individuals in accordance with the probable value of a college education to themselves, to the University, and the community," carefully adding that "a very large proportion of the less desirable, upon this basis, are at the present time the Jews."

78.     The committee's chairman was initially opposed, stating that "[e]verything in my education and bringing up makes me shrink from a proposal to begin a racial discrimination at Harvard—there's no use my pretending this isn't the case."

79.     In the end, however, the chairman agreed with President Lowell's notion of "a sound and discerning 'discrimination' among individuals" and expressed confidence that "such a discrimination would inevitably eliminate most of the Jewish element which is making trouble."

80.     Nevertheless, the chairman refused to endorse "a candid regulation excluding all but so many or such a proportion of 'Jews.'"  Instead, he advised President Lowell that more subtle measures to exclude Jewish applicants would be a wiser approach.

81.     In its report, the Committee made multiple recommendations along these lines. First, the committee recommended that Harvard limit its incoming class to just 1,000 students. Second, it recommended that "the application of the rule concerning candidates from the first seventh of their school be discretionary with the Committee on

Admission."  This modification would allow the committee to eliminate from the program high schools that sent too many Jewish students to Harvard.

82.     Finally, and most important, the committee rejected an admissions policy that would select the 1,000 students on the basis of scholarship alone.  According to the committee, it was "neither feasible nor desirable to raise the standards of the College so high that none but brilliant scholars can enter" and "the standards ought never to be too high for serious and ambitious students of average intelligence."

83.     Not only did the faculty adopt these proposals, but it also approved measures making the admissions process even more subjective.

84.     In particular, the faculty called on the admissions committee to interview as many applicants as possible to gather additional information on "character and fitness and the promise of the greatest usefulness in the future as a result of a Harvard education."

85.     In addition, Harvard began requiring a passport-sized photo "as an essential part of the application for admissions."

86.     Harvard also began using "legacy" preferences for the children of alumni as a strategy for reducing the admission of Jewish students.

87.     President Lowell was elated by these changes, realizing that they "provided a tremendous opportunity to impose, at long last, the policy of restriction he had favored since 1922."

88.     The reduction in Jewish enrollment at Harvard was immediate.  The Jewish portion of Harvard's entering class dropped from over 27 percent in 1925 to 15 percent the following year.

JA 37

89.     For the next 20 years, this percentage (15 percent) remained virtually unchanged.

90.     Harvard's new system of selection was far more complicated than the exam-based system that had preceded it, and implementing it required a new bureaucratic apparatus of information gathering and assessment.

91.     In addition to expanding its administrative staffing apparatus, the new Office of Admissions needed to collect vast quantities of data formerly unnecessary.

92.     The development of a procedure for identifying Jewish applicants was only the first step.   For the first time, candidates were asked to fill out lengthy applications that included demographic information, a personal essay, and a detailed description of extracurricular activities that might demonstrate "leadership" and reveal something about their "character."

93.     The centerpiece of the new system was the personal letter of recommendation, especially those from trusted sources such as alumni and headmasters or teachers from the leading feeder schools.

94.     Finally, to ensure that "undesirables" were identified and to assess important but subtle indicators of background and breeding such as speech, dress, deportment, and physical appearance, a personal interview was required, a final screening device usually conducted by the Director of Admissions or a trusted alumnus.

95.     The new policy permitted the rejection of scholastically brilliant students considered "undesirable," and it granted the director of admissions broad latitude to admit those of good background with weaker academic records.

JA 38

96.    The key code word used was "character"—a quality thought to be frequently lacking among Jewish applicants, but present congenitally among affluent Protestants.

97.    By emphasizing the inherently subjective character of admissions decisions, Harvard's new system of selection left it free to adapt to changing circumstances by admitting—and rejecting—whomever it wished.

98.    These tools gave admissions officials the power to discriminate, ostensibly on the basis of "objective" evidence.  Any number of reasons could be invoked to deny an applicant. "Selective admissions deflected much criticism precisely because it singled out no single status as 'key.'"

99.    As a consequence, university leaders could deny the existence of any racial or religious quotas, while still managing to reduce Jewish enrollment to a much lower level, and thereafter hold it essentially constant during the decades that followed.

**C.    1930s to 1960s: A Continuation of Policies**

100.    In the 1930s, Harvard continued the discriminatory admissions policies instituted during the previous decade.

101.    Instrumental during this time period was Richard Gummere, who served as Harvard's Chairman of the Committee on Admission from 1934 to 1952.

102.    Gummere continued to use Harvard's opaque admissions system to limit the number of Jewish students enrolling at Harvard.

103.    The key was secrecy.  In 1922, when he was headmaster of William Penn Charter School in Philadelphia, Gummere had recommend that Harvard follow the approach he had employed at his own school: "I feel that Doctor Edsall [a Harvard

22

faculty member] has stated the case very correctly and intelligently, as far as the experiences of the Penn Charter School in the Jew problem are concerned.  Such action was taken very definitely, and a very limited number of Jews is admitted; in fact, it is at present almost infinitesimal.  We are particularly careful not to make any issue of the matter, and when people of that persuasion wish to be admitted, and we either have enough in the school, or do not feel that the applicant is satisfactory, we employ the same methods of keeping them out of the school as we would any unsatisfactory candidate of any denomination.  As a matter of fact, I admitted only one Jew last fall, and plan to admit none this coming fall."

104.   Gummere continued the policies of the prior decade laid down by President Lowell, including the establishment of a fixed number of places in the freshman class and a clear statement to both applicants and the public that candidates would not be accepted on academic ability alone.

105.   Instead, a multiplicity of nonacademic criteria—alumni connections, athletic talent, geographical diversity, and vague qualities such as "character" and "leadership"—played a pivotal role in determining admission.

106.   Similarly, Gummere reported that "increased emphasis is being put on the preliminary interviews."  Rather than subjecting undesirable applicants, many of them Jewish, to a formal rejection, the committee preferred to discourage them—politely but firmly—from submitting a final application.

107.   For example, in 1936, Irving B. Rosenstein, a Jewish alumnus who had graduated first in his class at Harvard, contacted Dean Hanford about two young Jewish men who were applying for admission.  Hanford took notes during his conversation but

JA 40

did not pass on an endorsement.  Instead, he wrote directly to Gummere, stating that "I do not know either Goldberg or Rabinowitz, and I realize that we have quite enough applicants of this type." Nevertheless, Hanford continued, "I felt it my duty to pass along the information that Rosenstein had given me regarding the two boys."

108.    In another case, Jerome Greene, secretary to the Harvard Corporation, explained why a young Jewish man named S. A. Goldstein, who reportedly had high marks on his College Board exams, had been turned down.  Mr. Goldstein "came just under the 'weighted average,' which takes all pertinent factors into account."  Harvard, he declared, had "no reason to suppose that he is not a creditable representative of his race, many members of which are admitted to Harvard each year."  He closed his letter by assuring that "no personal discrimination against him was involved."

109.    During this time period, Harvard continued to accept mainly wealthy, Protestant applicants who could pay the tuition and meet minimal standards.  Harvard filled approximately 75 to 80 percent of the seats with individuals who could afford to pay the full tuition, and fewer than 13 percent of legacy applicants were rejected.

110.    In the late 1940s and early 1950s, following World War II, American public sentiment turned against anti-Semitism, and Harvard began to gradually reduce its discrimination against Jewish applicants.

111.    Harvard, however, retained the admissions policies that it had used to successfully cap Jewish enrollments in the past.

112.    In a 1952 report from the Harvard Committee on Admissions, the Dean of Admissions wrote that Harvard was "one of the few colleges with 'snob' appeal."  Accordingly, it attracted the children of the "upper-upper" class throughout the country

JA 41

who were "almost entirely paying guests."  It was possible, he acknowledged, that "a third or half of this group, strictly on their merits in terms of SAT scores, character and personality, was not particularly desirable."  But if Harvard rejected them, it "would lose most of the rest of the group, including a lot of able and desirable students."

113.    Similarly, allegations that Harvard was "dominated by Jews" could cause "students from upper-income, business backgrounds" to abandon Harvard for "colleges like Yale, Princeton, Dartmouth, Williams, etc."

114.    By the 1960s, Harvard was using a complex "docket system" of classifications to process each candidate.

115.    The docket system created 22 groups, ranging from the huge (Docket B, which covered eight Rocky Mountain states) to the very small (Docket P, limited to Boston Latin, and Docket Q, which covered the rest of metropolitan Boston).

116.    The docket system generated "targets" for each docket that proved strikingly close to the actual number of students admitted each year. Each docket was admitted at a different rate.

117.    For example, Docket D (covering the upper Midwest) had about a 25 percent acceptance rate.  By contrast, Docket M ("Select New England private schools") and Docket L ("Exeter and Andover") were admitted at a rate of 44 and 46 percent respectively, compared to just 20 percent for all applicants.

118.    The structure of this system ensured that competition would be almost entirely within rather than between dockets.

119.    The generous targets for some dockets were designed to insulate applicants from competition with other dockets while the restrained targets for others

were intended to guarantee that the number of students admitted would not upset Harvard's delicate "balance."

120.    At this time Harvard also used a second system of classification to rate each applicant individually along four dimensions: personal, academic, extracurricular, and athletic.

121.    The "personal" rating was critical.  According to Harvard's own statistical studies, the personal rating was a stronger predictor of which candidates would ultimately be admitted than the more objective academic rating.   A "4" rating ("generally acceptable") was all but fatal, with a rejection rate of 98 percent; a "1" was a virtual guarantee of admission, with a rejection rate of just 2.5 percent.

122.    Finally, at this time Harvard used a third major scheme to divide applicants into 12 categories.  This "typology," as Harvard called it, was an integral part of each student's file. Each candidate was assigned a code letter that was shorthand for the social type he was thought to embody.

123.    Under this typology, every candidate was placed in one of the following categories:

| 1 | S | First-rate scholar in Harvard departmental terms. |
| 2 | D | Candidate's primary strength is his academic strength, but it doesn't look strong enough to qualify as an S (above). |
| 3 | A | All-American – healthy, uncomplicated athletic strengths and style, perhaps some extracurricular participation, but not combined with top academic credentials. |
| 4 | W | Mr. School – significant extracurricular and perhaps (but not necessarily) athletic participation plus excellent academic record. |
| 5 | X | Cross-country style – steady man who plugs and plugs and plugs, won't quit when most others would.  Gets results largely through stamina and consistent effort. |
| 6 | P | PBH [Phillips Brooks House] style: in activities and personal concerns. |
| 7 | C | Creative in music, art, writing. |
| 8 | B | Boondocker – unsophisticated rural background. |
| 9 | T | Taconic – culturally depressed background, low income. |
| 10 | K | Krunch – main strength is athletic, prospective varsity athlete. |
| 11 | L | Lineage – candidate probably couldn't be admitted without the extra plus of being a Harvard son, a faculty son, or a local boy with ties to the university community. |
| 12 | O | Other – use when none of the above are applicable. |

124.   With only minor modifications, Harvard used this typology through at least 1988, which includes the period when Harvard submitted its description of the "Harvard Plan" to the Supreme Court in its *Bakke amicus* brief.

## V.    HARVARD HAS USED AND CONTINUES TO USE AN APPLICANT'S RACE AND ETHNCITY AS A FACTOR IN ADMISSION DECISIONS.

125.    Harvard has long expressly considered the race and ethnicity of applicants in making admissions decisions in ways that go far beyond its systematic discrimination against Jewish applicants.

126.    In 1926, Harvard's Chairman of Admissions, Henry Pennypacker, described how race would be considered under Harvard's new subjective admissions policies: "Race is a part of the record.  It is by no means the whole record and no man will be kept out on grounds of race; but those racial characteristics which make for race isolation will, if they are borne by the individual, be taken into consideration as a part of that individual's characteristics under the test of character, personality and promise.  That if there should result in fact any substantial change in the proportion of groups in the College following application of the test, this will be due, not to race discrimination or any quota system, but to the failure of particular individuals to possess as individuals those evidences of character, personality and promise which weighed with other evidences render them more fit than other individuals to receive all that Harvard has to offer.  Of course there will be criticisms.  It will be said that Harvard is discriminating on grounds of race. That will not be true."

127.    In the early 1960's, Harvard began actively seeking to increase the number of African-American students on its campus.  Notwithstanding this concerted effort, African-American enrollment stagnated until 1968.

128.    In 1968, Harvard altered its admissions policies and practices to admit more African Americans by taking into greater account the limitations of background and schooling that shaped the qualification of many African-American applicants.

129.    Under this new policy, an applicant who had "survived the hazards of poverty" and showed that he or she "is clearly intellectually thirsty" and "still has room for more growth" was given an admissions preference.

130.    In 1969, one year after this policy change, Harvard's African-American enrollment increased 76 percent over the prior year to 7 percent of the enrolled freshman class.   Although Harvard denied that it had instituted a quota, the enrollment rate consistently averaged 7 percent over the next several years.

131.    In 1969, a majority of the African-American applicants admitted to Harvard came from socioeconomically challenged backgrounds.  By 1973, however, this number had decreased dramatically, with 75 to 80 percent of the African Americans admitted to Harvard coming from backgrounds that did not include "the hazards of poverty."

132.    According to Dean Peterson, Harvard diminished its focus on applicants with disadvantaged backgrounds because African Americans from relatively privileged backgrounds allegedly made the transition to Harvard more easily than those from working class and poor backgrounds: "We have learned" that "we cannot accept the victims of social disaster, however deserving of promise they once might have been, or however romantically or emotionally an advocate (or a society) might plead for him."

133.    In 1978, Harvard submitted an *amicus* brief to the Supreme Court in *Regents of the University of California v. Bakke* that included a copy of the "Harvard College Admissions Program" as an Appendix.

134.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* stated that "for the past 30 years the Committee on Admissions" has

29

"adopted … [t]he belief … that if scholarly excellence were the sole or even predominant criterion, Harvard College would lose a great deal of its vitality and intellectual excellence and that the quality of the educational experience offered to all students would suffer."

135.   The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "The belief that diversity adds an essential ingredient to the educational process has long been a tenet of Harvard College admissions.  Fifteen or twenty years ago, however, diversity meant students from California, New York, and Massachusetts; city dwellers and farm boys; violinists, painters and football players; biologists, historians and classicists; potential stockbrokers, academics and politicians.  The result was that very few ethnic or racial minorities attended Harvard College.  In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups.  Harvard College now recruits not only Californians or Louisianans but also blacks and Chicanos and other minority students.  Contemporary conditions in the United States mean that if Harvard College is to continue to offer a first-rate education to its students, minority representation in the undergraduate body cannot be ignored by the Committee on Admissions."

136.   The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "In practice, this new definition of diversity has meant that race has been a factor in some admission decisions.  When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates'

JA 47

cases.  A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer.  Similarly, a black student can usually bring something that a white person cannot offer.  The quality of the educational experience of all the students in Harvard College depends in part on these differences in the background and outlook that students bring with them."

137.   The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated:  "In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year.  At the same time the Committee is aware that if Harvard College is to provide a truly heterogeneous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers.  It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi.  Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States.  Their small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential.  Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted.  But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted.  It means only that in choosing among thousands of applicants who are not only

JA 48

'admissible' academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many types and categories of students."

138.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "The further refinements sometimes required help to illustrate the kind of significance attached to race.  The Admissions Committee, with only a few places left to fill, might find itself forced to choose between A, the child of a successful black physician in an academic community with promise of superior academic performance, and B, a black who grew up in an inner-city ghetto of semi-literate parents whose academic achievement was lower, but who had demonstrated energy and leadership, as well as an apparently abiding interest in black power.  If a good number of black students much like A, but few like B, had already been admitted, the Committee might prefer B, and vice versa.  If C, a white student with extraordinary artistic talent, were also seeking one of the remaining places, his unique quality might give him an edge over both A and B.  Thus, the critical criteria are often individual qualities or experience not dependent upon race but sometimes associated with it."

139.    In 2003, Harvard submitted an *amicus* brief to the Supreme Court in *Grutter v. Bollinger*.

140.    The *Grutter amicus* brief stated that Harvard "considers an academically qualified student's race or ethnicity as one among many factors in a carefully designed, competitive admissions process that views each applicant as an individual and weighs the capacity of each to contribute to the class as a whole."

32

141.     The *Grutter amicus* brief further stated that Harvard seeks "racial and ethnic diversity as a natural part of a long and expanding policy of inclusion" and that it "has been pursuing the idea of student diversity for a period that dates back to the nineteenth century."  That includes the period when Harvard was discriminating against Jewish and other disfavored minority groups.

142.     The *Grutter amicus* brief further stated that a racial or ethnic admissions "quota" is "impermissible as an affront to the equal dignity of the excluded" and it defined a "quota" as a "policy that "exclude[s] someone altogether from a given position or opportunity on account of the individual's race."

143.     In 2012, Harvard submitted an *amicus* brief to the Supreme Court in *Fisher v. University of Texas at Austin*.

144.     The *Fisher amicus* brief stated that Harvard has "long used admissions policies similar to the Harvard Plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*."

145.     The *Fisher amicus* brief further stated that Harvard "consider[s] all aspects of an applicant's background and experience, including in some circumstances the applicant's racial or ethnic background."

146.     The *Fisher amicus* brief further stated that Harvard believes that "racial and ethnic diversity are a distinct kind of difference in background, and reliance on … race-neutral measures alone cannot substitute for individualized, holistic review that takes account of race and ethnicity."

JA 50

147.    In other words, it is now Harvard's position that race or ethnicity itself—not other factors that may be associated with race or ethnicity—is a distinguishing characteristic that warrants consideration in the admissions process.

## VI.    HARVARD HAS A LONG HISTORY OF INTENTIONALLY DISCRIMINATING SPECIFICALLY AGAINST ASIAN AMERICANS.

148.    Harvard started considering Asian-American students a discrete subset of its undergraduate applicant pool in the early 1970s.

149.    At that juncture, Harvard took the position that Asian Americans students were not "under represented" on its campus and therefore were not in need of "affirmative action."  Harvard nevertheless included Asian Americans in its affirmative-action compliance reports to the Federal government.

150.    Like Jewish applicants, Asian-American applicants tended to have superior academic records, and were well represented among the most successful students.

151.    Harvard came to the conclusion that Asian Americans were "over-represented" in its student body.

152.    According to Henry Rosovsky, Harvard's Dean of the Faculty of Arts and Sciences (and later Acting President), Asian-American students were "no doubt the most over-represented group in the university."

153.    In 1974, a group calling itself the Coalition of Asian Americans ("CAA") formed at Harvard.  For at least two years, Harvard refused to recognize the CAA as a minority student organization.

JA 51

154.    In 1976, Harvard continued to refuse to recognize Asian Americans as a minority and barred those Asian Americans that had accepted admission to the college from participating in its Freshman Minority Orientation.

155.    By 1977, the CAA had become the Asian-American Association ("AAA").    The AAA demanded, among other things, that Harvard expand Asian-American recruitment and include Asian Americans within the college's "affirmative action" program.

156.    Between 1976 and 1978, the proportion of Asian Americans increased from 3.6 percent to 6.5 percent of the freshman class—a result of the successful mobilization of Asian-American students at Harvard.    These events coincided with a massive increase in Asian Americans applying to Harvard for undergraduate admission.

157.    Despite these increases, Harvard held Asian Americans to a higher standard than other applicants.

158.    In 1983, Margaret Chin, a Harvard undergraduate who had worked in the college's admissions office, co-authored a report entitled "Admissions Impossible." Surveying data from 25 universities, the report found that while Asian-American applications to Harvard and other universities were soaring, enrollments were barely increasing.

159.    Although Harvard claimed that the lower admission rate for Asian-American applicants was attributable to weaker academic qualifications, the "Admissions Impossible" report found that, on average, Asian Americans were *more* qualified than other applicants and that Harvard had set an informal ceiling on Asian-American enrollment.

JA 52

160. In the wake of this report, Harvard abandoned the argument that Asian-American applicants had weaker qualifications. Former Dean of Admissions Fred Jewett instead claimed, on behalf of Harvard, that "arguments over numbers ignore a whole range of personal qualities," and that Harvard's official policy favored "choosing people who bring talents underrepresented in the applicant pool."

161. In 1987, a study found that Asian-American students admitted to Harvard had an average SAT score of 1467, whereas white students admitted to Harvard had an average SAT score of 1355—a 112-point difference.

162. In a 1987 *New York Times* article, Berkeley professor Ling-Chi Wang compared the way Asian Americans are considered in college admissions to the earlier treatment of Jews: "I think all of the elite universities in America suddenly realized they had what used to be called a 'Jewish problem' before World War II, and they began to look for ways of slowing down the admissions of Asians." Robert Lindsey, *Colleges Accused of Bias to Stem Asians' Gains*, New York Times (Jan. 19, 1987).

163. In 1988, Harvard rejected Ling-Chi Wang's claim of discrimination against Asian-American applicants just as it had rejected the "Admissions Impossible" study's findings of discrimination. Dean of Admissions William Fitzsimmons—who remains Dean of Admissions today—acknowledged that "Asian Americans are slightly stronger than whites on academic criteria," but blamed the disparity in admissions on Asian Americans, as a group, being "slightly less strong on extracurricular criteria."

164. In July 1988, the Office of Civil Rights ("OCR") of the U.S. Department of Education began investigating the treatment of Asian-American applicants at Harvard to determine whether Harvard was engaging in discrimination in violation of Title VI of the

Civil Rights Act.  However, the investigation was strictly limited to the treatment of Asian-American applicants as compared to white applicants.

165.   The OCR investigation lasted more than two years.  Under the pressure of the investigation, Harvard began to increase its enrollment of Asian Americans.  By the end of the investigation, the percentage of Asian Americans admitted to Harvard increased from 10.8 percent in 1988 to 16.1 percent in 1991.

166.   OCR announced its findings in October 1990.  Focusing on ten groups admitted from 1979 through 1988, it found that Asian Americans had been admitted at a significantly lower rate for each of the past seven years, even though they were "similarly qualified" to white applicants.  OCR nevertheless blamed the differential on legacy preferences and found that the differential admission rates were not the product of racial or ethnic discrimination.

167.   The OCR report was roundly criticized.  According to Harvard Law Professor Alan Dershowitz, for example, Harvard's rationale was just pretext for intentional discrimination: "Asian Americans clearly get a big whack—not a tip—in the direction against them.  Harvard wants a student body that possesses a certain racial balance…. I think the report was sloppy.  I have absolutely no faith in the Harvard system of admissions."

## VII.   HARVARD'S CURRENT DISCRIMINATORY ADMISSIONS PLAN

### A.   Harvard's Stated Admissions Goals.

168.   On its website, Harvard states as follows: "In our admissions process, we give careful, individual attention to each applicant.  We seek to identify students who will

JA 54

be the best educators of one another and their professors—individuals who will inspire those around them during their College years and beyond."

169.    The Harvard website further states that Harvard "asks [itself] many questions" about an applicant for admission, which generally fall under four categories: an applicant's "growth and potential," "interests and activities," "character and personality," and "contribution to the Harvard community."

170.    The Harvard website further states that, in assessing an applicant's "growth and potential, the committee asks questions such as "Have you reached your maximum academic and personal potential" and "Do you have initiative?" and "What sort of human being are you now?"

171.    The Harvard website further states that, in assessing an applicant's "interests and activities," the committee asks questions such as "Do you care deeply about anything—intellectual? Extracurricular? Personal?" and "What have you learned from your interests?" and "In terms of extracurricular, athletic, community, or family commitments, have you taken full advantage of opportunities?"

172.    The Harvard website further states that, in assessing "character and personality," the committee asks questions such as "What choices have you made for yourself?" and "Are you a late bloomer?" and "What about your maturity, character, leadership, self-confidence, warmth of personality, sense of humor, energy, concern for others, and grace under pressure?"

173.    The Harvard website further states, in assessing an applicant's "contribution to the Harvard community," the committee asks questions such as "Will you be able to stand up to the pressures and freedoms of College life?" and "Will you

JA 55

contribute something to Harvard and to your classmates?" and "Would other students want to room with you, share a meal, be in a seminar together, be teammates, or collaborate in a closely knit extracurricular group?"

174.    The Harvard website further states that its admissions process "strives to be deliberate, meticulous and fair" while acknowledging that the process "permits extraordinary flexibility and the possibility of changing decisions virtually until the day the Admissions Committee mails them."

**B.    Harvard's Admissions Process.**

1.    The Application.

175.    During an admissions cycle, the Harvard Admissions Committee reviews each student's admissions materials.   Those materials include: (1) the Common Application or Universal College Application, including an essay, and the required parts of the Harvard Supplement; (2) the high school transcript, school report, and mid-year school report—all submitted by a student's guidance counselor; (3) standardized test scores—submitted by the College Board; (4) teacher and guidance counselor recommendations; (5) optional on-campus and/or off-campus interviewer evaluation; (6) optional personal statements (found on the Harvard Supplement) in addition to the required essays; and (7) optional music tapes, artwork slides, or samples of academic work.

176.    Harvard gathers information about the race and ethnicity of its applicants through numerous ways.

177.    An applicant filling out a Common Application has the option of disclosing his or her racial identity.

JA 56

178.   The Common Application asks two questions to identify an applicant's race and ethnicity: (1) "Are you Hispanic/Latino?" and (2) "Regardless of your answer to the prior question, please indicate how you identify yourself. (Check one or more and describe your background.)   American Indian or Alaska Native (including all Original Peoples of the Americas); Asian (including Indian subcontinent and Philippines); Black or African American (including Africa and Caribbean); Native Hawaiian or Other Pacific Islander (Original People); or White (including Middle Eastern)."

179.   The Common Application requires applicants to identify their parents' first and last name, the parents' former last names, and their country of birth.

180.   Similarly, the Universal College Application gives the applicant the option of disclosing his or her racial identity.

181.   The Universal College Application asks two questions to identify an applicant's race and ethnicity: "Are you Hispanic or Latino?" and "How would you describe your racial background? (select one or more of the following categories): Asian ([if so, identify] country of family origin); Black or African American; American Indian or Alaska Native ([if so, identify where] enrolled [and] Tribal affiliation; Native Hawaiian or Other Pacific Islander; or White."

182.   The Universal College Application requires applicants to identify their parents' first and last names.

183.   The Universal College Application also requires applicants to identify, if it is not English, the "language spoken in your home."

184.   Harvard also encourages students to emphasize their race and ethnicity through their essays.  According to Monica Del Toro, a Harvard Admissions Officer, the

essay "is the most important part of the application." The biggest rule, she says, "is to stand out," and a good way "to truly stand out from the rest of the pack is to discuss your culture."

185.   Harvard accepts transfer students who have completed at least one continuous academic year in a full-time degree program at one college.

186.   Harvard evaluates applicants for transfer in the same purportedly "holistic" manner it evaluates all other applicants.  Harvard uses race or ethnicity as a factor in evaluating transfer applicants.

2.   <u>The Review Process.</u>

187.   Students are admitted through one of four lists: (1) early admissions; (2) regular admissions; (3) the waitlist; or (4) the "Z-list."  A student accepted through the early admission process must accept Harvard's offer of admission.

188.   As the admissions materials are received at the admissions office, they are stamped, dated, sorted, and organized in a folder, called the "file," along with a scorecard, called the "reading sheet," which is used to evaluate the applicant's eligibility for admission.

189.   Admissions officers start by assessing each applicant in four areas (academics, extracurriculars, personal qualities, and athletics) on a scale of one (best) to six (worst).

190.   Those who pass this initial threshold move forward to a second and sometimes third reader for further appraisal; the rest form the first batch of rejections, their folders marked with notes such as "below the edge" or "case falls flat."

JA 58

191.   Small teams of admissions officers, each responsible for one of the 25 or so geographic regions or "dockets" into which Harvard divides its applicants, then scrutinize the remaining applicants for as long as five days.

192.   After the docket reader has looked through and graded the file on the reading sheet, the folder is passed on to two more readers, who examine and evaluate all materials on separate reading sheets.  The information from the three reading sheets is compiled onto a final reading sheet.  Once this sheet has been prepared for all applicants in the docket, the admissions committee convenes to discuss the eligibility of all applicants from that docket.

193.   Between 5,000 and 7,000 applicants proceed to the last and most contentious stage, the full committee meeting, in which all 35 admissions officers debate and vote on who will make the final cut.  The committee's decisions are ultimately rendered by simple majority ballot.

194.   Typically, more students are voted in than space will permit.  So the final portion of the process is spent in "reruns," in which candidates who had won approval have their initial acceptances rescinded.

195.   After reruns, a final decision is made either to accept, reject, wait-list, or "Z-list" the applicant.

196.   Harvard considers race and/or ethnicity as a factor in whether to accept, reject, wait-list, or "Z-list" an applicant.

197.   Applicants who are waitlisted are reviewed again by Harvard admissions officials in May after the admissions office has received students' updated class grades, test scores, and achievements.

42

198.    Those select students placed on the "Z-list" are admitted on the condition that they take a mandatory year off before enrolling in Harvard.  Harvard uses the Z-list to admit legacies and children of affluent families and elite schools who cannot gain admission through the ordinary course.

199.    Harvard does not reveal publicly any aspect of its deliberative or decisional admissions process other than the end result.

## VIII. HARVARD CURRENTLY ENGAGES IN INTENTIONAL DISCRIMINATION AGAINST ASIAN-AMERICAN APPLICANTS.

200.    Harvard intentionally discriminates against Asian-American applicants. This discrimination is shown through both direct and circumstantial evidence, including statistical studies of Harvard's admissions decisions.  These studies confirm what Asian-American applicants and their parents already know: Harvard intentionally and artificially limits the number of Asian Americans to whom it will offer admission.

### A.    There Is Decisive Statistical Evidence That Harvard Discriminates Against Asian-American Applicants.

201.    Each year, Harvard publishes a significant amount of data concerning its application process.  Among other things, Harvard releases admitted student data and enrolled student data broken down by racial category.

202.    Harvard used to allow the public to examine admission rates by race as well.  More recently, however, Harvard began keeping these figures secret.  Harvard has never offered an explanation for this decision.

203.    By contrast, the prestigious University of California system routinely releases information about its applicant pool broken down by racial category, which allows the public to examine admission rates by race.

JA 60

204.    Nonetheless, significant data regarding Harvard's applicant pool has been made publicly available.

205.    This statistical evidence establishes that Harvard is intentionally discriminating against Asian Americans by making it far more difficult for Asian Americans than for any other racial and ethnic group of students to gain admission to Harvard.

206.    Princeton professor Thomas J. Espenshade and his coauthor, Alexandra Radford, conducted an authoritative study of the role of race in elite American undergraduate admissions for their book *No Longer Separate, Not Yet Equal*, which was published in 2009.  Espenshade and Radford gathered exhaustive application data on a group of three elite public and four elite private colleges.

207.    Controlling for a wide variety of academic, demographic, and personal characteristics, Espenshade and Radford found that Asian-American students were dramatically less likely to be admitted than otherwise similar students who identified themselves as white or Caucasian.  In fact, Espenshade and Radford's analysis showed that the negative odds-ratio affecting Asian Americans relative to Whites was larger than the positive odds-ratio affecting African Americans relative to Whites.

208.    The Espenshade-Radford study also expressed the admissions penalty facing Asian Americans in terms of SAT-point equivalents.  The authors reported that Asian Americans needed SAT scores that were about 140 points higher than white students, all other quantifiable variables being equal, to get into elite schools.  Thus, if a white student needed a 1320 SAT score to be admitted to one of these schools, an Asian American needed a 1460 SAT score to be admitted.  That is a massive penalty given that

44

marginal differences in SAT scores are magnified among those students competing for admission to the most elite universities, as there is less room at the very top of the SAT scale to differentiate between applicants.

209.    Recent statistical evidence reveals that discrimination against Asian Americans at Harvard is even more severe than the Espenshade-Radford study found.

210.    In recent years, *The Harvard Crimson* has been surveying incoming freshmen.  In 2013, nearly 80% of the incoming class of 2017 responded to its survey. According to the survey, the average SAT of respondents was 2237 (on a 2400-scale), while the average SAT of individual ethnic groups varied widely: 2299 for East Asians and Indians, 2107 for African-Americans, and 2142 for Native Americans).  Given this reporting, the average SAT for non-Hispanic Whites is at or somewhat below the overall median.

211.    This class average (2237) corresponds to roughly the 99.5 percentile of the SAT, meaning that Harvard draws half of its class from students scoring in the top 1/2 of 1 percent of the SAT I distribution.  The "East Asian and Indian" average of 2299 corresponds to the 99.9 percentile of the SAT, meaning that Harvard draws about half of this ethnic group from the top 1/10 of 1 percent of the SAT I distribution.  That is a dramatically higher standard of academic performance.  Harvard requires much more of its Asian-American applicants than it requires of other races and ethnicities.

212.    Dr. Richard Sander, a professor of law at UCLA, and Medha Uppala, a graduate student in statistics at UCLA, recently co-authored a working paper titled *The Evolution of SES Diversity in the Applicant Pool of Highly Selective Universities, 1994-2012*.  In this working paper, Dr. Sander and Ms. Uppala examine data on several Ivy

JA 62

League colleges that shed valuable light on the admissions practices at these schools. The paper examines the degree to which elite colleges, including Harvard, have expanded their access in recent years to students with low socioeconomic status. The primary data source is a widely used database from the College Board, which biannually compiles anonymized data on 100,000 SAT-takers nationwide. The paper reveals startling application patterns from the aggregated data that it reports, which, in conjunction with other data sources, make manifest Harvard's massive intentional discrimination against Asian Americans.

213.    As an initial matter, the paper finds that Asian Americans are being admitted to these schools at a far lower rate than the rate at which they apply. The paper notes that for "three of the most selective Ivy League colleges," the average racial makeup of all domestic score senders between 2008 and 2012 is 27.3 percent Asian American, 11.3 percent African American, 12.5 percent Hispanic, 40.4 percent non-Hispanic White, and 8.5 percent other race or non-identified. Over this same time period, however, Asian Americans represented only 17-20 percent of the admitted students. No other racial or ethnic group at these schools is as underrepresented relative to its application numbers as are Asian Americans. Indeed, no other racial or ethnic group comes even remotely close to this level of underrepresentation.

214.    Thus, if Harvard admitted randomly from its applicant pool, the number of Asian Americans in its entering freshman class would be far higher than it actually is.

215.    These data alone provide strong evidence that Harvard is engaging in intentional discrimination against Asian-American applicants absent some factor that makes this gross disparity explainable on non-discriminatory grounds.

46

216.    Moreover, the paper's data shows that Asian-American applicants have, on average, stronger qualifications for admission than any other racial or ethnic group applying to top Ivy League schools.

217.    Ironically, then, the most *underrepresented* group of admitted students relative to the applicant pool is the most *overrepresented* racial or ethnic group among top academic performers.

218.    Among "three of the most selective Ivy League colleges," the paper's data shows that, during the 2008, 2010, and 2012 admissions cycles, Asian Americans, on average, constituted nearly 39 percent of all domestic SAT-takers who (a) had scores of 2100 or higher and (b) sent their scores to these schools.

219.    *The Harvard Crimson* survey, as does every other available public source, confirms that the vast majority of Harvard's students come from this pool of applicants (with SAT scores of 2100 or higher).

220.    Remarkably, students with higher test scores were even more likely to be Asian Americans.  In 2008, Asian Americans made up 46 percent of domestic Harvard score-senders with SAT scores above 2200 (a range from which Harvard draws more than half of its students).   In addition, Asian Americans made up an even higher percentage of the very top students; they accounted for 55 percent of domestic Harvard score-senders with SAT scores above 2300.  These patterns are very similar across all of the top Ivy League schools.  In 2008-12, for the three Ivy League schools analyzed by Dr. Sander and Ms. Uppala, Asian Americans made up 38.9 percent of all domestic score-senders with SAT scores above 2100; 45 percent of domestic score-senders with SAT scores above 2200; and over 51 percent of domestic score-senders with SAT scores

above 2300.  These data, in combination with other publicly available data, demonstrate that Asian Americans admitted to Harvard are vastly underrepresented—by a factor of half or even two-thirds—relative to the number of applications from Asian Americans that Harvard receives.

221.    There is no reason to doubt that Harvard is one of the three Ivy League colleges in Dr. Sander's and Ms. Uppala's analysis.  Harvard is among the most selective colleges in the Ivy League (if not the most selective).  But even if Harvard is not one of the colleges they examined, its patterns of Asian-American enrollment and selectivity closely match those of the "three of the most selective Ivy League colleges" in Dr. Sander's and Ms. Uppala's analysis such that there is no reason to believe their conclusions would not apply to Harvard.

222.    In all events, Harvard's data is highly consistent with *all* other Ivy League schools, which as Table A shows, inexplicably enroll Asian Americans in remarkably similar numbers year after year after year.

JA 65

| Table A<br>Ivy League Enrollment (Asian Americans) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **School** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Brown** | 15% | 16% | 15% | 15% | 14% | 12% | 14% |
| **Columbia** | 17% | 17% | 16% | 16% | 16% | 16% | 18% |
| **Cornell** | 16% | 17% | 17% | 16% | 16% | 16% | 16% |
| **Dartmouth** | 14% | 14% | 15% | 15% | 14% | 14% | 14% |
| **Harvard** | 15% | 17% | 17% | 16% | 17% | 18% | 18% |
| **Penn** | 17% | 17% | 18% | 18% | 18% | 18% | 18% |
| **Princeton** | 14% | 15% | 16% | 17% | 18% | 19% | 17% |
| **Yale** | 14% | 14% | 15% | 15% | 15% | 16% | 16% |

223.    Various additional studies confirm that Harvard is intentionally discriminating against Asian-American applicants and that it is doing so in much the same manner as it discriminated against Jewish applicants decades ago.

224.    In 2012, Ron Unz, who holds an undergraduate physics degree from Harvard and studied theoretical physics at Stanford, conducted an extensive study of Ivy League admissions.  *See* Ron Unz, *The Myth of American Meritocracy*, American Spectator (Dec. 2012).  Mr. Unz found rampant discrimination against Asian Americans by Ivy League universities generally and Harvard specifically.

225.    Using data from the National Center for Educational Statistics, as well as other sources, Mr. Unz found that the "ethnic composition of Harvard's undergraduates … follows a highly intriguing pattern."  In particular, he found that after seeing a steady increase in Asian-American admissions through the 1980s and into the 1990s, in 1993 "Asian numbers went into reverse, generally stagnating in the two decades that followed, with the official 2011 figure being 17.2 percent."

226.    Unz found "[e]ven more surprising … the sheer constancy of these percentages, with almost every year from 1995-2011 showing an Asian enrollment within a single point of the 16.5 percent average, despite high fluctuations in the numbers of applications and the inevitable uncertainty surrounding which students will accept admission."   Unz highlighted that "this exactly replicates the historical pattern … in which Jewish enrollment rose very rapidly, leading to the imposition of an informal quota system, after which the numbers fell substantially, and thereafter remained roughly constant for decades."

227.    A report by the Consortium on Financing Higher Education, in the Harvard Class of 1995, also showed that Asian Americans are held to a higher standard than any other group of applicants. *See* Melissa Lee, *Report Discloses SATs, Admit Rate*, The Harvard Crimson (May 7, 1993).   Responding to this study, Dean Fitzsimmons stated that race is "only one factor in deciding whether a candidate is admitted," but that certain minority groups, particularly African Americans, are "highly sought after" and that, "[s]tatistically, one could make the argument that it's easier for certain minorities [to be admitted]."

228.    Dean Fitzsimmons added: "It's true that admission rates for Asian Americans and whites are lower than the admission rates for Hispanics and African American students and Native American students as well.   But it's more complicated than that. . . . The question we look at is how much more likely will white and Asian American students have access to the kind of preparation that will make one an outstanding college candidate here."

JA 67

229.    No non-discriminatory factor justifies the gross disparity in Asian American admissions relative to their presence in Harvard's applicant pool.

230.    One non-discriminatory factor that theoretically could justify this gross disparity would be if a disproportionally high percentage of Asian-American students were clustered at the low end of the applicant pool with regard to academic qualifications as compared to other racial groups.  But as Dr. Sander's and Ms. Uppala's paper and other data show, the opposite is in fact true.  A disproportionally high percentage of Asian-American students are clustered at the high end of the applicant pool with regard to academic qualifications.

231.    Another non-discriminatory factor that theoretically could justify this gross disparity would be if a disproportionally high percentage of Asian-American students were lacking with regard to non-academic criteria as compared to other racial groups.

232.    But there is no data to support that theory.  *See, e.g.*, Esteban M. Aucejo, Hanming Fang, and Ken Spenner, "Does Affirmative Action Lead to Mismatch? A New Test and Evidence," 2 Quantitative Economics 303 (2011).  This study found no racial advantage for underrepresented minority applicants in levels of personal achievement.

233.    Studies also have shown that high-achieving Asian-American students are equally, if not more, qualified than other racial groups with regard to non-academic criteria.  At the University of California, Los Angeles (UCLA), over several years, undergraduate admissions readers assigned each applicant three types of scores: "academic achievement" (principally high school grades, AP courses, and standardized test scores); "life challenges" (mainly socioeconomic background); and "personal

achievement" (such as leadership, musical ability, and community service). These three scores jointly determined virtually all admissions decisions. *See* Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins, and Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions*, Pennsylvania Journal of Constitutional Law (Fall 2014).

234.   The data cover over 100,000 undergraduate applicants to UCLA over three years and show absolutely no correlation between race and "personal achievement." Rather, the data show that the only strong predictor of personal-achievement scores is academic achievement; applicants with high test scores and grades tended to have personal achievement scores that were about one standard deviation higher than applicants with low test scores and grades.

235.   There is no evidence that Asian Americans applying to UCLA have personal achievement credentials that Asian Americans applying to Harvard uniformly lack. Rather, all available evidence points in the opposite direction.

236.   Moreover, notwithstanding Harvard's public relations emphasis on non-academic factors in reviewing applications, academic performance is the principal criteria for admission—except when it comes to minority groups that are either preferred or discriminated against based on their race and ethnicity.

237.   Academic analyses of dozens of application processes at colleges and law schools around the country demonstrate that selective schools give far more weight to academic achievement and preparation than to other types of accomplishment and activity. *See* Richard Sander, *Why Strict Scrutiny Requires Transparency: The Practical*

JA 69

*Effects of Bakke, Gratz, and Grutter* (2011).  In general, academic factors alone explain about 80 percent of admissions decisions at selective schools.

238.    The gross disparity between the percentage of Asian-American students in the applicant pool and those in the admitted pool therefore are not explainable on any grounds other than intentional discrimination on the basis of race.

### B.    Elite Schools That Use Race-Neutral Admissions Have Far Higher Asian-American Enrollment.

239.   Other elite colleges and universities do not consider race in their admissions process, and therefore serve as controls against which to measure Harvard's admission and enrollment figures.  Those universities uniformly admit and enroll far higher percentages of Asian American students than Harvard.

240.   For example, the California Institute of Technology (Caltech) is a private school that selects its students by strict academic standards and chooses not to consider race.  Almost 40 percent of its undergraduates are Asian American.

241.  Table B sets forth the Asian-American percentage of the total undergraduate enrollment at Caltech and Harvard:

JA 70

| Table B Asian-American Enrollment | | |
|---|---|---|
| | **Harvard** | **Caltech** |
| **1992** | 19.1% | 25.2% |
| **1993** | 20.6% | 26.9% |
| **1994** | 18.3% | 29.8% |
| **1995** | 18.4% | 29.1% |
| **1996** | 17.5% | 27.6% |
| **1997** | 17.4% | 27.4% |
| **1998** | 17.0% | 24.1% |
| **1999** | 17.2% | 24.3% |
| **2000** | 17.1% | 24.9% |
| **2001** | 16.4% | 24.5% |
| **2002** | 16.3% | 27.2% |
| **2003** | 16.2% | 31.1% |
| **2004** | 17.1% | 31.1% |
| **2005** | 17.6% | 33.0% |
| **2006** | 14.3% | 37.4% |
| **2007** | 15.4% | 38.1% |
| **2008** | 16.7% | 39.8% |
| **2009** | 17.0% | 39.9% |
| **2010** | 15.6% | 39.4% |
| **2011** | 17.2% | 38.8% |
| **2012** | 17.7% | 39.6% |
| **2013** | 18.0% | 42.5% |

242.    The following graph represents the Asian-American enrollment trends

between the two schools:



243.    The University of California system also does not use racial preferences, as they were banned via popular referendum in 1996.  Asian Americans currently make up 34.8 percent of UCLA's student body and 32.4 percent of the University of California at Berkley's student body.

244.    A similar phenomenon exists at elite high schools.  Those high schools that do not employ racial preferences have extraordinarily high percentages of Asian Americans.  For example, Hunter College High School in New York chooses students without giving preference to legacies, athletes, or underrepresented minorities.  This admissions system produced a student body that was 49 percent Asian American in 2013.

245.    Similarly, Thomas Jefferson High School for Science and Technology, a magnet school in Virginia that is consistently ranked one of the best high schools in the country, does not employ racial preferences.  Its 2014 entering fall class is 66 percent Asian American.

JA 72

C.    **Statements By Admissions Staff At Harvard And Other Schools
Provide Further Evidence That Harvard Discriminates Against
Asian-American Applicants**.

246.    Harvard evaluators consistently rank Asian-American candidates below White candidates in "personal qualities."  In comments written in applicants' files, Harvard admissions staff repeatedly have described Asian Americans as "being quiet/shy, science/math oriented, and hard workers."

247.    One Harvard official summed up the profile of a purportedly typical Asian applicant this way: "He's quiet and, of course, wants to be a doctor."

248.    Another Harvard official wrote that an applicant's "scores and application seem so typical of other Asian applications I've read: extraordinarily gifted in math with the opposite extreme in English."

249.    According to Hunter College High School's director of college counseling, admissions officers at elite universities often complain that Asian American applicants all look the same on paper.  "When Harvard calls us back and gives us a brief synopsis of why certain [Asian] kids didn't make it, they'll say, 'There were so many kids in the pool that looked just like this kid.'"

250.    Admissions officers at other top schools have expressed similar sentiments. For example, asked why Vanderbilt poured resources into recruiting Jewish students instead of Asian Americans, a former administrator said, "Asians are very good students, but they don't provide the kind of intellectual environment that Jewish students provide."

251.    Rod Bugarin, a former admissions officer at Wesleyan, Brown, and Columbia, stated: "The bar is different for every group.  Anyone who works in the

JA 73

industry knows that."  Without affirmative action, "our elite campuses will look like UCLA and Berkeley," and "[t]hat wouldn't be good for Asians or for anyone else."

**D.    College Counselors Acknowledge Discrimination Against Asian Americans At Elite Universities.**

252.  College counselors and advisors recognize that discrimination against Asian Americans occurs at elite universities such as Harvard and thus tell Asian Americans to hide their identity, to emphasize personal characteristics that avoid Asian stereotypes, and, in many cases, to lower their expectations and apply elsewhere.

253.  For example, the Princeton Review, the leading guide to college admissions, gives specific recommendations for Asian-American students applying to elite schools such as Harvard on how to overcome these schools' anti-Asian-American bias.  Its recommendations are both honest and discouraging.

254.  According to the Princeton Review: "Asian Americans comprise an increasing proportion of college students nationwide.  Many Asian Americans have been extraordinarily successful academically, to the point where some colleges now worry that there are 'too many' Asian Americans on their campuses.  Being an Asian American can now actually be a distinct disadvantage in the admissions processes at some of the most selective schools in the country.  Increasingly, the standard for affirmative action isn't minority status, but under-represented minority status.   Since Asian American populations at many colleges exceed the proportion of Asian Americans to the population of the state or country as a whole, Asian Americans are a minority, but not an under-represented minority, at those colleges…. If you are an Asian American—or even if you simply have an Asian or Asian-sounding surname—you need to be careful about what you do and don't say in your application."

255.    According to the Princeton Review: "You need to avoid being an Asian Joe Bloggs.  Asian Joe Bloggs is an Asian American applicant with a very high math SAT score, a low or mediocre verbal SAT score, high math- or science-related SAT II scores, high math and science grades, few credits in the humanities, few extracurricular activities, an intended major in math or the sciences, and an ambition to be a doctor, an engineer, or a research scientist.  The more you sound like this person, the more likely admissions officers will be to treat you as part of the 'Asian invasion' and reject your application, or at the very least make you compete against other Asian applicants with similar characteristics, rather than against the applicant pool as a whole."

256.    Princeton Review further explains: "If you share traits with Asian Joe Bloggs you should probably pay careful attention to the following guidelines:

- If you're given an option, don't attach a photograph to your application and don't answer the optional question about your ethnic background.  This is especially important if you don't have an Asian-sounding surname.  (By the same token, if you do have an Asian-sounding surname but aren't Asian, do attach a photograph.)

- Work on your verbal SAT score, take some literature and history courses, and get involved in activities other than math club, chess club, and computer club.

- Do not write your application essay about the importance of your family or the positive/negative aspects of living in two cultures.  These are Asian Joe Bloggs topics, and they are incredibly popular.  Instead, write about something entirely unrelated to your ethnic background.

- Don't say you want to be a doctor, and don't say you want to major in math or the sciences.  You don't have to lie.  If you have lousy SAT verbal scores, saying you want to be an English major isn't going to help you, either. Just say you're undecided.  The point is to distance yourself as much as possible from the stereotype.

- These guidelines are less important if you are chiefly interested in less selective schools or if you are applying to schools where all the students take only math and science courses and dream of medical or

58

> research careers.  In fact, Asian Joe Bloggs's high math and science
> scores can be an advantage in applying to schools below the Ivy league
> level. Even there, though, the less you sound like the stereotype, the
> better your chances will be."

257.  Whole new industries have sprung up to help Asian Americans overcome

discrimination and secure admission to elite universities, including Harvard.

258.  One organization called "Asian Advantage College Consulting" promises

to help an "Asian-American student applying to elite colleges beat the Asian Quotas."  Its

strategy is, first, recognizing that "Asian students need to approach the admissions

process in a completely different manner than the white or non-Asian applicant" and,

second, developing a strategy to stand out from the many "Asian-American applicants

with high grades and SAT/ACT scores, along with a seemingly impressive list of awards

and achievements in science fairs, musical competitions and school-based activities like

debate and the robotics club."

259.  Similarly, the Ivy League Coach, a college counseling practice, provides

specific recommendations for Asian Americans: "The fact is, highly selective colleges

seek a diverse incoming class and a diverse incoming class does not mean an all Asian

class.  So Asian students do indeed compete against each other.  Does that mean that an

Asian American student shouldn't check off 'Asian American' on their college

application?  Not necessarily.  A student should check off the ethnicity that they're most

comfortable with, the ethnicity or ethnicities that they most closely identify with.  But

what the article on Asians and college admissions … doesn't say is that college

admissions counselors are going to suspect that Henry Chang is Asian whether or not

Henry Chang checks the box.  But that doesn't mean Henry can't do something about

differentiating himself from other Asian American applicants….  Don't just be the math

JA 76

kid with perfect scores who competes in Mathletes.  Don't just play the violin.  Do something that many of the Asian American kids in your class aren't doing…. Whether or not the following is [politically correct], it's also true: What you want to do is distinguish yourself from any perceived stereotypes."

260.   The bias against Asian-American applicants discussed by these college counselors exists at Harvard.  Many high school guidance counselors caution students applying to Harvard not to list their race as Asian.

261.   According to one high school guidance counselor, Asian Americans face difficulty because they cannot distinguish themselves within their community: "[e]very single child has had music lessons.  Every single child succeeds well in math.  Every single child has done community service in a hospital. Every child has done Chinese or Korean studies on Saturday and is fluent in that language."

### E.    Asian-American Applicants And Their Families Know That They Are Being Discriminated Against By Elite Universities.

262.   Asian Americans are not blind to the discrimination employed by Harvard and other elite colleges and universities.

263.   According to Princeton economist Uwe Reinhardt, "within the Asian community, of which I'm a part, there's this feeling that, for you to get into Harvard or Princeton, you've got to be better than everybody else."

264.   According to Kara Miller, a former Ivy League admissions officer, "Asian kids know that when you look at the average SAT for the school, they need to add 50 or 100 to it.  If you're Asian, that's what you'll need to get in."

265.   For example, Iris Wang, a senior at Hunter College High School, one of the best public high schools in America, scored a 1520 SAT score and had top grades.  Her

father is a chemist and her mother a postal worker.  She was rejected by Harvard, as well as numerous other schools.  According to Wang, "All the schools basically say, 'we don't discriminate.'   But I went to the Columbia session and they said they value a multicultural community.  If they want to be multicultural, there's only so many of one culture they can take."

266.   Daniel Golden, the Pulitzer Prize-winning reporter then of *The Wall Street Journal*, described Jamie Lee, who applied to Harvard, as well as six other elite private schools:  According to Mr. Golden, "Jamie Lee was a superb student.  Born in Hong Kong to an English father and Chinese mother, he grew up in London, where teachers marveled at his ability and his IQ was measured at 162, widely considered genius level.  When his family emigrated to Greenwich, Connecticut, in 2003, he quickly established himself as a top student at Greenwich High, a premier public school.  On his first tries, without a test-prep course, he scored the maximum on the PSAT, the SAT, and two of his three SAT II subject tests; on the third SAT II, writing, he missed by only 20 points, scoring 780 out of 800.  Nor was he merely a standardized-test machine; his problem solving displayed impressive originality. In 2005, Jamie won the Greenwich High award given to the senior who 'demonstrates creative ability and inventiveness in math, who may take the unusual approach to a problem and come up with an unexpected answer.'  His creativity also emerged in music (the high school string ensemble performed his composition 'Three Dances,' with Jamie on cello) and mechanical design (he built an ingenious wooden cabinet with doors that automatically opened and closed a mobile rack for storing compact discs).  'He likes to be opposition and play the devil's advocate,' said his junior-year Latin teacher, Camille Fusco.  'He's very independent in his thinking.  On

61

an essay question, he'd deliberately take the point of view I didn't want to hear.  But he got away with it because he can take any view brilliantly.'"

267.   Despite this academic record, Harvard—as well as Princeton, Yale, Stanford, Columbia, Dartmouth, and MIT—denied Jamie Lee admission.  Fusco said he "'was really shocked [Jamie] didn't get in" because he "'thought of him as a Harvard person.'"

268.   Jamie's English literature teacher, Brigid Barry, said she too was "'very, very surprised.  There's no doubt he's an outstanding student,'" and that in eight years of teaching AP English, she had seen the Ivy League schools admit many weaker candidates.

269.   Marlyn McGrath Lewis, Harvard's director of admissions, told Jamie's father that Jamie "'was an excellent student but that a number of better musicians had applied.'"  When asked later if Jamie was held to a higher standard because he was half Asian, Ms. Lewis declined to comment.

270.   One strategy that Asian-American students applying to Harvard use is to avoid identifying their race.  Many Asian-American students are unwilling to state their race at all on college applications.

271.   For example, Lanya Olmstead was born in Florida to a mother who immigrated from Taiwan and an American father of Norwegian ancestry.  Ethnically, she considers herself half Taiwanese and half Norwegian.  But when applying to Harvard, Olmstead checked only one box for her race: white.  According to Olmstead: "I didn't want to put 'Asian' down … because my mom told me there's discrimination against

JA 79

Asians in the application process…. Not to really generalize, but a lot of Asians, they have perfect SATs, perfect GPAs, … so it's hard to let them all in."

272.    Said another student: "As someone who was applying with relatively strong scores, I didn't want to be grouped into that stereotype … I didn't want to be written off as one of the 1.4 billion Asians that were applying."

273.    Applicants who are part Asian American regularly attempt to conceal their Asian ancestry when applying to Harvard out of concern it would greatly reduce their chances of admission.

274.    For example, Harvard student Heather Pickerell, born in Hong Kong to a Taiwanese mother and American father, refused to check any race box on her application because "I figured it might help my chances of getting in."

275.    According to Lee Cheng, founder of the Asian American Legal Foundation, "Many Chinese-American children have internalized their anger and pain, confused about why they are treated differently from their non-Chinese friends.  Often they become ashamed of their ethnic heritage after concluding that their unfair denial is a form of punishment for doing something wrong."

276.    Another example is Henry Park.  According to Daniel Golden's reporting: "Henry Park ranked 14th out of 79 members of the class of 1998 at Groton School, a super competitive prep school in Groton, Massachusetts.  He got a perfect 800 on the math SAT for a combined score of 1560 out of 1600, placing him in the top one-quarter of 1 percent of college-bound students.  On the SAT II subject test, he scored another perfect 800 on the harder of the two math exams offered, along with 760 out of 800 in Latin and 740 in physics.  He played violin and competed on the cross-country team, and

JA 80

a respected math journal published a paper he coauthored with two classmates.  And as the son of hardworking, middle-class Korean immigrants who dreamed of a better life for their children and scrimped to pay Groton's tuition, Henry seemed to embody the up-by-his bootstraps American saga that is supposed to appeal to college admissions officers."

277.   Henry's guidance counselor at Groton nevertheless discouraged him from applying to the Ivy League, telling him "it was a long shot at best, and advised him to lower his expectations to second- and third-tier schools."

278.   Harvard denied Henry admission, as did Yale, Brown, and Columbia.  At the same time, Ivy League universities admitted 34 of Henry's Groton classmates. According to Henry: "When the decisions came out, and all these people started getting in, I was a little upset.  I feel I have to hold myself to a higher standard."  Added his mother, Suki Park, "I was naïve.  I thought college admissions had something to do with academics."

279.   Henry Park's mother described the harm caused to Henry and his family: "I have thought many, many times why Henry failed.  It was just devastating.  He just failed like a falling leaf….   Korean Americans have to do a lot better than Caucasians to get admitted, and it's probably the same for other Asians.  It's very, very tough.  Presently, yes, there is discrimination."

280.   When MIT's dean of admissions Marillee Jones was asked about Henry Park, who was rejected by Harvard, she said that "it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament.  My guess is that he just wasn't involved or interesting enough to surface to

JA 81

the top." To Ms. Jones, it made sense for universities to admit other students over "yet another textureless math grind."

281. The "model minority" stereotype of high-achieving Asian Americans does an even greater disservice to socioeconomically disadvantaged individuals by making it virtually impossible for disadvantaged Asian Americans to compete with disadvantaged students from other races who are held to a lower standard.

282. For example, Kai Chan, a Princeton doctoral student in economics and the son of Chinese immigrants, describes the struggles he has endured: "Is it fair in the name of (skin-deep) diversity to hold back qualified students from admission to the Ivies because of their race? After all, it is a fact that Asians need higher academic achievements than their peers to get admitted to the same school…. The misguided approach of programs like affirmative action can be seen through my experience. I am the son of poor, non-English speaking parents, neither of whom attended high school. They never read to me as a child. They never attended my graduations. I went to some terrible high schools. (Altogether, I attended five high schools, one of which was known locally as 'last chance high.') I worked practically full-time while attending high school and college. But I've never gotten the benefit of the doubt anytime in my life. If anything, I've had to be better than my peers."

283. Application statistics confirm that Asian Americans are aware of (and have responded to) the discrimination they suffer at Harvard. As the Asian-American population of the United States has grown, so has its share of academically high-achieving students. As Dr. Sander's paper shows, Asian Americans made up roughly 21 percent of all domestic SAT takers with scores above 1400 in the 1994, 1996, and 1998

JA 82

admissions cycles.  In the 2008, 2010, and 2012 admissions cycles, Asian Americans made up roughly 33 percent of all domestic SAT takers with scores above 2100—an increase roughly proportionate to the growth of the Asian-American proportion of all SAT takers.

284.   Yet during this same period, as many elite colleges, including Harvard, increasingly discriminated against Asian Americans, the proportion of high-scoring Asian Americans sending their scores to these schools declined sharply.  As Dr. Sander and Ms. Uppala report, the proportion of Asian Americans with top SAT scores (i.e., above 1400 in 1994-98 and 2100 in 2008-12) who sent their scores to the most selective Ivy League schools fell from 39.7 percent in the mid-1990s to only 27.4 percent during the 2008, 2010, and 2012 cycles.  No comparable drop occurred for any other racial group.

285.   Asian Americans understand that they are not competing for admission to Harvard against the entire applicant pool.   In light of Harvard's discriminatory admissions policies, they are competing only against each other, and all other racial and ethnic groups are insulated from competing against high-achieving Asian Americans.

286.  Because Asian Americans congregate at the high end of Harvard's applicant pool, the competition is fierce.  This has deterred and continues to deter many qualified Asian Americans from applying to Harvard.  Harvard's discriminatory reach thus extends far beyond those highly qualified Asian Americans who decide to apply and whose applications are treated unfairly in the admissions process.

287.   This discrimination has reached and continues to reach every Asian American student who has shied away or will shy away from applying to Harvard out of

the well-founded fear that he or she will not successfully make it out of the highly competitive Asian American admissions pool and gain admission to Harvard.

## IX.    HARVARD CURRENTLY ENGAGES IN RACIAL BALANCING.

288.    Not only does Harvard discriminate against Asian Americans, it racially balances its entering freshman class to ensure proportional representation of the various racial and ethnic groups present in Harvard's student body.

289.    Harvard's system of racial balancing is shown through both direct and circumstantial evidence, including statistical studies of Harvard's admissions decisions. This evidence confirms that Harvard is not using racial preference to pursue "critical mass" or any other diversity goal the Supreme Court has ever found permissible.

290.    As shown in Table C, the racial demographics of Harvard's admitted class have remained stable across all racial groups at least over the last 9 years.

| Table C | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Harvard Admissions (Percentage of Admitted Students by Race/Ethnicity) | | | | | | | | | |
| | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
| African American | 11.9% | 11.5% | 10.2% | 11.8% | 11.3% | 10.8% | 11.0% | 10.7% | 10.5% |
| Hispanic | 13.0% | 11.5% | 11.2% | 12.1% | 10.3% | 10.9% | 9.7% | 10.1% | 9.8% |
| Asian American | 19.7% | 19.9% | 20.7% | 17.8% | 18.2% | 17.6% | 18.5% | 19.6% | 17.7% |
| Native American | 1.9% | 2.2% | 1.7% | 1.9% | 2.7% | 1.3% | 1.3% | 1.5% | 1.4% |
| White and Other | 53.5% | 54.9% | 56.2% | 56.4% | 57.5% | 59.4% | 59.5% | 58.1% | 60.6% |

291.    As shown in Table D, the racial demographics of Harvard's enrolled first-year classes also have remained stable across all racial groups throughout the past decade.

JA 84

| Table D Harvard Enrollment (Percentage of First Years by Race/Ethnicity) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 |
| **Nonresident alien** | 11% | 11% | 12% | 10% | 10% | 10% | 10% | 9% | 9% | 9% | 8% |
| **Hispanic/Latino** | 10% | 9% | 10% | 9% | 9% | 7% | 8% | 8% | 7% | 9% | 8% |
| **American Indian or Alaska Native** | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| **Asian Americans** | 19% | 20% | 17% | 15% | 17% | 19% | 18% | 15% | 19% | 20% | 17% |
| **Black or African American** | 7% | 6% | 7% | 6% | 9% | 8% | 8% | 8% | 9% | 9% | 9% |
| **Native Hawaiian or Other Pacific Islander** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **White** | 43% | 45% | 45% | 44% | 40% | 41% | 42% | 44% | 47% | 47% | 50% |
| **Two or more races** | 7% | 6% | 6% | 6% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Race and ethnicity unknown** | 3% | 3% | 3% | 11% | 14% | 15% | 13% | 15% | 8% | 5% | 7% |

292.    As shown in Table E, the racial demographics of Harvard's overall student body likewise have remained remarkably stable across all racial groups throughout the past decade.

JA 85

| **Table E**<br>**Harvard Enrollment (Percentage of Student Body)** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2012** | **2011** | **2010** | **2009** | **2008** | **2007** | **2006** | **2005** | **2004** | **2003** |
| **Nonresident alien** | 11% | 11% | 11% | 10% | 10% | 10% | 9% | 10% | 8% | 8% | 7% |
| **Hispanic/Latino** | 9% | 9% | 9% | 8% | 8% | 7% | 7% | 7% | 7% | 8% | 7% |
| **American Indian or Alaska Native** | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| **Asian Americans** | 18% | 18% | 17% | 16% | 17% | 17% | 15% | 17% | 18% | 17% | 16% |
| **Black or African American** | 6% | 6% | 7% | 7% | 8% | 8% | 8% | 8% | 8% | 8% | 7% |
| **Native Hawaiian or Other Pacific Islander** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **White** | 45% | 45% | 45% | 44% | 42% | 45% | 46% | 45% | 49% | 49% | 49% |
| **Two or more races** | 6% | 5% | 5% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Race and ethnicity unknown** | 4% | 5% | 6% | 12% | 14% | 14% | 14% | 14% | 8% | 9% | 12% |

293.    Table C, Table D, and Table E, both individually and collectively, demonstrate that Harvard is engaging in racial balancing as there can be no non-discriminatory reason justifying such remarkable stability in its overall student body across all racial groups over this multi-year period.

294.    Indeed, Harvard's admissions and enrollment data tends to demonstrate that Harvard is engaging in racial balancing to a statistically significant degree.

295.    The year-to-year changes in the racial composition of Harvard's admitted and enrolled freshman class also reflect racial balancing as shown by, among other things, how Harvard has managed its balance between African Americans and Hispanics, and how it has managed its balance between Asians and Non-Hispanic whites.

JA 86

296.    Over the period between 1994 and 2008, African American enrollment has remained extraordinarily stable at Harvard, averaging 7.8 percent with a standard deviation (calculated by year over the 14-year period) of 0.3 percent.   Hispanic enrollment also remained quite stable, averaging 7.4 percent with a standard deviation of 0.4 percent.  This occurred despite the fact that throughout this period, the applicant pool of academically strong Hispanic students at Harvard and other elite Ivy League schools was substantially larger than the similar pool for African Americans, and the gap became larger over time.

297.    Yet Harvard and its peer Ivy League colleges have consistently admitted as many African Americans as Hispanics (if not more), even though this meant using substantially larger preferences for African Americans than for Hispanics.   In other words, Harvard has manipulated the size of racial preferences to ensure it maintained racial balance.

298.    Over the period between 2003 and 2012, the percentage of Asian Americans at Harvard wavered only slightly above and below approximately 17 percent. As noted earlier, this is despite the fact that, by 2008, Asian Americans made up over 27 percent of Harvard's applicant pool, and approximately 46 percent of applicants with academic credentials in the range from which Harvard admits the overwhelming majority of students.  But during this same period, Harvard's "non-Hispanic white" representation is only slightly declining.

299.    Given Harvard's other racial balancing goals, it is obvious that if Harvard evaluated Asian Americans and non-Hispanic whites equally, non-Hispanic white admissions would drop significantly, possibly to the point where Asian-American

enrollment and non-Hispanic white enrollment would be roughly comparable.  Although this would cause Harvard's overall level of racial diversity to increase, not decrease, Harvard nevertheless continues to use racial balancing to keep white enrollment more than twice as high as Asian-American enrollment.

300.    The minor year-to-year deviations in admissions and enrollment numbers demonstrate Harvard's commitment to maintaining racial stability over any four-year enrollment period.  In other words, when enrollment of a particular racial or ethnic group exceeds or falls short of Harvard's intended goal, in the next one or two admissions cycles, Harvard admits fewer or more applicants of that racial or ethnic group in order to balance out the overall student body.

301.    For example, in 2005, 18 percent of Harvard's student body was Asian American, which was a 16-year high.  In response, Harvard admitted an unusually low number of Asian Americans in the following admissions cycle (17.7 percent).  That predictably resulted in an unusually low yield of Asian Americans enrolling at Harvard (15.0 percent). Indeed, both the 2006 admissions and enrollment figures for Asian Americans were at or near 10-year lows.

302.    Similarly, in 2012, 6 percent of Harvard's overall student body was African American, which was a 24-year low.  In response, Harvard admitted an unusually high number of African Americans in the next two admissions cycle (11.5 percent and 11.9 percent, respectively), which were both record highs.  That predictably resulted in an usually high yield of African Americans enrolling at Harvard in 2013, which maintained an overall enrollment figure in line with the 20-year average, and would be expected to result in a similar enrollment level of African Americans in 2014.

303.   No factor or criteria for admission—other than racial balancing—could explain these admissions patterns and the overall consistency of Harvard's admissions, enrollment, and overall student body figures across all racial groups.

304.   As the Unz study found, "ethnic enrolment levels which widely diverge from academic performance data or applications rates and which remain remarkably static over time provide obvious circumstantial evidence for at least a *de facto* quota system."

## X.   HARVARD HAS AVAILABLE RACE-NEUTRAL ALTERNATIVES THAT CAN ACHIEVE STUDENT-BODY DIVERSITY.

305.   Harvard has a host of race-neutral alternatives that can achieve student body diversity without the use of racial classifications, including but not limited to: (a) increased utilization of non-race-based preferences; (b) increased use of financial aid, scholarships, and recruitment to attract and enroll minority applicants; and (c) elimination of admissions policies and practices that operate to the disadvantage of minority applicants.   Furthermore, eliminating racial preferences at Harvard will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preference, the Harvard community, and society as a whole.

### A.   Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Non-Racial Preferences.

306.   Colleges and universities that have eliminated race-based admissions have maintained or increased their student body diversity by placing greater emphasis on socioeconomic factors, which often strongly correlate with an applicant's race but are not exclusively reserved for applicants of a particular race or ethnicity.   Using socioeconomic

JA 89

preferences thus increases racial diversity *and* achieves the broader diversity that Harvard claims to seek by opening the door of opportunity for poor students of all races.

307.    In a recent study of ten leading public universities that ended race-based preferences, researchers found that seven of these schools maintained or increased their enrollment of African-American and Hispanic students by adopting strategies that target socioeconomic inequality. *See* Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, The Future of Affirmative Action (2014).

308.    For example, the University of Colorado has devised an admissions formula that gives a significant preference to students from socioeconomically disadvantaged backgrounds.   This refined formula takes into consideration numerous socioeconomic factors, including single-parent status, parents' education level, family income, native language, the number of dependents in the family, whether the applicant attended a rural high school, the percentage of students from the applicant's high school eligible for free or reduced-price lunch, the school-wide student-to-teacher ratio, and the size of the twelfth-grade class.

309.    Under this admissions program, the University of Colorado found not only that the socioeconomic diversity of its incoming class increased substantially, but that racial and ethnic diversity increased as well.   African-American and Hispanic acceptance rates to the University of Colorado increased from 56 percent under race-based admissions to 65 percent under class-based admissions.   *See* Matthew N. Gaertner, *Advancing College Access with Class-Based Affirmative Action*, The Future of Affirmative Action (2014).

JA 90

310.    Recently, a national simulation was conducted to determine whether the use of socioeconomic preferences could achieve student body diversity without the use of racial preferences at elite universities.  *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014).  The study simulated various admissions models at the top-rated 193 colleges and universities "because the dialogue about affirmative action often implies that it is access to these schools and the opportunities they provide in business, social and career advancement that truly matters."  The study examined, among other things, the effect of substituting socioeconomic preference for race-based preferences at America's elite college and universities using test scores and high-school grades as measures of merit.

311.    The national simulation ultimately found that "it is possible to achieve both racial and economic diversity in selective colleges without using race per se as an admissions criterion" and, importantly, that it could be achieved consistent with the understanding "that affirmative action models ought to promote racial diversity as an educational benefit instead of promoting racial diversity for its own sake."

312.    Another study found that increased focus on parental education and wealth—as opposed to income—as a measure of socioeconomic status also can help achieve student body diversity without the use of racial preferences.  *See* Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, The Future of Affirmative Action (2014).  The study found that "the most important factor in predicting individual academic success is the education of a parent" and the "economic factor" that mattered most was "parental net worth (that is, wealth) and not income."  Indeed, "wealth

74

conceptually captures the legacy of historical inequalities of opportunity better than aspects of class that cannot be literally transferred directly from one generation to the next by signing a check (or a deed or a will)."  While African Americans make on the order of 60 to 70 percent of what whites make in income, the median African-American family wealth is just 10 percent of white family wealth.

313.    Affording a community-based preference is another means of achieving student body diversity by admitting more socioeconomically disadvantaged students.  *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* (2014). African Americans and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites.  *See* John R. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics, and Asians in Metropolitan America* (2011), Table 2.

314.    Universities have used this community-based homogeneity to promote racial and ethnic diversity through race-neutral means.  For example, Texas, California, and Florida have adopted "percent plans" that guarantee admission to state universities for top graduates (based on grades) from each high school in the state.  These percentage plans have been successful in promoting community, socioeconomic, and racial diversity.

315.    In addition to statewide percentage plans, a university can achieve student body diversity by granting a preference within their existing admissions framework utilizing other community-based metrics, such as an applicant's zip code.  *See* Danielle Allen, *Talent is Everywhere: Using Zip Codes and Merit to Enhance Diversity*, The Future of Affirmative Action (2014).

JA 92

316.    Studies show that students admitted based on socioeconomic as opposed to racial criteria regularly outperform all other admitted students. These students drop out at lower rates, graduate in shorter time periods, and receive better grades.

317.    The Espenshade-Radford study found that selective private institutions use racial preferences that are two to three times as large as their socioeconomic preferences.

318.    This failure to give weight to socioeconomic preferences is exemplified by Harvard, particularly given the lack of socioeconomic diversity in the student body as compared to racial diversity.

319.    Measured in terms of those students receiving federal Pell Grants, which are awarded to students coming from low-income families, Harvard lags far behind other schools. The percentage of students at Harvard who receive Pell Grants has ranged in recent years from 11 percent to 19 percent. In comparison, universities that employ race-neutral admissions had far greater numbers of Pell Grant recipients, including UCLA (35 percent), UC Berkeley (33 percent), and the University of Florida (30 percent). *2014 National Universities Rankings – Social Mobility*, Washington Monthly (2014).

320.    According to a survey of the 2014 freshman class that *The Harvard Crimson* conducted, 14 percent reported annual family income above $500,000 and another 15 percent came from families making more than $250,000 per year. In contrast, only 20 percent reported incomes less than $65,000. Taking these statistics at face value, they show that a high school student from the top "1 percent" of the income distribution is approximately 35 times more likely to attend Harvard than one from the bottom 50 percent.

76

321.    According to former Harvard president Lawrence Summers, only ten percent of students at selective colleges and universities, including Harvard, come from the bottom half of the income scale.  *See* Harvard University President Lawrence H. Summers Commencement Address (2004).

322.    By contrast, Harvard places far greater weight on an applicant's race— regardless of his or her socioeconomic status or the community of origin.

323.    By increasing the weight given to an applicant's socioeconomic status and/or community of origin, Harvard could achieve student body diversity without resorting to the disfavored tool of racial preferences.

**B.    <u>Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Financial Aid And Scholarships To Attract Minority Candidates.</u>**

324.    Relying on socioeconomic instead of racial preferences at the admissions stage is the first step.  But Harvard needs to ensure that those underprivileged minorities that benefit from socioeconomic preferences are in a position to accept the offer of admission and enroll at Harvard.  To that end, Harvard can achieve student body diversity by increasing its use of financial aid and scholarships.

325.    Colleges and universities that have eliminated racial preferences have maintained or increased student body diversity by offering more financial aid to socioeconomically disadvantaged students.  For example, the University of California system, which does not use race-based preferences, covers system-wide tuition for students from families with incomes below $80,000.  The University of California devotes one-third of tuition revenue to financial aid.

326.    Harvard, in contrast, only covers the tuition of students from families with incomes below $65,000.  This is a trivial use of Harvard's vast economic resources.

JA 94

Harvard's $36.4 billion endowment is the largest in the nation; it exceeds the gross domestic product of over 100 nations.  Yet it costs students $43,938 per year in tuition alone, and $58,607 overall per year, to attend Harvard.

327.    Harvard has the economic resources to increase the coverage of full tuition far beyond the current $65,000 threshold.  Doing so would make it possible for underprivileged minorities, especially those in the lower middle class and those who may have slightly higher income levels but less wealth, admitted to Harvard through the increased use of socioeconomic preferences (as opposed to affluent minorities currently admitted due to racial preferences) to be in a position to accept an offer of admission and enroll at Harvard.

C.    **Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through Increased Recruitment And Other Steps Designed To Encourage More Qualified Minority Students To Apply For Admission.**

328.    Harvard can achieve student body diversity by bringing more highly qualified, socioeconomically disadvantaged minorities into its applicant pool.

329.    Across the country, there are tens of thousands of high-achieving, socioeconomically disadvantaged minorities who fail to apply to selective schools, including Harvard, at which they would likely be admitted and at which they would enroll if offered sufficient financial aid.

330.    One study found that between 25,000 and 35,000 socioeconomically disadvantaged high school seniors obtain an SAT or ACT in the 90th percentile or higher and have a GPA of A- or better.  Nearly 6 percent of this group is African American and nearly 8 percent is Hispanic.  A great many of these socioeconomically disadvantaged students "undermatch" by applying to and enrolling at colleges and universities less

78

selective than the ones to which they could have been admitted.  *See* Caroline Hoxby, Christopher Avery, *The Missing "One-Offs": The Hidden Supply of High-Achieving, Low-Income Students*, Brookings Papers on Economic Activity (Spring 2013).

331.   The "undermatch" problem is a serious issue in the Ivy League.  Among the highly selective Ivy League schools studied by Dr. Sander and Ms. Uppala, the applicant pools of these schools included, on average, less than 20 percent of the socioeconomically disadvantaged students in the country with SAT scores above 2100. The rate is even lower for high-scoring, socioeconomically disadvantaged Asian Americans, in which less than 18 percent of such students are, on average, in the applicant pools of the highly selective Ivy League schools.

332.   Universities with race-neutral admissions have increased their student body diversity by improving recruitment of these socioeconomically disadvantaged, high-achieving minority students.  For example, after race-based admissions were eliminated in Texas, the University of Texas at Austin increased its student body diversity by implementing numerous programs designed to recruit students from underrepresented regions and high schools, including "Longhorn Game Weekends," which focus on specific geographic regions, and "Longhorn for a Day," which reaches out to students in underrepresented high schools.

333.   Furthermore, a study found that simply mailing a well-designed, targeted brochure to high-achieving, socioeconomically disadvantaged students could be instrumental in causing them to apply to selective colleges and universities.  *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* 49 (2014).

JA 96

334.    Universities also have achieved student body diversity by aggressively recruiting high-achieving community college students, who are more likely to be African American or Hispanic.  For example, in 1997, after California banned racial preferences, the University of California substantially increased its recruitment and enrollment of community college students.  As a result of the University of California's efforts, by 2012, about 29 percent of new students enrolling in the University of California system were transfers from community colleges.  *See Preparing California for Its Future: Enhancing Community College Student Transfer to the University of California* (2014).

335.    Harvard does little to recruit high-achieving, socioeconomically disadvantaged minority students or high-achieving community college students.

336.    Harvard focuses its recruitment in parts of the country with small numbers of socioeconomically disadvantaged achievers and neglects regions with a significant number of such students.  For example, Harvard recruits heavily in New England, which has only 3.5 percent of low-income high achievers nationwide, yet neglects Midwest and Rocky Mountain states, which produce 21.2 percent of these students.

337.    This failure to recruit socioeconomically disadvantaged students is reflected in Harvard's applicant pool.  Although there are more than 10,000 high schools in the country that have students with the credentials to be admitted to Harvard, only a small fraction of these schools have students who ultimately apply to Harvard.

338.    In addition, community college transfer students are a miniscule percentage of Harvard's student body.  Each year, Harvard accepts fewer than three students from community colleges across the country.

JA 97

339.    Harvard officials have flatly conceded that they make little effort to recruit students from community colleges and other nontraditional educational backgrounds. *See* Arianna Markel, *Harvard Lags in Community College Recruitment*, The Harvard Crimson (Dec. 12, 2007).

340.    Harvard could achieve its student body diversity without the use of racial preferences by improving its recruitment of socioeconomically disadvantaged, high-achieving minorities, and community college students.

**D.    Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through The Elimination Of Admissions Policies And Practices That Harm Minority Applicants.**

341.    Harvard employs a series of admissions practices and policies that make it more difficult for socioeconomically disadvantaged minorities to gain admission. Eliminating these practices and policies would allow Harvard to achieve student body diversity without using racial preferences.

342.    Harvard grants an admissions preference to "legacy" applicants.

343.    The acceptance rate for legacy applicants to Harvard is about 30 percent, which is roughly five times the rate at which all other applicants are admitted to Harvard.

344.    At most universities throughout the country, including Harvard, alumni children are less likely to be socioeconomically disadvantaged or racial minorities than the rest of the student body.  Thus, colleges and universities, like Harvard, that grant admissions preferences to legacies give a competitive advantage to mainly white, wealthy applicants, while undermining the chances for admission of socioeconomically disadvantaged and minority applicants.  *See* John Brittain and Eric L. Bloom, *Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic*

*Ideal on Students of Color in College Admissions*, Affirmative Action for the Rich (2010).

345.    As a consequence, eliminating legacy preferences in conjunction with other race-neutral admissions policies can achieve student body diversity.   Several universities, including Texas A&M University, the University of Georgia, and the University of California, have increased their student body diversity by ending their practice of favoring legacies in the admissions process in conjunction with the elimination of racial preferences.

346.    Furthermore, one study found that eliminating legacy preferences in combination with other race-neutral admissions criteria could more than double African-American and Hispanic enrollment and more than triple the enrollment of socioeconomically disadvantaged students.  *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014).

347.    Harvard can achieve student body diversity without using racial preferences by eliminating legacy admissions preferences in conjunction with other race-neutral measures.

348.    Eliminating legacy preferences is a workable race-neutral strategy. Research finds that the existence of legacy preferences does not increase alumni donations to an institution.  *See* Chad Coffman, Tara O'Neil, and Brian Starr, *An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities*, Affirmative Action for the Rich (2010).

JA 99

349.    Harvard also grants admissions preferences to non-legacy students whose parents make significant donations to Harvard, notwithstanding its $36.4 billion endowment.

350.    For example, a wealthy New Jersey real estate developer who did not attend Harvard pledged $2.5 million to Harvard in 1998.  That same year, his son applied to Harvard, even though he did not take demanding classes in high school and his test scores were below Ivy League standards.  His son's high school advisors were "surprised when he applied to Harvard—and dismayed when he was admitted."

351.    As one of his advisors explained, "[t]here was no way anybody in the administrative office of the school thought he would on the merits get into Harvard.  His GPA did not warrant it, his SAT scores did not warrant it.  We thought for sure, there was no way this was going to happen.  Then, lo and behold, [he] was accepted.  It was a little bit disappointing because there were at the time other kids we thought should really get in on the merits, and they did not."

352.    Minority students are far less likely to be children of wealthy donors.  Thus, colleges and universities, like Harvard, that grant admissions preferences to children of wealthy donors give a competitive advantage to mainly white applicants while undermining the chances for admission of minority applicants.

353.    Harvard's preferences for legacies and children of wealthy donors often operate in tandem to the detriment of minority applicants.  For example, one applicant, who was a fifth-generation Harvard legacy, scored 1440 on her SATs, which is below Harvard's average, and ranked in the second quartile her high school class.  Before she applied to Harvard, her father donated $1 million to the university and pledged an

additional $5 million in future years.  Shortly after her junior year, the applicant's father arranged for her to meet the Dean of Admissions, William Fitzsimmons.  She was admitted to Harvard the following year.

354.    When asked whether it was fair that she was admitted, she stated that legacy preferences are a "valid thing for a college to do.  Any college has to be careful about the students it lets in from a social perspective.  If you let in too many of any one group, it can affect social cohesiveness.  At one time, Harvard had too many Asian American students….  It's important to Harvard to have people who know what it means to work hard, make good friends, and go out at night.  A lot more alumni children are well-rounded kids, probably because they come from more stable families."

355.    Harvard can achieve student body diversity without using racial preferences by eliminating admissions preferences for children of wealthy donors, both legacies and non-legacies, in conjunction with other race-neutral measures.

356.    Harvard also operates a unique form of admissions known as the "Z-list." The Z-list is an admissions process under which Harvard admits a select group of students on the condition that they take a year off before enrolling in Harvard.

357.    Harvard admits between 20 and 50 students through the Z-list every year.

358.    Harvard principally uses the Z-list to admit legacies and children of affluent families who cannot gain admission through the ordinary course and who can afford to take a year off before enrolling in college.

359.    In 2010, *The Harvard Crimson* interviewed 28 students admitted under the Z-list.  Of these students, 18 were children of Harvard alumni and all but four received no financial aid from Harvard.

JA 101

360.    Students admitted through the Z-list are overwhelmingly wealthy and white, and have a worse academic record than the rest of the student body.

361.    For example, in 2006, Harvard used the Z-list to admit the granddaughter of a Harvard alumnus who had endowed a professorship in computer science, even though she had inferior admissions credentials.   By contrast, one of her high school classmates, Jennifer Soo Hoo, who is of Chinese descent, had comparatively outstanding credentials: she was a Cum Laude Society member, an Advance Placement Scholar, a National Merit Scholar, an all-conference center back on the soccer team, and scored a 34 out of 36 on the ACT.   Jennifer was rejected by every Ivy League school to which she applied.

362.    Harvard can achieve student body diversity without using racial preferences by eliminating Z-list admissions in conjunction with other race-neutral measures.

363.    Finally, Harvard admits applicants through an early admission program. Early admissions is a practice in which schools allow students to submit their application in the early Fall if they apply to only one school or promise to attend the school if admitted.

364.    Early admission programs, like Harvard's program, usually benefit wealthier and better-informed students because these students have the resources to submit their application early and do not need to hold out for the prospect of financial aid.  *See* Justin Pope, *Harvard Drops Early Admissions, Saying They Favor Wealthier Students Over Minorities, Poor*, Associated Press (Sept. 12, 2006).

JA 102

365.    By contrast, socioeconomically disadvantaged students and minorities face a disadvantage under early admission programs because they often receive inadequate information and counseling and lack the economic resources to commit to a school so early in the process.

366.    Because early admissions undermine the chances of socioeconomically disadvantaged and minority applicants, in 2006, Harvard terminated this program. According to Harvard's then-President Derek Bok, "We think this will produce a fairer process because the existing process has been shown to advantage those who are already advantaged."

367.    Similarly, Dean of Admissions William Fitzsimmons supported ending early admissions because "[t]here are lots of very talented students out there from poor and moderate-income backgrounds who have been discouraged by this whole hocus-pocus of early admissions."

368.    Harvard reinstated early admissions in 2011.  The reintroduction of early admissions has again hurt the ability of socioeconomically disadvantaged and minority students to apply and be admitted to Harvard.

369.    Harvard can achieve student body diversity without using racial preferences by eliminating its early admission program in conjunction with other race-neutral measures.

**E.    Achieving Student Body Diversity Through Race-Neutral Means Eliminates The Heavy Cost Imposed By The Use Of Racial Preferences.**

370.    Any assessment of the feasibility of race-neutral alternatives must also take into account the heavy costs of *not* employing them.  The costs of continuing to use

racial preferences, when workable race-neutral alternatives exist, are high from both a legal and a practical perspective.

371.    As a legal matter, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect."  *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) (citations and quotations omitted).

372.    As a result, the Fourteenth Amendment, and therefore Title VI, "forbids the use even of narrowly drawn racial classifications except as a last resort."  *Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

373.    Harvard's practice of labeling all applicants according to broad racial categories illustrates why such classifications are pernicious and always create the "danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics."  *Croson*, 488 U.S. at 493.

374.    These racial categories lump together students in categories such as "African American" or "Hispanic" or "Asian American," even though they come from vastly different cultures, experiences, and backgrounds.

375.    For example, Harvard's category of "Asian Americans" comprises roughly 60 percent of the world's population, including individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, and Indian descent.

376.    While many Asian Americans have been in the United States for generations, others are recent immigrants or children of immigrants.  Some Asian Americans came to the United States to escape communism, authoritarianism, war, and

JA 104

poverty, while others simply sought out greater opportunities.  Some Asian Americans come from highly educated families, but many others do not.

377.    Asian Americans also have a wide range of religious beliefs, including Christianity, Islam, Buddhism, Judaism, Hinduism and many others.  Some come from cultures that aggressively promote education, while many others come from cultures that take a less demanding approach.

378.    Thus, for example, Indian-American students are different from Japanese-American students; Vietnamese-American students are different from Chinese-American students; and students from Mainland China, Hong Kong, and Taiwan all have unique perspectives and cultural experiences.

379.    Given this diversity, it is lamentable for Harvard to lump all Asian Americans together in the admissions process.  Yet this categorization is the inevitable byproduct of using group-based racial classifications instead of employing race-neutral alternatives that are able to account for the vast differences among applicants.

380.    Racial classifications also have a stigmatizing effect on the supposed beneficiaries of these policies.  Irrespective of whether an individual African-American or Hispanic applicant is admitted to Harvard because of a racial preference, so long as racial preferences exist, it will often be assumed that race is the reason for the applicant's admission to the school.  This stigma can have a devastating effect on the psyche of impressionable students.

381.    For example, according to one African American who attended an elite liberal arts college, upon arriving at school, "I was immediately stereotyped and put into a box because I was African-American.  And that made it harder to perform. . . .  There

was a general feeling that all blacks on campus were there either because they were athletes or they came through a minority-recruitment program and might not really belong there."  Shaken by the experience, the student dropped out after his freshman year.

382.   Harvard can eliminate the harmful effects these unfair stereotypes cause by using race-neutral alternatives.

383.   Finally, the "mismatch effect" of racial preferences far too frequently put the supposed beneficiaries of race-based admissions policies in a position where they cannot succeed academically in order to fulfill the university's social-engineering vision.

384.   This "mismatch" effect happens when a school employs such a large admissions preference that the student is academically damaged in a variety of ways by being placed in an academic environment where most of the student's peers have substantially stronger levels of academic preparation.

385.   For example, a student who would flourish at a less elite school instead finds himself or herself at Harvard, where the professors are not teaching at a pace designed for him or her.  Instead, they are teaching to the "middle" of the class, introducing terms and concepts at a speed that is unnerving even to the best-prepared student.

386.   The student who is underprepared relative to others in that class falls behind from the start and becomes increasingly lost as the professor and classmates race ahead.  The student's grades on his or her first exams or papers put him or her at the bottom of the class.  Worse, the experience may well induce panic and self-doubt,

JA 106

making learning even more difficult, thus creating a vicious cycle that only exacerbates the problem.

387.   The "mismatch effect" has been documented in dozens of studies.  *See, e.g.*, Peter Arcidiacono, Esteban M. Aucejo, and Ken Spenner, *What Happens After Enrollment? An Analysis of the Time Path of Racial Differences in GPA and Major Choice* (2011); U.S. Commission on Civil Rights, *Encouraging Minority Students to Pursue Science, Technology, Engineering and Math Careers, Briefing Report* (October 2010); Richard Sander and Roger Bolus, *Do Credential Gaps in College Reduce the Number of Minority Science Graduates?* (2009); Richard Sander, *A Systemic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004); Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003); Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions,* 37 Research in Higher Education 681 (1996).

388.   As this research demonstrates, African-American college freshmen are more likely to aspire to science or engineering careers than are white freshmen, but mismatch causes African Americans to abandon these fields at twice the rate of whites.

389.   As a consequence, African Americans who start college interested in pursuing a doctorate and an academic career are twice as likely to be derailed from this path if they attend a school where they are mismatched.

390.   Furthermore, about half of African-American college students rank in the bottom 20 percent of their classes.

391.    Mismatch also creates social problems on campus.  The academic research shows that interracial friendships are more likely to form among students with relatively similar levels of academic preparation; thus, African Americans and Hispanics are more socially integrated on campuses where they are less academically mismatched.

392.    Harvard has and is continuing to experience the problems associated with the "mismatch" effect as documented in major, unrebutted empirical studies that either included Harvard or included studies of close peer institutions.

393.    "Academic mismatch" has been documented at Harvard by sociologists Stephen Cole and Elinor Barber.  *See* Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003).  Cole and Barber undertook their research in large part at the urging of Harvard President Neil Rudenstein, and the Council of Ivy League Presidents financially supported their work.  The purpose of the study was to understand why there were so few underrepresented minorities—particularly African Americans—in the academic pipeline leading to university faculty positions.

394.    Cole and Barber found that a prime cause of the constrained pipeline was academic mismatch.  Promising African American and Hispanic students who were interested in academic careers sought to go to selective colleges.  Through the operation of racial preferences, these students often found themselves being admitted and courted by super-elite colleges, and often unwittingly found themselves at schools where their level of academic preparation was far below the median.  In these environments, the students survived but did not flourish.  Their grades tended to be well below the median, and in large numbers they soured on the prospect of pursuing a career in academia.  The study found that otherwise similar students who went to less elite schools—such as

flagship state universities—performed better and retained their interest in academic careers at much higher rates.

395.    Harvard also has a documented "mismatch" problem in the sciences.  In 2004, two psychologists at the University of Virginia published a peer-reviewed study of minority attrition in the sciences.  *See* Frederick L. Smyth and John J. McArdle, *Ethnic and Gender Differences in Science Graduation at Selective Colleges With Implications For Admission Policy and College Choice*, Research In Higher Education, Vol. 45, No. 4 (June 2003).  These scholars gained permission to use the College and Beyond dataset assembled by the Mellon Foundation.  This dataset, which included comprehensive data from several Ivy League colleges (Columbia, Princeton, and Yale) as well as approximately twenty less selective schools, served as the basis for the well-known study of affirmative action, The Shape of the River (1998).

396.    Smyth and McArdle examined what factors affected the success of students in science, technology, engineering, and math ("STEM") fields of study.  They found that a critical factor was a student's academic preparation relative to her peers. Moreover, they found that this effect was essentially identical for white, African American, and Hispanic students.  In all cases, students who attended a school where their level of academic preparation was substantially lower than those of their peers were far more likely to drop out of STEM fields as compared to identical students who attended schools where their relative peer position was higher.  The effect was so large that Smyth and McArdle advised high school counselors to take potential mismatch into account in helping students understand the pros and cons of attending "reach" schools.

397.   In 1996, a group of researchers at Dartmouth University, led by Dartmouth psychologist Rogers Elliott, published a peer-reviewed study that examined rates of STEM attrition at four Ivy League colleges.  *See* Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions*, 37 Research in Higher Education 681 (1996).  They found that although African-American freshmen aspired to STEM majors at roughly the same rate as other students, only about 10 percent of African-American aspirants actually achieved bachelor degrees in STEM fields.  Many of these students switched to majors in the humanities and social sciences; some failed to graduate at all.  The study found that a principal reason for the high attrition rate of African Americans was their relative position among a group of peers who generally had much higher levels of academic preparation, and could thus compete effectively in the demanding, sequential, rigorously graded STEM curricula.

398.   Harvard has disregarded the "mismatch effect" that is harming the many African American and Hispanic students who are admitted to and enroll at Harvard because of its large admissions preference.

399.   Harvard can eliminate this harmful mismatch and allow students to excel at schools for which they are most prepared by eliminating the use of racial preferences and employing race-neutral alternatives that bring high-performing, socioeconomically disadvantaged minorities into the applicant pool.

## XI.   GOVERNING LAW

400.   Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

401.    Under Title VI, "the term 'program or activity' and the term 'program' mean all of the operations … of a college, university, or other postsecondary institution, or a public system of higher education … any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d-4a.

402.    An institution that accepts federal funds violates Title VI when it engages in racial or ethnic discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *See Gratz v. Bollinger*, 539 U.S. 244, 257 n.23 (2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.") (citing *Alexander v. Sandoval,* 532 U.S. 275, 281 (2001)).

403.    The Fourteenth Amendment provides, in relevant part, that no person shall be denied "the equal protection of the laws." The "central mandate" of equal protection is "racial neutrality" by the government or institution subject to the Fourteenth Amendment. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "Whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

404.    "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted).

Thus, "any official action that treats a person differently on account of race or ethnic origin is inherently suspect." *Id*. (citation and quotations omitted). In other words, "because racial classifications so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." *Id*. (citations and quotations omitted).

405.   "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227.  "Strict scrutiny is a searching examination, and it is the government [or institution subject to the Fourteenth Amendment through Title VI] that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted).  Strict scrutiny thus requires a "detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." *Adarand*, 515 U.S. at 227.

406.   In particular, strict scrutiny requires a "detailed examination, both as to ends and to means." *Adarand*, 515 U.S. at 236.  When those governmental or other institutions subject to the Fourteenth Amendment directly or through Title VI implement policies and practices that "touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

407.   Racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." *Grutter*, 539 U.S. at 326.

JA 112

408.    "Strict scrutiny requires the university to demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to accomplish that purpose." *Fisher*, 133 S. Ct. at 2418.

409.    To meet strict scrutiny, the end must be "compelling"—not merely legitimate or important.  To be narrowly tailored, "the means chosen" must "fit" the unmet compelling interest "so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493 (citations and quotations omitted).  In other words, "racial classifications, however, compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342.

410.    "To survive strict scrutiny," moreover, the institution "must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).  The institution must establish the necessity of using race by a "strong basis in evidence" because "the mere recitation" of a compelling interest is "not an automatic shield which protects against any inquiry" into the justification for race-based action." *Croson*, 488 U.S. at 495, 500.

411.    Strict scrutiny "forbids the use even of narrowly drawn racial classifications except as a last resort." *Id.* at 519 (Kennedy, J., concurring in part and concurring in the judgment).

412.    An institution's use of race or ethnicity that is in any way motivated by "prejudice or stereotype" against a particular group violates the Fourteenth Amendment and therefore violates Title VI. *Croson*, 488 U.S. at 493.  "[T]he Equal Protection Clause

prohibits a State [or institution subject to the Fourteenth Amendment through Title VI] from taking any action based on crude, inaccurate racial stereotypes." *Batson v. Kentucky,* 476 U.S. 79, 104 (1986); *see also Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir. 1999) ("Title VII's prohibition against 'disparate treatment because of race' extends both to employer acts based on conscious racial animus and to employer decisions that are based on stereotyped thinking or other forms of less conscious bias.").

413.     In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). The Supreme Court has identified five, non-exhaustive "subjects of proper inquiry in determining whether racially discriminatory intent existed" based on circumstantial evidence. *Id.* at 268.

414.   First, the Court looks to whether the policy, notwithstanding its purportedly neutral rationale, "bears more heavily on one race than another. . . . Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* at 266.

415.   Second, the Court looks to "the historical background" of the policy, "particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.

JA 114

416.    Third, "[t]he specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes." *Id.*

417.    Fourth, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.  Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*

418.    Fifth, and last, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268.

419.    Even if not motivated by prejudice or stereotype, a racial classification violates the Fourteenth Amendment and therefore violates Title VI if it is a quota.  In the educational setting, then, "universities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks.  Nor can universities insulate applicants who belong to certain racial or ethnic groups from the competition for admission." *Grutter*, 539 U.S. at 334 (citation omitted).

420.    Moreover, a university's policy violates the Fourteenth Amendment and therefore violates Title VI if it amounts to "racial balancing,  which is patently unconstitutional." *Id.* at 329.  Racial balancing is a program designed "to assure within [the school's] student body some specified percentage of a particular group merely because of its race or ethnic origin." *Id.* (citations and quotation omitted).  "[P]roportional representation" is never a constitutional "rationale for programs of preferential treatment." *Id.* at 343.

JA 115

421.    The only interest in using racial preferences in higher education that the Supreme Court has accepted as "compelling" is the interest "in obtaining the educational benefits that flow from a diverse student body." *Grutter*, 539 U.S. at 343.  Redressing past discrimination does "not serve as a compelling interest, because a university's broad mission of education is incompatible with making the judicial, legislative, or administrative findings of constitutional or statutory violations necessary to justify remedial racial classification." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

422.    The interest in student body diversity the Supreme Court has found compelling "is not an interest in simply ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Fisher*, 133 S. Ct. at 2418 (citation and quotations omitted).  "[C]ritical mass is defined by reference to the educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330.

423.    Even in the pursuit of critical mass, the Supreme Court has permitted race to be used only as a "plus" factor in admissions decisions. *Id.* at 333.  "[I]t remains at all times the University's obligation to demonstrate, and the Judiciary's obligations to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Fisher*, 133 S. Ct. at 2418 (quoting *Grutter*, 539 U.S. at 337).  Thus, even if "the University has established that its goal of diversity is consistent with strict scrutiny, … there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation.  The University must

99

prove that the means chosen by the University to attain diversity are narrowly tailored to that goal." *Id*. at 2419-20.

424.    "Narrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity. This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Id*. at 2420 (internal citation omitted). Accordingly, strict scrutiny uniformly "require[s] a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" *Id.* (quoting *Grutter*, 539 U.S. at 339- 340).

425.    "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If a nonracial approach … could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Id*. (citations and quotations omitted).

426.    As a consequence, "strict scrutiny imposes on the university the ultimate burden of demonstrating, *before turning to racial classifications*, that available, workable race-neutral alternatives do not suffice." *Id*. (emphasis added).

## XII.    CLAIM FOR RELIEF

427.    Harvard's use of racial preferences in undergraduate admissions violates Title VI of the Civil Rights Act of 1964.  Plaintiff should be granted relief on that claim for a host of reasons.  First, Harvard is intentionally discriminating against Asian-American applicants.  Second, Harvard is engaging in racial balancing.  Third, Harvard's

use of racial preference is not narrowly tailored because Harvard is not pursuing the critical-mass interest found permissible in *Grutter*. Fourth, Harvard's use of racial preferences is not narrowly tailored because Harvard is not using this disfavored tool merely to fill the "few places" left in its incoming class contrary to the "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke*. Fifth, Harvard is not fully utilizing a number of race-neutral alternatives that can achieve student body diversity. Finally, whether or not Harvard is found to be acting permissibly under Supreme Court precedent, the Supreme Court should overrule any decision holding that the Fourteenth Amendment and therefore Title VI ever permits the use of racial preferences to achieve "diversity."

## COUNT I

**Violation of 42 U.S.C. § 2000d *et seq.*
(Intentional Discrimination Against Asian Americans)**

428.   Plaintiff incorporates the allegations and averments contained in paragraphs 1-427 as if fully set forth herein.

429.   Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that intentionally discriminates against Asian-American applicants on the basis of race or ethnicity.

430.   Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the

Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,'" and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

431.    Title VI is privately enforceable.

432.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

433.    An institution's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group violates the Fourteenth Amendment and therefore violates Title VI.

434.    Harvard has intentionally discriminated against Asian-American applicants for admission on the basis of race or ethnicity based on prejudicial and stereotypical assumptions about their qualifications.

435.    Harvard officials have made prejudicial and stereotypical statements about Asian-American applicants for admission.  Among other things, Harvard officials have made racially stereotypical statements assuming that, as a group, Asian Americans all have same academic interests, experiences, and personal attributes and that Asian Americans, as a group, lack certain qualities that Harvard values.

JA 119

436.    Harvard's admissions system has a disproportionately negative effect on Asian-American applicants for admission that is not explainable on grounds other than intentional discrimination on the basis of race or ethnicity.  As the statistical evidence demonstrates, Asian Americans are underrepresented at Harvard in relation to their share of the applicant pool and are massively underrepresented in relation to the share of the highly qualified portion of Harvard's applicant pool.  Asian Americans represent roughly 46 percent of the highly qualified portion of Harvard's applicant pool, yet they represent only about 17 percent of those admitted and/or enrolled at Harvard over a multi-year period.

437.    Harvard has a long and unfortunate history of intentional discrimination on the basis of race or ethnicity, including a history of intentional discrimination against Asian Americans.  The Harvard Plan itself is a product of admissions policies created to advance an invidious purpose.  Harvard has a history of using the rubric of "holistic" admissions in general, and the Harvard Plan in particular, to limit the admission of Jewish applicants and other minority groups.  Indeed, Harvard is using the same pretextual excuses to justify its disparate treatment of Asian Americans that it used to deny that it was discriminating against Jewish applicants in the past.  In short, Harvard's intentional discrimination against Asian-American applicants exhibits the same pattern as its previous discrimination against Jewish applicants.

438.    Harvard's departure from its normal procedures, including its abrupt decision to no longer make public the application figures grouped by racial category, demonstrates that steps were taken for the improper purpose of engaging in intentional discrimination on the basis of race or ethnicity.

JA 120

439.    Harvard's substantive decision to abandon or place considerably less reliance, when it comes to Asian Americans, on the academic factors it usually considers important for purposes of granting or denying admission demonstrates that Harvard is engaging in intentional discrimination on the basis of race or ethnicity.

440.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

441.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

442.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## <u>COUNT II</u>

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Racial Balancing)

443.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-442 as if fully set forth herein.

444.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an

undergraduate admissions policy that balances the class according to its racial or ethnic composition.

445.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

446.    Title VI is privately enforceable.

447.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

448.    A university that uses its admissions system to pursue quotas or proportional representation of racial or ethnic groups either in the entering class or in the overall student body violates the Fourteenth Amendment and therefore violates Title VI.

JA 122

449.    The remarkable stability of Harvard's admissions figures across racial and ethnic groups—especially in the overall student body—demonstrates that Harvard is seeking proportional representation and therefore is engaged in racial balancing.

450.    There is no non-discriminatory reason that could justify admissions figures this stable across all racial groups over a period of several years given the unique characteristics of each applicant for admission.  If Harvard were truly treating each applicant for admission as an individual, as it professes to do, "[o]ne would expect the percentage of specified minority enrollees produced by such a such a system to vacillate widely from year to year, reflecting changes in each year's applicant pool."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 382 n.13 (1979).  That is not happening.

451.    The pursuit of "critical mass" could never justify admissions figures this stable given the balancing that occurs between African-American and Hispanic applicants.  But even if the pursuit of "critical mass" led to stable admissions figures for African Americans and Hispanics, which it did not, that would not provide a non-discriminatory explanation for why the white and Asian-American admissions and enrollment figures have been this stable over a multi-year period.

452.    The stability of Harvard's admission and enrollment figures across all racial groups notwithstanding the massive changes in the racial and ethnic makeup of Harvard's admissions pool over time—especially the significant increase in highly qualified Asian-American applicants—confirms that Harvard is engaged in racial balancing.

106

453.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

454.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

455.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

**Violation of 42 U.S.C. § 2000d *et seq*.**
**(Failure To Use Race Merely As A "Plus" Factor In Admissions Decisions)**

456.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-455 as if fully set forth herein.

457.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., by employing an undergraduate admissions policy that is not narrowly tailored because it does not use race merely as a "plus" factor in order to achieve student body diversity.

458.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for

JA 124

violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,'" and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

459.    Title VI is privately enforceable.

460.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

461.    Harvard is not complying with the requirement of narrow tailoring because it is not using race merely as a "plus" factor in admissions decisions in order to achieve student body diversity.

462.    The statistical evidence shows that each applicant for admission is not evaluated as an individual.  Instead, race or ethnicity is the defining feature of the application.  That is especially true for Asian-American applicants.  Only using race or ethnicity as a dominant factor in admissions decisions could account for the remarkably low admission rate for high-achieving Asian-American applicants.

463.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

464.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

465.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### COUNT IV

**Violation of 42 U.S.C. § 2000d *et seq*.**
**(Failure To Use Race To Merely Fill The Last**
**"Few Places" In The Incoming Freshman Class)**

466.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-465 as if fully set forth herein.

467.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., by employing an undergraduate admissions policy that is not narrowly tailored because it does not merely use race as a factor in filling the last "few places" in the entering freshman class.

468.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for

JA 126

violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

469.    Title VI is privately enforceable.

470.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

471.    In its *Bakke amicus* brief, Harvard informed the Supreme Court that it was using race as a factor in admissions decisions only when it had "a few places left to fill" in the entering freshman class. But to the extent that Harvard ever used race in this way, given that the Harvard Plan itself was the product of racial and ethnic discrimination, it clearly is no longer using race in this fashion.

472.    In its *Fisher amicus* brief, Harvard stated that it uses admissions "policies similar to the Harvard Plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*." But an admissions policy similar in any fashion to the plan employed by the University of Michigan Law School by definition

110

uses race beyond filling the remaining few places. In such a plan, race is—to one degree or another—a factor for every applicant as it is ostensibly being used to pursue a "critical mass" of underrepresented minorities in the overall student body.

473.    Moreover, the statistical evidence demonstrates that Harvard is not using race merely to fill the last few places in the entering freshman class. Rather, especially for Asian Americans, race or ethnicity is a factor in admissions decision far beyond those competing for the last few places. Only using race or ethnicity as a dominant factor in admissions decisions could account for the remarkably low admission rate for high-achieving Asian-American applicants.

474.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

475.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

476.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT V

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Race-Neutral Alternatives)

477.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-476 as if fully set forth herein.

478.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity.

479.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

480.    Title VI is privately enforceable.

JA 129

481.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

482.    Harvard's use of racial preferences is narrowly tailored only if using them is necessary to achieve student body diversity.  If Harvard can achieve student body diversity without resorting to racial preferences, it is required to do so as a matter of law. Moreover, Harvard must have a strong basis in evidence that a non-racial approach will not work about as well as a race-based approach *before* turning to the use of racial preferences.

483.    There is no evidence that Harvard studied all of the available race-neutral alternatives and had a strong basis in evidence that none would work about as well as a race-based approach *before* turning to racial preferences.  Indeed, Harvard claims that it has been using racial preferences—to one degree or another—continuously for nearly a century.

484.    Whether Harvard considered them all or not, there are a host of race-neutral alternatives that if implemented can achieve student body diversity without resorting to racial preferences.   Among these alternatives, both individually and collectively, are (a) increased use of non-racial preferences, (b) increased financial aid, scholarships, and recruitment efforts, and (c) elimination of admissions policies and practices that negatively affect minority applicants.

485.    The use of race-neutral alternatives instead of racial preferences would not only achieve student body diversity, it would eliminate the heavy costs that using race as

JA 130

a factor in admissions decisions imposes on minority applicants who receive such admissions preference, the Harvard community, and society as a whole.

486.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

487.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

488.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VI

### Violation of 42 U.S.C § 2000d *et seq.*
### (Any Use of Race As A Factor In Admissions)

489.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-488 as if fully set forth herein.

490.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that uses race as a factor in admissions.

114

491.　Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.　*See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

492.　Title VI is privately enforceable.

493.　Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

494.　The Supreme Court's decisions holding that there is a compelling government interest in using race as a factor in admissions decisions in pursuit of "diversity" should be overruled.　Those decisions were wrongly decided at the time they were issued and they remain wrong today.　"Diversity" is not an interest that could ever justify the use of racial preferences under the Fourteenth Amendment and Title VI.

JA 132

495.    Even if there were a compelling government interest in "diversity" in the abstract, however, the use of racial preferences in the educational setting nevertheless should be forbidden for several important reasons.

496.    The Supreme Court's jurisprudence in this area has been built on mistakes of fact and law.    The Supreme Court first accepted the use of racial preferences in admissions on the assumption that they would be used consistent with the Harvard Plan, which purported to use race merely as a contextual factor in filling the final few places in the entering class.    But the Harvard Plan itself was created in order to hide racial and ethnic discrimination.    Thus, it is far from certain that Harvard has *ever* used race in the way the Supreme Court envisioned.

497.    "The raison d'être for race-specific affirmative action programs has simply never been diversity for the sake of education."    Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 407 (1979).    It is instead "a clever post facto justification for increasing the number of minority group students in the student body." *Id.*

498.    In any event, neither Harvard nor any other college or university uses race in this manner now.    Instead, colleges and universities, including Harvard, claim to use race in order to pursue a "critical mass" of underrepresented minorities in the student body.    But Harvard, and many others, are not pursuing this interest.    Even when this interest is actually being pursued, moreover, it is nothing more than racial balancing in that it necessarily seeks to ensure a proportional number of students of certain races or ethnicities in the entering class.    Critical mass is a formula for ensuring "a specified

116

percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Bakke*, 438 U.S. at 315 (Powell, J.).

499.    Ultimately, there is overwhelming evidence that colleges and universities will take advantage of any leeway given by the Supreme Court to use the dangerous tool of racial preferences in inappropriate ways. The experience with Harvard confirms that, if given the chance, colleges and universities will use racial preferences "for the ostensible purpose of enhancing education diversity of the student body" with the true "goal of simply increasing the number of minority persons in the universities and in the professions that these universities feed." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

500.    There simply is no practical way to ensure that colleges and universities will use race in their admissions processes in any way that would meet the narrow tailoring requirement. The strong medicine of strict scrutiny has proven insufficient to ensure that the Fourteenth Amendment and Title VI operate in conformity of racial neutrality except in those rare circumstances that justify the use of this disfavored remedy. Time after time, district courts and the courts of appeals have been either unwilling or unable to force these colleges and universities to provide a strong evidentiary basis for their conclusion that use of racial preferences is *necessary* to achieve diversity. Nor have they been willing to engage in the close review of admissions programs to ensure that schools are treating each applicant as an individual.

JA 134

501.    There also have been important factual developments since this question was last considered by the Supreme Court.  There is now much evidence that race-neutral alternatives can achieve the benefits of diversity.  This is crucially important in light of the equally compelling evidence that racial preferences impose significant costs on the university community, society in general, and the very minority students these programs are purported to benefit.

502.    In the end, the costs of allowing the use of racial preferences in admissions decisions—even in a limited way—far exceed any rapidly diminishing benefits.  No principle of *stare decisis* counsels in favor of retaining decisions allowing their use.  Those decisions were not well reasoned, were predicated on mistakes of fact, have been undermined by more recent developments, and have proven to be unworkable.  Any decision allowing the use of racial preferences in the educational setting should be overruled.

503.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

504.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

JA 135

505.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff, Students for Fair Admissions, Inc., prays for the following relief as to all counts:

(a)    A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that Harvard's admissions policies and procedures violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*;

(b)    A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that any use of race or ethnicity in the educational setting violates the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*;

(c)    A permanent injunction prohibiting Harvard from using race as a factor in future undergraduate admissions decisions;

(d)    A permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission;

(e)    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

(f)    All other relief this Court finds appropriate and just.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all triable issues.

JA 136

Respectfully submitted,

By: _____

Paul M. Sanford BBO #566318                    William S. Consovoy
Benjamin C. Caldwell BBO #67506                Thomas R. McCarthy
BURNS & LEVINSON LLP                           J. Michael Connolly
One Citizens Plaza, Suite 1100                 CONSOVOY MCCARTHY PLLC
Providence, RI 02903                           3033 Wilson Boulevard
Tel: 617-345-3000                              Suite 700
Fax: 617-345-3299                              Arlington, Virginia 22201
psanford@burnslev.com                          Tel: 703.243.4923
bcaldwell@burnslev.com                         Fax: 703.243.4923
                                               will@consovoymccarthy.com
                                               tom@consovoymccarthy.com
                                               mike@consovoymccarthy.com

                                               *Counsel for Plaintiff Students for Fair
Dated: November 17, 2014                       Admissions, Inc.*

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff,

v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION); and THE
HONORABLE AND REVEREND THE BOARD OF
OVERSEERS,

Defendants.

Civil Action No. _____

## DECLARATION OF EDWARD J. BLUM

Edward J. Blum, pursuant to 28 U.S.C. § 1746, declares the following:

1.    I am an individual over twenty-one years of age, and of sound mind, who has never been convicted of a felony, is capable of making this declaration, and am fully competent to declare as to matters stated herein.

2.    I am the President of Students for Fair Admissions, Inc. ("SFFA"), which is an Internal Revenue Code Section 501(c)(3) organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means.  More specifically, SFFA seeks to promote and protect the right of the public to be free from discrimination on the basis of race in higher education admissions.

3.    SFFA is a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their parents, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions. SFFA has members throughout the country.

1

4.    SFFA has at least one member ("Applicant") who applied for and was denied admission to Harvard's 2014 entering class.

5.    Applicant is Asian American.

6.    Applicant's parents are first-generation immigrants to the United States from China.

7.    Applicant graduated from high school ranked 1 out 460 students by weighted and un-weighted grade point average.

8.    U.S. News and World Report ranks Applicant's high school in the top 5% in the United States.

9.    Applicant achieved a perfect score of 36 on the ACT.  Applicant achieved a perfect score of 800 for SAT II History and a perfect score of 800 for SAT II Math.

10.    Among other academic achievements, Applicant was named an AP Scholar with distinction, a National Scholar, and a National Merit Scholarship semifinalist.

11.    While in high school, Applicant participated in numerous extracurricular and volunteer activities.  Among other things, Applicant was captain of the varsity tennis team, volunteered at a community tennis camp, volunteered for the high school's student peer tutoring program, was a volunteer fundraiser for National Public Radio, and traveled to China as part of a program organized by the United States Consulate General and Chinese American Students Education and Exchange to assist students in learning English writing and presentation skills.

12.    Applicant was denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.

13.     Applicant was accepted to and has enrolled at a university that is ranked in the Top 20 in the nation by U.S. News and World Report.  That university does not grant an admissions preference on the basis of race or ethnicity.

14.     Applicant is ready, able, and intends to seek to transfer to Harvard when it ceases the use of race or ethnicity as an admissions preference and ceases its intentional discrimination against Asian Americans.

15.     SFFA has members who are currently in high school and intend to apply for admission to Harvard ("Future Applicants").  Some of these Future Applicants are Asian American.

16.     Future Applicants will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Future Applicants may be denied admission to Harvard because of these discriminatory policies.

17.     SFFA has members whose children intend to apply for admission to Harvard ("Parents").  Some of these Parents are Asian Americans.

18.     Parents' children will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Parents' children may be denied admission to Harvard because of these discriminatory policies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, November 14 2014.

Edward J. Blum

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-DJC |

## ANSWER

Defendant President and Fellows of Harvard College hereby answers the Complaint. Except as hereinafter expressly admitted, Defendant denies each and every allegation, statement, and matter contained in the Complaint and, in particular, denies that it has engaged in racial discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

Many of the more than five hundred allegations in the Complaint—often stated in vague and general terms—concern Defendant's historical admissions practices, dating back more than a century. Those historical allegations are legally immaterial to the claims pleaded in the Complaint, and none of Defendant's current employees possesses personal knowledge that would be sufficient to enable Defendant to form a belief about the truth of those allegations.

Defendant responds to the numbered allegations in the Complaint as follows:

1.      Paragraph 1 states conclusions of law and Plaintiff's characterization of its claims, to which no response is necessary.

2.      Paragraph 2 states conclusions of law, to which no response is necessary. To the extent a response is deemed necessary, Defendant lacks knowledge or information sufficient to

1

form a belief about the truth of the allegations in paragraph 2 and therefore denies those

allegations.

      3.      Defendant denies the allegations in paragraph 3.

      4.      Defendant denies the allegations in paragraph 4, except to the extent they contain

conclusions of law, which require no response.

      5.      Defendant denies the allegations in paragraph 5, except to the extent they contain

conclusions of law, which require no response.

      6.      Defendant denies the allegations in paragraph 6.

      7.      Defendant denies the allegations in paragraph 7, except as to the third and fourth-

to-the-last sentences which purport to raise vague, overbroad allegations as to all "[h]igh-

achieving Asian-American applicants."  With respect to those allegations, Defendant lacks

knowledge or information sufficient to form a belief about the truth of the allegations and

therefore denies them.

      8.      Defendant denies the allegations in paragraph 8.

      9.      Defendant denies the allegations in paragraph 9, except to the extent they contain

conclusions of law, which require no response.

      10.      Defendant admits that Plaintiff brought this action under 42 U.S.C. § 2000d *et*

*seq.* and that 28 U.S.C. §§ 1331 and 1343 authorize the Court's subject-matter jurisdiction over

such actions.  Defendant denies that the Court possesses subject-matter jurisdiction over this

case, however.

      11.      Defendant admits that venue is proper.

      12.      Defendant lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 12 and therefore denies those allegations.

13.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 and therefore denies those allegations.

14.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 and therefore denies those allegations.

15.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15 and therefore denies those allegations.

16.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 and therefore denies those allegations.

17.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17 and therefore denies those allegations.

18.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18 and therefore denies those allegations.

19.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 and therefore denies those allegations.

20.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 20 and therefore denies those allegations.

21.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21 and therefore denies those allegations.

22.     Defendant denies the allegations in paragraph 22.

23.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 and therefore denies those allegations.

24.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 and therefore denies those allegations.

JA 145

25.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 and therefore denies those allegations.

26.     Defendant denies the allegations in paragraph 26.

27.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 27 and therefore denies those allegations.

28.     Defendant denies the allegations in paragraph 28.

29.     Defendant admits that the Harvard Corporation is Harvard University's senior governing board.  The Board of Overseers has been dismissed as a defendant by stipulation of the parties.

30.     Defendant admits that Harvard University is a private educational institution with its legal address in Cambridge, Massachusetts.

31.     Defendant admits that Harvard College is a component of Harvard University that offers undergraduate education.  Defendant otherwise denies the allegations in paragraph 31.

32.     Defendant admits that Harvard University's endowment was valued at $36.4 billion as of June 30, 2014.  Defendant further admits that Harvard University receives federal funds in various forms—including research funding—and that it received more than $6.6 million from such sources in 2010, more than $11.9 million in 2011, more than $20.9 million in 2012, and more than $13.4 million in 2013, and received federal funds from such sources in 2014. Defendant otherwise denies the allegations in paragraph 32.

33.     Defendant admits that Harvard College enrolls a number of students who receive federal financial aid.

34.     Paragraph 34 states a conclusion of law, which requires no response.

35.     Defendant denies the allegations in paragraph 35.

4

36.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 and therefore denies those allegations.

37.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 37 and therefore denies those allegations.

38.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 and therefore denies those allegations.

39.    Defendant admits that the number of enrolled freshmen has historically varied from year to year.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 and therefore denies those allegations.

40.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 and therefore denies those allegations.

41.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 and therefore denies those allegations.

42.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42 and therefore denies those allegations.

43.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 and therefore denies those allegations.

44.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 and therefore denies those allegations.

45.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 and therefore denies those allegations.

46.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46 and therefore denies those allegations.

JA 147

47.     Defendant states that to the extent the allegations set forth in paragraph 47 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 47 are inconsistent with any such document, Defendant denies the allegations in paragraph 47.  To the extent that paragraph 47 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 47 and therefore denies those allegations.

48.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48 and therefore denies those allegations.

49.     Defendant states that to the extent the allegations set forth in paragraph 49 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 49 are inconsistent with any such document, Defendant denies the allegations in paragraph 49.  To the extent that paragraph 49 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 49 and therefore denies those allegations.

50.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 50 and therefore denies those allegations.

51.     Defendant states that to the extent the allegations set forth in paragraph 51 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 51 are inconsistent with any such document, Defendant denies the allegations in paragraph 51.  To the extent that paragraph 51 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information

sufficient to form a belief about the truth of such allegations in paragraph 51 and therefore denies those allegations.

52.    Defendant states that to the extent the allegations set forth in paragraph 52 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 52 are inconsistent with any such document, Defendant denies the allegations in paragraph 52.  To the extent that paragraph 52 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 52 and therefore denies those allegations.

53.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 53 and therefore denies those allegations.

54.    Defendant states that to the extent the allegations set forth in paragraph 54 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 54 are inconsistent with any such document, Defendant denies the allegations in paragraph 54.  To the extent that paragraph 54 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 54 and therefore denies those allegations.

55.    Defendant states that to the extent the allegations set forth in paragraph 55 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 55 are inconsistent with any such document, Defendant denies the allegations in paragraph 55.  To the extent that paragraph 55 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information

7

sufficient to form a belief about the truth of such allegations in paragraph 55 and therefore denies those allegations.

56.     Defendant states that to the extent the allegations set forth in paragraph 56 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 56 are inconsistent with any such document, Defendant denies the allegations in paragraph 56.  To the extent that paragraph 56 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 56 and therefore denies those allegations.

57.     Defendant states that to the extent the allegations set forth in paragraph 57 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 57 are inconsistent with any such document, Defendant denies the allegations in paragraph 57.  To the extent that paragraph 57 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 57 and therefore denies those allegations.

58.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 58 and therefore denies those allegations.

59.     Defendant states that to the extent the allegations set forth in paragraph 59 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 59 are inconsistent with any such document, Defendant denies the allegations in paragraph 59.  To the extent that paragraph 59 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information

sufficient to form a belief about the truth of such allegations in paragraph 59 and therefore denies those allegations.

60.     Defendant states that to the extent the allegations set forth in paragraph 60 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 60 are inconsistent with any such document, Defendant denies the allegations in paragraph 60.  To the extent that paragraph 60 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 60 and therefore denies those allegations.

61.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61 and therefore denies those allegations.

62.     Defendant states that to the extent the allegations set forth in paragraph 62 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 62 are inconsistent with any such document, Defendant denies the allegations in paragraph 62.  To the extent that paragraph 62 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 62 and therefore denies those allegations.

63.     Defendant states that to the extent the allegations set forth in paragraph 63 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 63 are inconsistent with any such document, Defendant denies the allegations in paragraph 63.  To the extent that paragraph 63 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information

JA 151

sufficient to form a belief about the truth of such allegations in paragraph 63 and therefore denies those allegations.

64.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 64 and therefore denies those allegations.

65.     Defendant states that to the extent the allegations set forth in paragraph 65 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 65 are inconsistent with any such document, Defendant denies the allegations in paragraph 65.  To the extent that paragraph 65 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 65 and therefore denies those allegations.

66.     Defendant states that to the extent the allegations set forth in paragraph 66 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 66 are inconsistent with any such document, Defendant denies the allegations in paragraph 66.  To the extent that paragraph 66 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 66 and therefore denies those allegations.

67.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 67 and therefore denies those allegations.

68.     Defendant states that to the extent the allegations set forth in paragraph 68 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 68 are inconsistent with any such document, Defendant denies the allegations in

10

paragraph 68.  To the extent that paragraph 68 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 68 and therefore denies those allegations.

69.    Defendant states that to the extent the allegations set forth in paragraph 69 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 69 are inconsistent with any such document, Defendant denies the allegations in paragraph 69.  To the extent that paragraph 69 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 69 and therefore denies those allegations.

70.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 70 and therefore denies those allegations.

71.    Defendant states that to the extent the allegations set forth in paragraph 71 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 71 are inconsistent with any such document, Defendant denies the allegations in paragraph 71.  To the extent that paragraph 71 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 71 and therefore denies those allegations.

72.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 72 and therefore denies those allegations.

73.    Defendant states that to the extent the allegations set forth in paragraph 73 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 73 are inconsistent with any such document, Defendant denies the allegations in paragraph 73.  To the extent that paragraph 73 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 73 and therefore denies those allegations.

74.    Defendant states that to the extent the allegations set forth in paragraph 74 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 74 are inconsistent with any such document, Defendant denies the allegations in paragraph 74.  To the extent that paragraph 74 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 74 and therefore denies those allegations.

75.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 75 and therefore denies those allegations.

76.    Defendant states that to the extent the allegations set forth in paragraph 76 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 76 are inconsistent with any such document, Defendant denies the allegations in paragraph 76.  To the extent that paragraph 76 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 76 and therefore denies those allegations.

JA 154

77.     Defendant states that to the extent the allegations set forth in paragraph 77 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 77 are inconsistent with any such document, Defendant denies the allegations in paragraph 77.  To the extent that paragraph 77 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 77 and therefore denies those allegations.

78.     Defendant states that to the extent the allegations set forth in paragraph 78 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 78 are inconsistent with any such document, Defendant denies the allegations in paragraph 78.  To the extent that paragraph 78 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 78 and therefore denies those allegations.

79.     Defendant states that to the extent the allegations set forth in paragraph 79 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 79 are inconsistent with any such document, Defendant denies the allegations in paragraph 79.  To the extent that paragraph 79 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 79 and therefore denies those allegations.

80.     Defendant states that to the extent the allegations set forth in paragraph 80 are from a written document, the document speaks for itself and, to the extent the allegations of

paragraph 80 are inconsistent with any such document, Defendant denies the allegations in paragraph 80. To the extent that paragraph 80 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 80 and therefore denies those allegations.

81.    Defendant states that to the extent the allegations set forth in paragraph 81 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 81 are inconsistent with any such document, Defendant denies the allegations in paragraph 81. To the extent that paragraph 81 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 81 and therefore denies those allegations.

82.    Defendant states that to the extent the allegations set forth in paragraph 82 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 82 are inconsistent with any such document, Defendant denies the allegations in paragraph 82. To the extent that paragraph 82 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 82 and therefore denies those allegations.

83.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 83 and therefore denies those allegations.

84.    Defendant states that to the extent the allegations set forth in paragraph 84 are from a written document, the document speaks for itself and, to the extent the allegations of

14

paragraph 84 are inconsistent with any such document, Defendant denies the allegations in paragraph 84. To the extent that paragraph 84 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 84 and therefore denies those allegations.

85. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 85 and therefore denies those allegations.

86. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 86 and therefore denies those allegations.

87. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 87 and therefore denies those allegations.

88. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 88 and therefore denies those allegations.

89. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 89 and therefore denies those allegations.

90. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 90 and therefore denies those allegations.

91. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 91 and therefore denies those allegations.

92. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 92 and therefore denies those allegations.

93. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 93 and therefore denies those allegations.

JA 157

94.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 94 and therefore denies those allegations.

95.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 95 and therefore denies those allegations.

96.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 96 and therefore denies those allegations.

97.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 97 and therefore denies those allegations.

98.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 98 and therefore denies those allegations.

99.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 99 and therefore denies those allegations.

100.      Paragraph 100 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 100 and therefore denies those allegations.

101.      Defendant admits that Mr. Gummere served as Chairman of its Committee on Admission between 1934 and 1952.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 101 and therefore denies those allegations.

102.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 102 and therefore denies those allegations.

103.      Defendant states that to the extent the allegations set forth in paragraph 103 are from a written document, the document speaks for itself and, to the extent the allegations of

16

paragraph 103 are inconsistent with any such document, Defendant denies the allegations in paragraph 103. To the extent that paragraph 103 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 103 and therefore denies those allegations.

104.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 104 and therefore denies those allegations.

105.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 105 and therefore denies those allegations.

106.    Defendant states that to the extent the allegations set forth in paragraph 106 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 106 are inconsistent with any such document, Defendant denies the allegations in paragraph 106. To the extent that paragraph 106 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 106 and therefore denies those allegations.

107.    Defendant states that to the extent the allegations set forth in paragraph 107 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 107 are inconsistent with any such document, Defendant denies the allegations in paragraph 107. To the extent that paragraph 107 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 107 and therefore denies those allegations.

JA 159

108.    Defendant states that to the extent the allegations set forth in paragraph 108 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 108 are inconsistent with any such document, Defendant denies the allegations in paragraph 108. To the extent that paragraph 108 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 108 and therefore denies those allegations.

109.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 109 and therefore denies those allegations.

110.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 110 and therefore denies those allegations.

111.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 111 and therefore denies those allegations.

112.    Defendant states that to the extent the allegations set forth in paragraph 112 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 112 are inconsistent with any such document, Defendant denies the allegations in paragraph 112. To the extent that paragraph 112 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 112 and therefore denies those allegations.

113.    Defendant states that to the extent the allegations set forth in paragraph 113 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 113 are inconsistent with any such document, Defendant denies the allegations in

18

paragraph 113. To the extent that paragraph 113 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 113 and therefore denies those allegations.

114. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 114 and therefore denies those allegations.

115. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 115 and therefore denies those allegations.

116. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 116 and therefore denies those allegations.

117. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 117 and therefore denies those allegations.

118. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 118 and therefore denies those allegations.

119. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 119 and therefore denies those allegations.

120. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 120 and therefore denies those allegations.

121. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 121 and therefore denies those allegations.

122. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 122 and therefore denies those allegations.

JA 161

123.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 123 and therefore denies those allegations.

124.    Defendant admits that the admissions office used letter designations as shorthand for certain characteristics of applicants at some time after the 1960s, as one among many factors that the office evaluated holistically in determining whether to make an offer of admission. Defendant otherwise denies the allegations in paragraph 124.

125.    Defendant denies the allegations in paragraph 125.

126.    Defendant states that to the extent the allegations set forth in paragraph 126 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 126 are inconsistent with any such document, Defendant denies the allegations in paragraph 126.  To the extent that paragraph 126 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 126 and therefore denies those allegations.

127.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 127 and therefore denies those allegations.

128.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 128 and therefore denies those allegations.

129.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 129 and therefore denies those allegations.

130.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 130 and therefore denies those allegations.

131.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 131 and therefore denies those allegations.

132.     Defendant states that to the extent the allegations set forth in paragraph 132 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 132 are inconsistent with any such document, Defendant denies the allegations in paragraph 132.  To the extent that paragraph 132 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 132 and therefore denies those allegations.

133.     Defendant admits that Harvard University was one signatory to an amicus brief in *Bakke* (filed jointly on behalf of Columbia University, Harvard University, Stanford University, and the University of Pennsylvania) and that this brief included a copy of the Harvard College Admissions Program as an appendix.

134.     Defendant states that to the extent the allegations set forth in paragraph 134 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 134 are inconsistent with any such document, Defendant denies the allegations in paragraph 134.  To the extent that paragraph 134 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 134 and therefore denies those allegations.

135.     Defendant states that to the extent the allegations set forth in paragraph 135 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 135 are inconsistent with any such document, Defendant denies the allegations in

paragraph 135.  To the extent that paragraph 135 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 135 and therefore denies those allegations.

136.    Defendant states that to the extent the allegations set forth in paragraph 136 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 136 are inconsistent with any such document, Defendant denies the allegations in paragraph 136.  To the extent that paragraph 136 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 136 and therefore denies those allegations.

137.    Defendant states that to the extent the allegations set forth in paragraph 137 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 137 are inconsistent with any such document, Defendant denies the allegations in paragraph 137.  To the extent that paragraph 137 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 137 and therefore denies those allegations.

138.    Defendant states that to the extent the allegations set forth in paragraph 138 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 138 are inconsistent with any such document, Defendant denies the allegations in paragraph 138.  To the extent that paragraph 138 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or

JA 164

information sufficient to form a belief about the truth of such allegations in paragraph 138 and therefore denies those allegations.

139.    Defendant admits that Harvard University was one signatory to an amicus brief in *Grutter* (filed jointly on behalf of Harvard University, Brown University, the University of Chicago, Dartmouth College, Duke University, the University of Pennsylvania, Princeton University, and Yale University).

140.    Defendant states that to the extent the allegations set forth in paragraph 140 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 140 are inconsistent with any such document, Defendant denies the allegations in paragraph 140.  To the extent that paragraph 140 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 140 and therefore denies those allegations.

141.    Defendant states that to the extent the allegations set forth in paragraph 141 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 141 are inconsistent with any such document, Defendant denies the allegations in paragraph 141.  To the extent that paragraph 141 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 141 and therefore denies those allegations.

142.    Defendant states that to the extent the allegations set forth in paragraph 142 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 142 are inconsistent with any such document, Defendant denies the allegations in

paragraph 142.  To the extent that paragraph 142 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 142 and therefore denies those allegations.

143.    Defendant admits that Harvard University was one signatory to an amicus brief in *Fisher* (filed jointly on behalf of Brown University, the University of Chicago, Columbia University, Cornell University, Dartmouth College, Duke University, Harvard University, Johns Hopkins University, the Massachusetts Institute of Technology, the University of Pennsylvania, Princeton University, Stanford University, Vanderbilt University, and Yale University).

144.    Defendant states that to the extent the allegations set forth in paragraph 144 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 144 are inconsistent with any such document, Defendant denies the allegations in paragraph 144.  To the extent that paragraph 144 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 144 and therefore denies those allegations.

145.    Defendant states that to the extent the allegations set forth in paragraph 145 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 145 are inconsistent with any such document, Defendant denies the allegations in paragraph 145.  To the extent that paragraph 145 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 145 and therefore denies those allegations.

146.    Defendant states that to the extent the allegations set forth in paragraph 146 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 146 are inconsistent with any such document, Defendant denies the allegations in paragraph 146.  To the extent that paragraph 146 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 146 and therefore denies those allegations.

147.    Defendant admits that the admissions committee considers each applicant's background and personal characteristics, including—where relevant—the applicant's race or ethnicity as it bears on the holistic review, as one among many factors that it evaluates holistically in determining whether to make an offer of admission.  Defendant otherwise denies the allegations in paragraph 147.

148.    Defendant denies the allegations in paragraph 148.

149.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 149 and therefore denies those allegations.  As to the allegations in the second sentence of paragraph 149, Defendant admits that it complied with the federal reporting requirements and otherwise denies the allegations.

150.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 150 and therefore denies those allegations.

151.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 151 and therefore denies those allegations.

152.    Defendant states that to the extent the allegations set forth in paragraph 152 are from a written document, the document speaks for itself and, to the extent the allegations of

JA 167

paragraph 152 are inconsistent with any such document, Defendant denies the allegations in paragraph 152. To the extent that paragraph 152 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 152 and therefore denies those allegations.

153. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 153 and therefore denies those allegations.

154. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 154 and therefore denies those allegations.

155. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 155 and therefore denies those allegations.

156. Defendant admits that the proportion of self-reported Asian-Americans among matriculating freshmen was 3.6% in 1976. Defendant otherwise denies the allegations in the first sentence of paragraph 156. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 156 and therefore denies those allegations.

157. Defendant denies the allegations in paragraph 157.

158. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 158 and therefore denies those allegations.

159. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 159 and therefore denies those allegations.

160. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 160 and therefore denies those

JA 168

allegations.  Defendant states that to the extent the allegations set forth in the second sentence of paragraph 160 are from a written document, the document speaks for itself and, to the extent the allegations of the second sentence of paragraph 160 are inconsistent with any such document, Defendant denies the allegations in the second sentence of paragraph 160.  To the extent that the second sentence of paragraph 160 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in the second sentence of paragraph 160 and therefore denies those allegations.

161.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 161 and therefore denies those allegations.

162.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 162 and therefore denies those allegations.

163.    Defendant states that to the extent the allegations set forth in paragraph 163 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 163 are inconsistent with any such document, Defendant denies the allegations in paragraph 163.  To the extent that paragraph 163 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 163 and therefore denies those allegations.

164.    Defendant admits that the Office of Civil Rights conducted an investigation of Harvard College's admissions practices, beginning in 1988 and ending in 1990.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 164 and therefore denies those allegations.

JA 169

165.    Defendant admits that the Office of Civil Rights conducted an investigation of Harvard College's admissions practices, beginning in 1988 and ending in 1990.  Defendant otherwise denies the allegations in paragraph 165.

166.    Defendant admits the allegations in the first sentence of paragraph 166.  The remainder of the allegations in paragraph 166 purport to characterize a written document, which speaks for itself.  To the extent the allegations of paragraph 166 are inconsistent with that document, Defendant denies the allegations in paragraph 166.

167.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 167 and therefore denies those allegations.

168.    Defendant states that to the extent the allegations set forth in paragraph 168 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 168 are inconsistent with any such document, Defendant denies the allegations in paragraph 168.  To the extent that paragraph 168 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 168 and therefore denies those allegations.

169.    Defendant states that to the extent the allegations set forth in paragraph 169 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 169 are inconsistent with any such document, Defendant denies the allegations in paragraph 169.  To the extent that paragraph 169 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 169 and therefore denies those allegations.

28

170.    Defendant states that to the extent the allegations set forth in paragraph 170 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 170 are inconsistent with any such document, Defendant denies the allegations in paragraph 170.  To the extent that paragraph 170 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 170 and therefore denies those allegations.

171.    Defendant states that to the extent the allegations set forth in paragraph 171 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 171 are inconsistent with any such document, Defendant denies the allegations in paragraph 171.  To the extent that paragraph 171 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 171 and therefore denies those allegations.

172.    Defendant states that to the extent the allegations set forth in paragraph 172 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 172 are inconsistent with any such document, Defendant denies the allegations in paragraph 172.  To the extent that paragraph 172 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 172 and therefore denies those allegations.

173.    Defendant states that to the extent the allegations set forth in paragraph 173 are from a written document, the document speaks for itself and, to the extent the allegations of

paragraph 173 are inconsistent with any such document, Defendant denies the allegations in paragraph 173.  To the extent that paragraph 173 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 173 and therefore denies those allegations.

174.    Defendant states that to the extent the allegations set forth in paragraph 174 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 174 are inconsistent with any such document, Defendant denies the allegations in paragraph 174.  To the extent that paragraph 174 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 174 and therefore denies those allegations.

175.    Defendant admits the allegations in paragraph 175.

176.    Defendant admits that applicants, on the Common Application, may choose to provide information about their race or ethnicity.  Defendant otherwise denies the allegations in paragraph 176.

177.    Defendant states that to the extent the allegations set forth in paragraph 177 purport to characterize a written document, the document speaks for itself and, to the extent the allegations of paragraph 177 are inconsistent with any such document, Defendant denies the allegations in paragraph 177.  To the extent that paragraph 177 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 177 and therefore denies those allegations.

JA 172

178.    Defendant states that to the extent the allegations set forth in paragraph 178 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 178 are inconsistent with any such document, Defendant denies the allegations in paragraph 178.  To the extent that paragraph 178 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 178 and therefore denies those allegations.

179.    Defendant states that to the extent the allegations set forth in paragraph 179 purport to characterize a written document, the document speaks for itself and, to the extent the allegations of paragraph 179 are inconsistent with any such document, Defendant denies the allegations in paragraph 179.  To the extent that paragraph 179 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 179 and therefore denies those allegations.

180.    Defendant states that to the extent the allegations set forth in paragraph 180 purport to characterize a written document, the document speaks for itself and, to the extent the allegations of paragraph 180 are inconsistent with any such document, Defendant denies the allegations in paragraph 180.  To the extent that paragraph 180 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 180 and therefore denies those allegations.

181.    Defendant states that to the extent the allegations set forth in paragraph 181 are from a written document, the document speaks for itself and, to the extent the allegations of

paragraph 181 are inconsistent with any such document, Defendant denies the allegations in

paragraph 181. To the extent that paragraph 181 contains allegations neither set forth in a

written document nor inconsistent with such a document, Defendant lacks knowledge or

information sufficient to form a belief about the truth of such allegations in paragraph 181 and

therefore denies those allegations.

182. Defendant states that to the extent the allegations set forth in paragraph 182

purport to characterize a written document, the document speaks for itself and, to the extent the

allegations of paragraph 182 are inconsistent with any such document, Defendant denies the

allegations in paragraph 182. To the extent that paragraph 182 contains allegations neither set

forth in a written document nor inconsistent with such a document, Defendant lacks knowledge

or information sufficient to form a belief about the truth of such allegations in paragraph 182 and

therefore denies those allegations.

183. Defendant states that to the extent the allegations set forth in paragraph 183

purport to characterize a written document, the document speaks for itself and, to the extent the

allegations of paragraph 183 are inconsistent with any such document, Defendant denies the

allegations in paragraph 183. To the extent that paragraph 183 contains allegations neither set

forth in a written document nor inconsistent with such a document, Defendant lacks knowledge

or information sufficient to form a belief about the truth of such allegations in paragraph 183 and

therefore denies those allegations.

184. Defendant denies the allegations in the first sentence of paragraph 184.

Defendant states that to the extent the allegations set forth in the second and third sentences of

paragraph 184 are from a written document, the document speaks for itself and, to the extent the

allegations of the second and third sentences of paragraph 184 are inconsistent with any such

JA 174

document, Defendant denies the allegations in the second and third sentences of paragraph 184.

To the extent that the second and third sentences of paragraph 184 contain allegations neither set

forth in a written document nor inconsistent with such a document, Defendant lacks knowledge

or information sufficient to form a belief about the truth of such allegations in the second and

third sentences of paragraph 184 and therefore denies those allegations.

185.    Defendant admits that the Harvard College admissions office considers for

transfer admission students who have completed at least one continuous academic year in a full-

time degree program at one college.  Defendant otherwise denies the allegations in paragraph

185.

186.    Defendant admits that the Harvard College admissions office considers applicants

for transfer admission in a holistic manner and that, as with applicants for early or regular

admission, it considers each applicant's background and personal characteristics, including—

where relevant—the applicant's race or ethnicity as it bears on the holistic review, as one among

many factors that it evaluates holistically in determining whether to make an offer of admission.

Defendant otherwise denies the allegations in paragraph 186.

187.    Defendant denies the allegations in paragraph 187.

188.    Defendant denies the allegations in paragraph 188.

189.    Defendant denies the allegations in paragraph 189.

190.    Defendant denies the allegations in paragraph 190.

191.    Defendant denies the allegations in paragraph 191.

192.    Defendant denies the allegations in paragraph 192.

193.    Defendant denies the allegations in paragraph 193.

JA 175

194.    Defendant admits that toward the end of the admissions process, the admissions committee is typically considering more candidates for admission than it has room to admit. Defendant otherwise denies the allegations in paragraph 194.

195.    Defendant denies the allegations in paragraph 195.

196.    Defendant admits that the admissions committee considers each applicant's background and personal characteristics, including—where relevant—the applicant's race or ethnicity as it bears on the holistic review, as one among many factors that it evaluates holistically in determining whether to make an offer of admission. Defendant otherwise denies the allegations in paragraph 196.

197.    Defendant admits that after May 1 of each year, to the extent the admissions committee anticipates having space to admit applicants from the waitlist, it reviews any new information pertaining to the applications of waitlisted students. Defendant otherwise denies the allegations in paragraph 197.

198.    As to the first sentence of paragraph 198, Defendant admits that some waitlisted applicants may be offered deferred admission to a later class. Defendant otherwise denies the allegations in the first sentence of paragraph 198. Defendant denies the allegations in the second sentence of paragraph 198.

199.    Defendant denies the allegations in paragraph 199.

200.    Defendant denies the allegations in paragraph 200.

201.    Defendant admits that Harvard annually publishes information on the number of admitted students and matriculating students who self-report as belonging to certain racial or ethnic groups. Defendant otherwise denies the allegations in paragraph 201.

202.    Defendant denies the allegations in paragraph 202.

JA 176

203.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 203 and therefore denies those allegations.

204.    Defendant admits that Harvard annually publishes information about applications to Harvard College.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 204 and therefore denies those allegations.

205.    Defendant denies the allegations in paragraph 205.

206.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 206 and therefore denies those allegations.

207.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 207 and therefore denies those allegations.

208.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 208 and therefore denies those allegations.

209.    Defendant denies the allegations in paragraph 209.

210.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 210 and therefore denies those allegations.

211.    Defendant denies the allegations in paragraph 211.

212.    Defendant states that to the extent the allegations set forth in paragraph 212 are from a written document, the document speaks for itself.  Defendant further states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 212 and therefore denies those allegations.

213.    Defendant states that to the extent the allegations set forth in paragraph 213 are from a written document, the document speaks for itself.  Defendant further states that it lacks

JA 177

knowledge or information sufficient to form a belief about the truth of the allegations in
paragraph 213 and therefore denies those allegations.

214.    Defendant denies the allegations in paragraph 214.

215.    Defendant denies the allegations in paragraph 215.

216.    Defendant states that to the extent the allegations set forth in paragraph 216 are
from a written document, the document speaks for itself.  Defendant further states that it lacks
knowledge or information sufficient to form a belief about the truth of the allegations in
paragraph 216 and therefore denies those allegations.

217.    Defendant denies the allegations in paragraph 217.

218.    Defendant states that to the extent the allegations set forth in paragraph 218 are
from a written document, the document speaks for itself.  Defendant further states that it lacks
knowledge or information sufficient to form a belief about the truth of the allegations in
paragraph 218 and therefore denies those allegations.

219.    Defendant lacks knowledge or information sufficient to form a belief about the
truth of the allegations in paragraph 219 and therefore denies those allegations.

220.    Defendant denies the allegations in the last sentence of paragraph 220.  Defendant
otherwise lacks knowledge or information sufficient to form a belief about the truth of the
allegations in paragraph 220 and therefore denies those allegations.

221.    Defendant denies the allegations in the last sentence of paragraph 221.  Defendant
otherwise lacks knowledge or information sufficient to form a belief about the truth of the
allegations in paragraph 221 and therefore denies those allegations.

JA 178

222.     Defendant denies the allegations in paragraph 222 as to its own enrollment. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 222 and therefore denies those allegations.

223.     Defendant denies the allegations in paragraph 223.

224.     Defendant states that to the extent the allegations set forth in paragraph 224 are from a written document, the document speaks for itself.  Defendant further states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 224 and therefore denies those allegations.

225.     Defendant states that to the extent the allegations set forth in paragraph 225 are from a written document, the document speaks for itself.  Defendant further states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 225 and therefore denies those allegations.

226.     Defendant states that to the extent the allegations set forth in paragraph 226 are from a written document, the document speaks for itself.  Defendant further states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 226 and therefore denies those allegations.

227.     Defendant states that to the extent the allegations set forth in the first two sentences of paragraph 227 are from a written document, the document speaks for itself. Defendant further states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first two sentences of paragraph 227 and therefore denies those allegations.   Defendant states that to the extent the allegations set forth in the last sentence of paragraph 227 are from a written document, the document speaks for itself and, to the extent the allegations of the last sentence of paragraph 227 are inconsistent with any such document,

37

Defendant denies the allegations in the last sentence of paragraph 227. To the extent that the last sentence of paragraph 227 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in the last sentence of paragraph 227 and therefore denies those allegations.

228.    Defendant states that to the extent the allegations set forth in paragraph 228 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 228 are inconsistent with any such document, Defendant denies the allegations in paragraph 228. To the extent that paragraph 228 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 228 and therefore denies those allegations.

229.    Defendant denies the allegations in paragraph 229.

230.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 230 and therefore denies those allegations.

231.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 231 and therefore denies those allegations.

232.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 232 and therefore denies those allegations.

233.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 233 and therefore denies those allegations.

234.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 234 and therefore denies those allegations.

JA 180

235.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 235 and therefore denies those allegations.

236.    Defendant denies the allegations in paragraph 236.

237.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 237 and therefore denies those allegations.

238.    Defendant denies the allegations in paragraph 238.

239.    Defendant denies the allegations in the first sentence of paragraph 239. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 239 and therefore denies those allegations.

240.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 240 and therefore denies those allegations.

241.    Defendant denies the allegations in paragraph 241 as to its own enrollment. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 241 and therefore denies those allegations.

242.    Defendant denies the allegations in paragraph 242 as to its own enrollment. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 242 and therefore denies those allegations.

243.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 243 and therefore denies those allegations.

244.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 244 and therefore denies those allegations.

245.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 245 and therefore denies those allegations.

JA 181

246.    Defendant denies the allegations in the first sentence of paragraph 246. Defendant states that to the extent the allegations set forth in the second sentence of paragraph 246 are from a written document, the document speaks for itself and, to the extent the allegations in the second sentence of paragraph 246 are inconsistent with any such document, Defendant denies the allegations in the second sentence of paragraph 246. To the extent that the second sentence of paragraph 246 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations and therefore denies those allegations.

247.    Defendant denies the allegations in paragraph 247.

248.    Defendant states that to the extent the allegations set forth in paragraph 248 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 248 are inconsistent with any such document, Defendant denies the allegations in paragraph 248. To the extent that paragraph 248 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 248 and therefore denies those allegations.

249.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 249 and therefore denies those allegations.

250.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 250 and therefore denies those allegations.

251.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 251 and therefore denies those allegations.

JA 182

252.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 252 and therefore denies those allegations.

253.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 253 and therefore denies those allegations.

254.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 254 and therefore denies those allegations.

255.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 255 and therefore denies those allegations.

256.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 256 and therefore denies those allegations.

257.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 257 and therefore denies those allegations.

258.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 258 and therefore denies those allegations.

259.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 259 and therefore denies those allegations.

260.     Defendant denies the allegations in the first sentence of paragraph 260. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 260 and therefore denies those allegations.

261.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 261 and therefore denies those allegations.

JA 183

262.    Defendant denies that it discriminates against Asian Americans.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 262 and therefore denies those allegations.

263.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 263 and therefore denies those allegations.

264.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 264 and therefore denies those allegations.

265.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 265 and therefore denies those allegations.

266.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 266 and therefore denies those allegations.

267.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 267 and therefore denies those allegations.

268.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 268 and therefore denies those allegations.

269.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 269 and therefore denies those allegations.

270.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 270 and therefore denies those allegations.

271.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 271 and therefore denies those allegations.

272.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 272 and therefore denies those allegations.

JA 184

273.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 273 and therefore denies those allegations.

274.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 274 and therefore denies those allegations.

275.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 275 and therefore denies those allegations.

276.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 276 and therefore denies those allegations.

277.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 277 and therefore denies those allegations.

278.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 278 and therefore denies those allegations.

279.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 279 and therefore denies those allegations.

280.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 280 and therefore denies those allegations.

281.    Defendant denies the allegations in paragraph 281.

282.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 282 and therefore denies those allegations.

283.    Defendant denies the allegations set forth in the first sentence of paragraph 283. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 283 and therefore denies those allegations.

JA 185

284.    Defendant denies that it discriminates against Asian Americans.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 284 and therefore denies those allegations.

285.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 285 and therefore denies those allegations.  Defendant denies the allegations in the second sentence of paragraph 285.

286.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of paragraph 286 and therefore denies those allegations.  Defendant denies the allegations in the third sentence of paragraph 286.

287.    Defendant denies the allegations in paragraph 287.

288.    Defendant denies the allegations in paragraph 288.

289.    Defendant denies the allegations in paragraph 289.

290.    Defendant denies the allegations in paragraph 290.

291.    Defendant denies the allegations in paragraph 291.

292.    Defendant denies the allegations in paragraph 292.

293.    Defendant denies the allegations in paragraph 293.

294.    Defendant denies the allegations in paragraph 294.

295.    Defendant denies the allegations in paragraph 295.

296.    Defendant denies the allegations in the first and second sentences of paragraph 296.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the allegations in paragraph 296 and therefore denies those allegations.

297.    Defendant lacks knowledge or information sufficient to form a belief about the allegations in the first sentence of paragraph 297 as they pertain to the admissions practices of

other institutions and therefore denies those allegations.  Defendant denies the allegations in

paragraph 297 as to its own practices.

298.    Defendant denies the allegations in paragraph 298.

299.    Defendant denies the allegations in paragraph 299.

300.    Defendant denies the allegations in paragraph 300.

301.    As to the first sentence of paragraph 301, Defendant admits that during the 2005-

2006 academic year, 18% of the Harvard College student body self-reported as Asian-American.

Defendant otherwise denies the allegations in paragraph 301.

302.    Defendant denies the allegations in paragraph 302.

303.    Defendant denies the allegations in paragraph 303.

304.    Defendant lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 304 and therefore denies those allegations.

305.    The first sentence of paragraph 305 states a conclusion of law, which requires no

response.  To the extent a response is required, Defendant denies the allegations in the first

sentence of paragraph 305.  Defendant denies the allegations in the second sentence of paragraph

305.

306.    Defendant lacks knowledge or information sufficient to form a belief about the

truth of the allegations in the first sentence of paragraph 306 and therefore denies those

allegations.  The second sentence of paragraph 306 states a conclusion of law, which requires no

response.  To the extent a response is required, Defendant denies the allegations in the second

sentence of paragraph 306.

307.    Defendant lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 307 and therefore denies those allegations.

JA 187

308.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 308 and therefore denies those allegations.

309.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 309 and therefore denies those allegations.

310.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 310 and therefore denies those allegations.

311.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 311 and therefore denies those allegations.

312.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 312 and therefore denies those allegations.

313.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 313 and therefore denies those allegations.

314.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 314 and therefore denies those allegations.

315.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 315 and therefore denies those allegations.

316.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 316 and therefore denies those allegations.

317.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 317 and therefore denies those allegations.

318.    Defendant denies the allegations in paragraph 318.

JA 188

319.    Defendant denies the allegations in the first sentence of paragraph 319.
Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of
the allegations in paragraph 319 and therefore denies those allegations.

320.    Defendant lacks knowledge or information sufficient to form a belief about the
truth of the allegations in paragraph 320 and therefore denies those allegations.

321.    Defendant denies the allegations in paragraph 321.

322.    Defendant denies the allegations in paragraph 322.

323.    Paragraph 323 states a conclusion of law, which requires no response.  To the
extent a response is required, Defendant denies the allegations in paragraph 323.

324.    Defendant lacks knowledge or information sufficient to form a belief about the
truth of the allegations in the first two sentences of paragraph 324.  The allegations in the third
sentence of paragraph 324 state conclusions of law, which require no response.  To the extent a
response is required, Defendant denies the allegations in the third sentence of paragraph 324.

325.    Defendant lacks knowledge or information sufficient to form a belief about the
truth of the allegations in paragraph 325 and therefore denies those allegations.

326.    Defendant admits that its financial aid program is among the most generous in the
country.  Defendant denies the allegations in the first and second sentences of paragraph 326.  As
to the third and fourth sentences of paragraph 326, Defendant admits that Harvard University's
endowment was valued at $36.4 billion as of June 30, 2014 and admits that for the 2014-2015
academic year, Harvard College tuition and fees are $43,938, exclusive of financial aid, which
many students receive.  Defendant otherwise lacks knowledge or information sufficient to form a
belief about the truth of the allegations in the third and fourth sentences of paragraph 326 and
therefore denies those allegations.

JA 189

327.    Defendant denies the allegations in paragraph 327.

328.    Paragraph 328 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in paragraph 328.

329.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 329 and therefore denies those allegations.

330.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 330 and therefore denies those allegations.

331.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 331 and therefore denies those allegations.

332.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 332 and therefore denies those allegations.

333.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 333 and therefore denies those allegations.

334.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 334 and therefore denies those allegations.

335.    Defendant denies the allegations in paragraph 335.

336.    Defendant denies the allegations in paragraph 336.

337.    Defendant denies the allegations in the first sentence of paragraph 337. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 337 and therefore denies those allegations.

338.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 338 and therefore denies those allegations.  Defendant otherwise denies the allegations in paragraph 338.

JA 190

339.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 339 and therefore denies those allegations.

340.    Paragraph 340 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in paragraph 340.

341.    Defendant denies the allegations in the first sentence of paragraph 341.  The second sentence of paragraph 341 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in the second sentence of paragraph 341.

342.    Defendant admits that the fact that a particular applicant is the child of an alumnus or alumna of Harvard College or Radcliffe College may be one among many factors that the Harvard College admissions committee evaluates holistically in determining whether to offer admission to the applicant.  Defendant otherwise denies the allegations in paragraph 342.

343.    Defendant denies the allegations in paragraph 343.

344.    Defendant denies the allegations in the second sentence of paragraph 344 as to Harvard College.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 344 and therefore denies those allegations.

345.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 345 and therefore denies those allegations.

346.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 346 and therefore denies those allegations.

347.    Paragraph 347 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in paragraph 347.

JA 191

348.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 348 and therefore denies those allegations.

349.    Defendant denies the allegations in paragraph 349.

350.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 350 and therefore denies those allegations.

351.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 351 and therefore denies those allegations.

352.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 352 and therefore denies those allegations.  Defendant denies the allegations in the second sentence of paragraph 352.

353.    Defendant denies the allegations in the first sentence of paragraph 353. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 353 and therefore denies those allegations.

354.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 354 and therefore denies those allegations.

355.    Paragraph 355 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in paragraph 355.

356.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 356 and therefore denies those allegations.  As to the allegations in the second sentence of paragraph 356, Defendant admits that some waitlisted applicants may be offered deferred admission to a later class.  Defendant otherwise denies the allegations in paragraph 356.

357.    Defendant denies the allegations in paragraph 357.

JA 192

358.    Defendant denies the allegations in paragraph 358.

359.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 359 and therefore denies those allegations.

360.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 360 and therefore denies those allegations.

361.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 361 and therefore denies those allegations.

362.    Paragraph 362 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in paragraph 362.

363.    Defendant denies the allegations in paragraph 363 as to itself.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 363 as they may pertain to "early admissions" at any other institution and therefore denies those allegations.

364.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 364 with respect to other institutions and therefore denies those allegations.  Defendant denies the allegations in paragraph 364 with respect to itself.

365.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 365 and therefore denies those allegations.

366.    Defendant denies the allegations in the first sentence of paragraph 366. Defendant states that to the extent the quotation set forth in the second sentence of paragraph 366 is from a written document, the document speaks for itself, and, to the extent the allegations of the second sentence of paragraph 366 are inconsistent with any such document, Defendant denies the allegations in the second sentence of paragraph 366.  To the extent that the second sentence

51

of paragraph 366 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations contained in the second sentence of paragraph 366 and therefore denies those allegations.

367.    Defendant states that to the extent the quotation set forth in paragraph 367 is from a written document, the document speaks for itself, and, to the extent the allegations of paragraph 367 are inconsistent with any such document, Defendant denies the allegations in paragraph 367. To the extent that paragraph 367 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations contained in paragraph 367 and therefore denies those allegations.

368.    Defendant denies the allegations in paragraph 368.

369.    Paragraph 369 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in paragraph 369.

370.    The first sentence of paragraph 370 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant denies the allegations in the first sentence of paragraph 370.  Defendant denies the allegations in the second sentence of paragraph 370.

371.    Paragraph 371 states a conclusion of law, which requires no response.

372.    Paragraph 372 states a conclusion of law, which requires no response.

373.    Defendant denies the allegations in paragraph 373.

374.    Defendant denies the allegations in paragraph 374.

375.    Defendant denies the allegations in paragraph 375.

JA 194

376.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 376 and therefore denies those allegations.

377.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 377 and therefore denies those allegations.

378.    Defendant admits that individual applicants differ from one another on multiple dimensions, including in some instances because their backgrounds offer unique perspectives and cultural experiences.  Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 378 and therefore denies those allegations.

379.    Defendant denies the allegations in paragraph 379.

380.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 380 and therefore denies those allegations.

381.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 381 and therefore denies those allegations.

382.    Defendant denies the allegations in paragraph 382.

383.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 383 and therefore denies those allegations.

384.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 384 and therefore denies those allegations.

385.    Defendant denies the allegations in paragraph 385.

386.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 386 and therefore denies those allegations.

JA 195

387.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 387 and therefore denies those allegations.

388.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 388 and therefore denies those allegations.

389.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 389 and therefore denies those allegations.

390.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 390 and therefore denies those allegations.

391.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 391 and therefore denies those allegations.

392.    Defendant denies the allegations in paragraph 392.

393.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 393 and therefore denies those allegations.

394.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 394 and therefore denies those allegations.

395.    Defendant denies the allegations in the first sentence of paragraph 395. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 395 and therefore denies those allegations.

396.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 396 and therefore denies those allegations.

397.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 397 and therefore denies those allegations.

398.    Defendant denies the allegations in paragraph 398.

JA 196

399.    Defendant denies the allegations in paragraph 399.

400.    Paragraph 400 states a conclusion of law, which requires no response.

401.    Paragraph 401 states a conclusion of law, which requires no response.

402.    Paragraph 402 states a conclusion of law, which requires no response.

403.    Paragraph 403 states a conclusion of law, which requires no response.

404.    Paragraph 404 states a conclusion of law, which requires no response.

405.    Paragraph 405 states a conclusion of law, which requires no response.

406.    Paragraph 406 states a conclusion of law, which requires no response.

407.    Paragraph 407 states a conclusion of law, which requires no response.

408.    Paragraph 408 states a conclusion of law, which requires no response.

409.    Paragraph 409 states conclusions of law, which require no response.

410.    Paragraph 410 states conclusions of law, which require no response.

411.    Paragraph 411 states a conclusion of law, which requires no response.

412.    Paragraph 412 states conclusions of law, which require no response.

413.    Paragraph 413 states conclusions of law, which require no response.

414.    Paragraph 414 states a conclusion of law, which requires no response.

415.    Paragraph 415 states a conclusion of law, which requires no response.

416.    Paragraph 416 states a conclusion of law, which requires no response.

417.    Paragraph 417 states a conclusion of law, which requires no response.

418.    Paragraph 418 states a conclusion of law, which requires no response.

419.    Paragraph 419 states conclusions of law, which require no response.

420.    Paragraph 420 states conclusions of law, which require no response.

421.    Paragraph 421 states conclusions of law, which require no response.

JA 197

422.    Paragraph 422 states conclusions of law, which require no response.

423.    Paragraph 423 states conclusions of law, which require no response.

424.    Paragraph 424 states conclusions of law, which require no response.

425.    Paragraph 425 states conclusions of law, which require no response.

426.    Paragraph 426 states a conclusion of law, which requires no response.

427.    Defendant denies the allegations in paragraph 427, denies that it has violated Title VI, and denies that Plaintiff is entitled to any relief whatsoever.

## COUNT I

428.    Defendant incorporates its responses to paragraphs 1-427 of the Complaint.

429.    Defendant denies the allegations in paragraph 429.

430.    Defendant states that to the extent the allegations set forth in paragraph 430 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 430 are inconsistent with any such document, Defendant denies the allegations in paragraph 430.  To the extent that paragraph 430 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 430 and therefore denies those allegations.

431.    Paragraph 431 states a conclusion of law, which requires no response.

432.    Paragraph 432 states a conclusion of law, which requires no response.

433.    Paragraph 433 states a conclusion of law, which requires no response.

434.    Defendant denies the allegations in paragraph 434.

435.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 435 and therefore denies those allegations.

JA 198

436.    Defendant denies the allegations in paragraph 436.

437.    Defendant denies the allegations in paragraph 437.

438.    Defendant denies the allegations in paragraph 438.

439.    Defendant denies the allegations in paragraph 439.

440.    Defendant denies the allegations in paragraph 440.

441.    Defendant denies that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

442.    Defendant denies that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

### COUNT II

443.    Defendant incorporates its responses to paragraphs 1-442 of the Complaint.

444.    Defendant denies the allegations in paragraph 444.

445.    Defendant states that to the extent the allegations set forth in paragraph 445 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 445 are inconsistent with any such document, Defendant denies the allegations in paragraph 445.  To the extent that paragraph 445 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 445 and therefore denies those allegations.

446.    Paragraph 446 states a conclusion of law, which requires no response.

447.    Paragraph 447 states a conclusion of law, which requires no response.

448.    Paragraph 448 states a conclusion of law, which requires no response.

449.    Defendant denies the allegations in paragraph 449.

JA 199

450.    Defendant denies the allegations in paragraph 450.

451.    Defendant denies the allegations in paragraph 451.

452.    Defendant denies the allegations in paragraph 452.

453.    Defendant denies the allegations in paragraph 453.

454.    Defendant denies that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

455.    Defendant denies that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## COUNT III

456.    Defendant incorporates its responses to paragraphs 1-455 of the Complaint.

457.    Defendant denies the allegations in paragraph 457.

458.    Defendant states that to the extent the allegations set forth in paragraph 458 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 458 are inconsistent with any such document, Defendant denies the allegations in paragraph 458.  To the extent that paragraph 458 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 458 and therefore denies those allegations.

459.    Paragraph 459 states a conclusion of law, which requires no response.

460.    Paragraph 460 states a conclusion of law, which requires no response.

461.    Defendant denies the allegations in paragraph 461.

462.    Defendant denies the allegations in paragraph 462.

463.    Defendant denies the allegations in paragraph 463.

JA 200

464.    Defendant denies that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

465.    Defendant denies that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## COUNT IV

466.    Defendant incorporates its responses to paragraphs 1-465 of the Complaint.

467.    Defendant denies the allegations in paragraph 467.

468.    Defendant states that to the extent the allegations set forth in paragraph 468 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 468 are inconsistent with any such document, Defendant denies the allegations in paragraph 468.  To the extent that paragraph 468 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 468 and therefore denies those allegations.

469.    Paragraph 469 states a conclusion of law, which requires no response.

470.    Paragraph 470 states a conclusion of law, which requires no response.

471.    Defendant denies the allegations in paragraph 471.

472.    Defendant states that to the extent the allegations set forth in the first sentence of paragraph 472 are from a written document, the document speaks for itself and, to the extent the allegations in the first sentence of paragraph 472 are inconsistent with any such document, Defendant denies the allegations in the first sentence of paragraph 472.  To the extent that the first sentence of paragraph 472 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form

JA 201

a belief about the truth of such allegations and therefore denies those allegations.  Defendant

denies the allegations in the second and third sentences of paragraph 472.

473.    Defendant denies the allegations in paragraph 473.

474.    Defendant denies the allegations in paragraph 474.

475.    Defendant denies that Plaintiff is entitled to a declaratory judgment, a permanent

injunction, or any other relief whatsoever.

476.    Defendant denies that Plaintiff is entitled to attorneys' fees, costs, or any other

relief whatsoever.

## COUNT V

477.    Defendant incorporates its responses to paragraphs 1-476 of the Complaint.

478.    Defendant denies the allegations in paragraph 478.

479.    Defendant states that to the extent the allegations set forth in paragraph 479 are

from a written document, the document speaks for itself and, to the extent the allegations of

paragraph 479 are inconsistent with any such document, Defendant denies the allegations in

paragraph 479.  To the extent that paragraph 479 contains allegations neither set forth in a

written document nor inconsistent with such a document, Defendant lacks knowledge or

information sufficient to form a belief about the truth of such allegations in paragraph 479 and

therefore denies those allegations.

480.    Paragraph 480 states a conclusion of law, which requires no response.

481.    Paragraph 481 states a conclusion of law, which requires no response.

482.    Paragraph 482 states conclusions of law, which require no response.

483.    Defendant denies the allegations in paragraph 483.

484.    Defendant denies the allegations in paragraph 484.

JA 202

485.     Defendant denies the allegations in paragraph 485.

486.     Defendant denies the allegations in paragraph 486.

487.     Defendant denies that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

488.     Defendant denies that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

<u>**COUNT VI**</u>

489.     Defendant incorporates its responses to paragraphs 1-488 of the Complaint.

490.     Defendant denies the allegations in paragraph 490.

491.     Defendant states that to the extent the allegations set forth in paragraph 491 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 491 are inconsistent with any such document, Defendant denies the allegations in paragraph 491.  To the extent that paragraph 491 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 491 and therefore denies those allegations.

492.     Paragraph 492 states a conclusion of law, which requires no response.

493.     Paragraph 493 states a conclusion of law, which requires no response.

494.     Paragraph 494 states conclusions of law, which requires no response.

495.     Paragraph 495 states a conclusion of law, which requires no response.

496.     The first sentence of paragraph 496 states a conclusion of law, which requires no response.  Defendant lacks knowledge or information sufficient to form a belief about the truth

JA 203

of the allegations in the second sentence of paragraph 496 and therefore denies those allegations. Defendant denies the remaining allegations in paragraph 496.

497.    Defendant denies the allegations in paragraph 497.

498.    Defendant denies the allegations in paragraph 498 as to its own practices. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 498 and therefore denies those allegations.

499.    Defendant denies the allegations in paragraph 499 as to its own practices. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 499 and therefore denies those allegations.

500.    Defendant denies the allegations in paragraph 500, except to the extent they state conclusions of law, which require no response.

501.    Defendant denies the allegations in paragraph 501, except to the extent they state conclusions of law, which require no response.

502.    Defendant denies the allegations in paragraph 502, except to the extent they state conclusions of law, which require no response.

503.    Defendant denies the allegations in paragraph 503.

504.    Defendant denies that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

505.    Defendant denies that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## **RELIEF SOUGHT**

Plaintiff is not entitled to any form of relief.

JA 204

## DEMAND FOR JURY TRIAL

Plaintiff is not entitled to a jury trial.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative defenses on the basis of its current

knowledge and information, reserving the right to withdraw any of these defenses or to assert

additional defenses as further information becomes available.

1.      The Court lacks subject-matter jurisdiction over this action.

2.      Plaintiff fails to state a claim upon which relief can be granted.

3.      Plaintiff fails to allege irreparable harm or any other basis upon which injunctive

relief would be available.

**WHEREFORE**, Defendant respectfully requests that the Court enter judgment in its

favor and award it the costs of this action, together with attorneys' fees, expert fees, and such

other relief as the Court may deem just and proper.

/s/ Seth P. Waxman
Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717

JA 205

Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Felicia H. Ellsworth (BBO #665232)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Dated:  February 18, 2015

*Counsel for Defendant President and
Fellows of Harvard College*

JA 206

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on February 18, 2015.

<u>/s/ Seth P. Waxman</u>
Seth P. Waxman

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT COURT OF MASSACHUSETTS
## BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## MOTION TO INTERVENE IN DEFENSE OF HARVARD'S ADMISSIONS POLICY

Movants and Proposed Intervenors, M.B., K.C., Y.D., G.E., A.G., I.G., R.H., J.L., and R.S., nine minority students intending to apply for Harvard College, as well as Sarah Cole, Fadhal Moore, Arjini Kumari Nawal, Itzel Libertad Vasquez-Rodriguez, and Keyanna Wigglesworth, five minority Harvard College students (collectively, "Movants"), respectfully move to intervene in this case, pursuant to Fed. R. Civ. P. 24, in defense of Harvard's right to consider race or ethnicity in admissions.  As detailed in the accompanying memorandum of reasons, Movants satisfy each of the requirements for intervention as of right under Fed. R. Civ. P. 24(a), but if the Court does not find that all of the Rule 24(a) elements have been met, Movants request in the alternative that they be allowed to intervene permissively under Fed. R. Civ. P. 24(b).

In addition to the memorandum, Movants have filed two additional supporting documents: (1)  pursuant to Local Rule 7.1(b)(1), a declaration from each Proposed Intervenor

setting forth facts upon which this motion is based, *see* Ex. 1, and (2) pursuant to Fed. R. Civ. P. 24(c), a Proposed Answer.

**WHEREFORE**, Movants respectfully request that this Court grant this Motion to Intervene.

Dated: April 29, 2015                    Respectfully submitted,

                                         /s/ Rahsaan D. Hall
                                         Rahsaan D. Hall, BBO # 645369
                                         LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                         AND ECONOMIC JUSTICE
                                         294 Washington St. Suite 443
                                         Boston, MA 02108
                                         Tel: (617) 988-0608
                                         rhall@lawyerscom.org

                                         /s/ Jon M. Greenbaum
                                         Jon M. Greenbaum, DC Bar # 489887
                                         LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                         UNDER LAW
                                         1401 New York Avenue, NW, Suite 400
                                         Washington, DC 20005
                                         Tel: (202) 662-8600
                                         jgreenbaum@lawyerscommittee.org

                                         ATTORNEYS FOR PROPOSED DEFENDANT
                                         INTERVENORS

## CERTIFICATE OF CONFERENCE

In accordance with Local Rule 7.1(a), I hereby certify that I conferred with counsel for Plaintiff and counsel for Defendant.  Neither Plaintiff SFFA nor Defendant Harvard has decided its position on this motion and both wish to respond to it in accordance with the timeframe established by local rule.

                                         /s/ Jon M. Greenbaum
                                         Jon M. Greenbaum

JA 209

**CERTIFICATE OF SERVICE**

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through the ECF system on April 29, 2015 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Rahsaan D. Hall
Rahsaan D. Hall

JA 210

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**EXHIBITS IN SUPPORT OF PROPOSED DEFENDANT-INTERVENORS'
MOTION TO INTERVENE**

Exhibit 1.1:    **Declaration of M.B.**

Exhibit 1.2:    **Declaration of K.C.**

Exhibit 1.3:    **Declaration of Y.D.**

Exhibit 1.4:    **Declaration of G.E.**

Exhibit 1.5:    **Declaration of A.G.**

Exhibit 1.6:    **Declaration of I.G.**

Exhibit 1.7:    **Declaration of R.H.**

Exhibit 1.8:    **Declaration of J.L.**

Exhibit 1.9:    **Declaration of R.S.**

Exhibit 1.10:   **Declaration of Sarah Cole**

Exhibit 1.11:   **Declaration of Fadhal Moore**

Exhibit 1.12:   **Declaration of Arjini Kumari Nawal**

Exhibit 1.13:   **Declaration of Itzel Libertad Vasquez-Rodriguez**

Exhibit 1.14:   **Declaration of Keyanna Wigglesworth**

# EXHIBIT 1.1

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT COURT OF MASSACHUSETTS**
**BOSTON DIVISION**

STUDENTS FOR FAIR ADMISSIONS,
INC,

       Plaintiff,

       v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE (HARVARD
CORPORATION),

       Defendants.

Civil Action No. 1:14-cv-14176-DJC

**DECLARATION OF M.B.**

M.B., pursuant to 28 U.S.C. Section 1746, declares the following:

1.  My name is M.B., I am under 18 years of age and I am fully competent to make this Declaration.

2.  I attend a private school, and am in the 11th grade.

3.  I am African American and Caucasian.

4.  My school coursework includes the follow Advance Placement Courses: World History, Biology, and Spanish Language.  I will be taking Calculus BC, Physics I, and Spanish Literature.

5. My extracurricular activities include Brain Talk/Quidsi and the Feminism Club, and my community service includes volunteering at a local "no kill" animal shelter.

6. I self-published a novel at the age of fifteen. I wrote it in a month for an annual writing contest, NaNoWriMo, in my freshman year. I later edited it and published it through CreateSpace the summer before my sophomore year.

7. In college, I think my racial identity will serve to show non-diverse kids the new normal.  I think that being mixed-race is an important change for our society.  Just being so can have a positive impact on a college or on my college experience because of the message it broadcasts, which is that diversity comes in many forms, and that it is important to understand what diversity means and what it can look like.

8. I hope that there is a relatively high percentage and representation of minority students on my college campus. I personally believe that white kids are not the only ones who should be able to receive higher education, and I would like to go to a college where other minority kids think that as well.

9. I think diversity is the pinnacle of the "American dream," and college is a turning point in the lives of many young adults. So, I think it is important for them to be exposed to the world they are living in.  Our modern world has so many different sides to it, many of which come from the different cultures, backgrounds, and identities of minority or diverse students.

10. When I apply to college, I intend to apply to Harvard University.  I plan also to apply for financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 27 , 2015.

M.B.

**M.B.**

# EXHIBIT 1.2

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

STUDENTS FOR FAIR ADMISSIONS, INC,

        Plaintiff,

        v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

        Defendant,

    and

[_____],

        Proposed Defendant-
        Intervenors.

Civil Action No. 1:14-cv-14176-DJC

DECLARATION OF K.C.

K.C., pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is K.C. and I am fully competent to make this Declaration.

2. I attend a parochial high school, where I am in the 10th grade.

3. I am an enrolled member of the Coquille Indian Tribe.

4. My school is majority white, with an Indian population of 1%.

5. My school is a challenging college-prep school. I have been an Honor Roll
   student while at my school, and my G.P.A. is consistently above a 3.75. In
   addition to my core classes, I have taken Honors Math and Science courses during

9th and 10th grades. I am studying French as my foreign language.

6. My work and volunteer experience includes being a student intern for the Affiliated Tribes Energy Program (June- August, 2014 and again this summer, 2015), and a volunteer for the A. Susana Santos: Journeys In Creativity, Exploration in Native American Art community outreach workshops.

7. I have been active in the following school-sponsored clubs: the American Indian Science and Engineering Society, the Earth Club and the Food Club.

8. My community involvement includes being a member of the Grand Ronde and Coquille Tribal Canoe Families (both are community cultural groups). Every summer I participate with my Canoe Families in the Tribal Canoe Journey. I am also a student artist. My artwork is sold at the Coquille Indian Tribe's gift shop.

9. In addition to being an enrolled member of the Coquille Indian Tribe, I am also of Warm Springs, Wasco, Yakama, and Snoqualmie descent. I have spent a significant amount of time learning about my tribal heritage, and traveling to different tribal communities for cultural gatherings. I have spent a lot of time with my grandparents on both sides of my family, learning about my heritage from them. My Father is of Coquille, Coos, Filipino, and Caucasian heritage. My Mother is of Warm Springs, Wasco, Yakama, Snoqualmie, Filipino, Chinese, and Caucasian descent.

10. As a Native American student, I am an underrepresented minority at my school. I believe my Native American identity gives me a unique perspective among a student population that is predominately Caucasian and Christian. My worldview is shaped by my family, community, formal education, and my tribal cultural

knowledge and experiences.

11. I know access to higher education in my Native American community is a privilege, and many deserving students do not get the opportunity to go to college. This is unfortunate as many Native American students can offer so much to the college learning environment. So, I know when I go to college I will actively seek opportunities to share with my peers my unique perspectives that have been shaped by my Native American heritage.

12. In college, I am hoping to find a racially diverse environment.

13. Racial diversity adds depth and richness to the learning experience and forces us as students to challenge our opinions and beliefs.

14. When I apply to college, I plan to apply to Harvard University and I will seek financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April __27__ , 2015.

_____

K.C.

# EXHIBIT 1.3

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant, <br><br> and <br><br> [_____], <br><br> Proposed Defendant-Intervenors. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF Y.D.

Y.D., pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is Y.D. and I am fully competent to make this Declaration.

2. I attend a public high school, where I am in the 11th grade.

3. I am a member of the Oneida Tribe.

4. My school has an Indian population of 5-10%.

5. I have maintained being on honor roll all throughout high school. I have taken college credit level classes, and I am a member of the National Honor Society. I have received the award of Outstanding Student of the Year awarded by my state's Indian Education Association.

6. Throughout my high school career, I have participated in basketball and track & field. I was a member of my high school's winter musical theatre production. I participate in the Native Daughters after school group offered by the student enrichment services at my school. I took part in helping plant wild rice at the new lake in my community, and I also work at my local McDonald's.

7. I was asked to be a cultural ambassador and give a presentation to our local elementary school's first grade students. The presentation consisted of information regarding the Oneida language, culture, practices, and beliefs.

8. I am very proud that I am Native American, and I believe that being a young Native American high school student has lots of extra responsibilities. For me, it makes me want to do the absolute best I can in everything I do to show that being Native American is, and will, not be a barrier for me. I embrace all aspects of my ethnicity and use that as my motivation. I want to make a positive difference.

9. In college I hope to find other Native Americans, and I hope to connect with them for support and encouragement throughout our college years. Also, I hope to find some type of Native American club or group.

10. It is my intention to apply to Harvard University. I also will apply for financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 28th, 2015.

_____
Y.D.

# EXHIBIT 1.4

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC,

Plaintiff,

v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

Defendants.

Civil Action No. 1:14-cv-14176-DJC

DECLARATION OF G.E.

G.E., pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is G.E., I am under 18 years of age and I am fully competent to make this Declaration.

2. I am in the 9th grade at a public charter high school.

3. I am Native American, with a tribal enrollment in the Gila River Indian Community.

4. There is a 1% Native American population in my school, and a white population of 68%.

5. I'm taking five honors classes per semester. My first/fall semester's honor classes were Honors Geometry, Honors Poetry, Honors Biology, Honors Humane Letters,

and Honors Spanish. This spring semester, I am taking Honors Biology, Honors Geometry, Honors Humane Letters, Honors Spanish, and Honors Fine Arts. (Humane Letters is a rigorous combination of an English and History class. It is worth two credits.)

6. I participate in sports (JV Volleyball, JV Basketball, Varsity Traveling Club Basketball); I tutor middle school students in math; I was in the school orchestra and choir; I coach middle school basketball; and, I am in the Upward Bound program at a well-known state university.

7. I dance competitively at powwows, which are Native American social events. Most recently, I won first place in the Teen Jingle Dress Dance at an Indian Fair in my state in March. I have danced since I could walk. Dancing is an important part of my identity. I have a large extended family, many of whom live on the reservation. They are my link to my culture and a major reason why I want to go to college.

8. Most of my school's staff members have no concept of extended Native family or community obligations or of dealing with tribal services. (There are some exceptions.) However, these examples are typical: when I took two days off to travel to my South Dakota reservation while my great-uncle (in Native terms, my Grandpa) was dying, I was disciplined for vacationing. When I get health care from my tribal clinic, which has limited hours, my teachers cannot understand why I cannot schedule appointments outside of school hours. My school coaches criticize choosing to attend an infrequent yet important tribal event over optional practices. I could go on.

9. My school does do lots of things well.  It's academically very strong and offers a small campus and small classes.  All my teachers know me.  My college counselor is very supportive.  The rigorous classes seem to cut down the number of students who just goof off.   However, understanding Native life just is not a strength of the school.

10. I'm more likely to select a college that has an Indian community. I'm more likely to select a college that offers Native American studies.  In college, I hope to find more racial diversity in the students and more open-minded teachers.  I also hope to find people who are similar to me.

11. I would like to be a surgeon someday and know college is an important step.  I chose to attend my high school, knowing its lack of diversity, because of the number of honors courses it offers.  It was a difficult decision – choosing between a diverse high school and an academically rigorous one.  I chose the school that I thought would best prepare me for college.  Not every Native student has this choice. Schools in Indian communities are notoriously bad.  I feel very fortunate.

12. Even though I have significantly more resources and opportunities than my on-reservation family members and peers, I cannot afford to enroll in the costly SAT test prep courses that most of my schoolmates attend.

13. When I apply to college three years from now, I plan to apply to Harvard University.  I will also apply for financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April ___28___ , 2015.

_____

G.E.

# EXHIBIT 1.5

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendants. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF A.G.

A.G., pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is A.G., I am under 18 years of age and I am fully competent to make this Declaration.

2. I am in the 11th grade at a private high school.

3. I am of Hispanic heritage.

4. Hispanic students are in the minority in my school.

5. I have a very high GPA, and have taken the following advanced courses:  AP Chemistry; AP Computer Science (Java); AP Calculus; AP Statistics; College Trig-Based Physics; Molecular Biology; and AP Spanish Language.

6.  My extracurricular and volunteer experiences include: The Hispanic Student Association (2013- present), Club Soccer Team Captain  (State Championship finalists, 2013); High School Soccer, Varsity starter 2012 to present (State Champions, 2012; semi-finalists, 2013; finalists, 2014); High School Soccer – Varsity Soccer Player of the Year 2014; Track and Field participant; Youth soccer coach and referee; Summer High School Pre-Medical Institute, Washington University in St. Louis (July 2014);
North Science Center volunteer; Project Share volunteer; Roadrunner Food Bank volunteer; and, Read to Excel volunteer.

7.  I am also of Filipino descent.  My race and ethnicity are at the core of who I am, how I view the world, and in many ways, how others view me. Culturally, my beliefs and principles are grounded in my family and our history. In turn, this has provided me a richer understanding and appreciation for my friends and colleagues at school (both regardless of and in regard for their race, gender and culture), a greater value in our differences and a deeper desire to encourage participation by what each of us brings to the conversation.

8.  I believe that because of my family, our history, our experiences and our beliefs, I can contribute in much more meaningful, broader and important ways to not only my education, but to the education and understanding of others around me.

9.  In college I hope to be part of a highly diverse environment, including race, ethnicity, gender, points of view, and other elements that create opportunities for learning, growing and appreciating variety and understanding.

10.  My plans include applying to Harvard University. I plan to apply for scholarships

and any other form of financial aid that may be available to me.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April __28__ , 2015.

A.G.

Case: 15-1823    Document: 00116883548    Page: 234    Date Filed: 09/02/2015    Entry ID: 5934391

# EXHIBIT 1.6

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendants. | Civil Action No. 1:14-cv-14176-DJC |

**DECLARATION OF I.G.**

I.G., pursuant to 28 U.S.C. Section 1746, declares the following:

1.  My name is I.G., I am under 18 years of age and I am fully competent to make this Declaration.

2.  I am in the 9th grade at an independent high school.

3.  I am Hispanic.

4.  My school is approximately 50% white and 50% minority.

5.  My relevant coursework includes Math: Algebra I and II, Geometry, Trigonometry, Pre-calculus; Science: Earth Science, Physics I, Chemistry I; and, Spanish (IA, IIA), English, and History.

6.  Award and Honors I've received:

  a. The Follansbee Award (awarded for unusually distinguished academic and athletic records at my school) – May 2012

  b. The Robert Schroeder Memorial Award (awarded for best exemplifying the ideals of my school through spirit, citizenship, and contribution to the welfare of the school) – May 2014

  c. My artwork was selected for a juried exhibition at an art gallery in a well-known center for art, and I received the Alumni Award for unique vision and creativity – April 2015

7. My relevant extracurricular activities are:  USATF Cross Country Junior Olympics National Championships 2012; Varsity Track and Field (State Championship medalist, 2014); Competitive Soccer (2008-2015); Varsity High School Soccer (2014), and Basketball.

8. My volunteer activities include cooking meals for families staying at the local Ronald McDonald House, preparing and serving meals to low-income and homeless people of my community through a local agency, and sorting produce at a local food bank.

9. I'm proud of my heritage, being Hispanic and Filipino. Through my interactions with my cousins, friends, and volunteer activities, I've come to appreciate differences based on family, socio-economic status and alternative experiences. I think that my own experiences and heritage give me a unique perspective that is important to share with others.

10. The campus environment I would prefer is one that brings together people of different races, ethnicities and perspectives. I believe that a variety of perspectives ultimately results in better solutions.

11.  Although my college applications are several years away, I want to apply to Harvard University. I will also apply for financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April  28  , 2015.

_____

I.G.

# EXHIBIT 1.7

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),<br><br>Defendants. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF R.H.

R.H., pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is R.H., I am under 18 years of age and I am fully competent to make this Declaration.

2. I attend an independent high school, where I am in the 11th grade.

3. I am African American.

4. My school has only a very small percentage of African-American students.

5. Whenever there's a character in a book the class is reading who has the same ethnicity as me, I am called upon to comment on that character and motivations, as though just being black makes me understand.

6. In college I hope to find a more racially diverse environment, where I can find my place in the community.

7. By the time I graduate, I will have taken 5 A.P. courses.

8. I am a participant with Science Olympiad, and I will be representing my school at nationals next month.

9. I run track and field, I work as a lifeguard year round, and I have done community service at Wanagi Wolf Fund and Rescue.

10. Next year I plan to apply to Harvard University and I also will apply for financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 27 , 2015.

_____

R.H.

# EXHIBIT 1.8

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC,

Plaintiff,

v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

Defendants.

Civil Action No. 1:14-cv-14176-DJC

DECLARATION OF J.L.

J.L., pursuant to 28 U.S.C. Section 1746, declares the following:

1.  My name is J.L., I am under 18years of age and I am fully competent to make this
    Declaration.

2.  I attend a private school, and am in the 10th grade.

3.  My tribal affiliation is Jemez Pueblo and Zuni Tribe.

4.  My school is approximately 50% students of color, but there are few Native
    American students.

5.  I have taken advanced courses in math, science, language and other core courses.

6.  I have participated in three years of varsity cross-country and track, and two years
    of basketball. I have been playing classical guitar for five years at my school.

Also, I was selected to run on the Wings of America team, a qualifying team of the top 7 Native American runners in the country, to represent Native communities across the US at the USA Cross Country National Meet (2014 & 2015).

7.  I participate in traditional Pueblo Indian dances and cultural events throughout the year in Jemez Pueblo and Zuni Tribe.  Being a Native American makes me unique to my classmates, who seem to have little knowledge of Native American life. It allows me to bring my experiences and ideas to another community away from home.

8.  In college I hope to provide a good influence on my peers by being an ambassador of the Native American world. I believe the majority of the U.S. population does not have much knowledge about Native Americans. They only know the stereotypes of substance abuse and Indian casinos. I want to attend a highly regarded college to obtain the best education, so that I may come back home and improve the lives of people of my community in Jemez, Zuni, and my state.

9.  Being around a diverse community enables me to interact with different people who have their own personal backgrounds, which have formed their outlook on life. When I meet Native Americans of other tribes, I am able to connect with them easily because we share the same challenges and interests.

10. Receiving a good education has been the hope of my parents for my brothers and me, so that we can go back to our communities in Jemez and Zuni Pueblos to improve the current living situation on the reservation. My people suffer from

alcoholism, obesity, and poverty, which is my inspiration to earn good grades and to strive for excellence. I want to practice medicine, so I can take my skills to the communities that are in dire need of quality medical education and services.

11. I have also used my success in running to reach other Native American youth in New Mexico and across the country. Running has allowed me to connect to more Native Americans from other tribes and given me an opportunity to inspire them to strive for the best of their ability. I try to show them that another Native American can excel in education and athletics to be competitive with the outside world. The Native American communities are in need of good, positive influences that show what Native Americans are capable of, and show that it is possible to be successful.

12. I plan to apply to Harvard University. I will also apply for financial aid because it is very expensive to attend prestigious colleges and universities like Harvard.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April **2 8**, 2015.

_____
J.L.

Case: 15-1823    Document: 00116883548    Page: 245    Date Filed: 09/02/2015    Entry ID: 5934391

# EXHIBIT 1.9

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE (HARVARD CORPORATION),<br><br>Defendants. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF R.S.

R.S., pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is R.S., I am under 18 years of age and I am fully competent to make this Declaration.

2. I am a 9th grader in a public high school.

3. I am Native American, of the Confederated Tribes of the Umatilla Indian Reservation.

4. My school is majority white.

5. I am currently in 2 AP honors classes.

6.  My extracurricular activities include being a youth employee, a babysitter, a
    fisherman and a basketball player.  I am also active in my Tribal culture.

7.  I am the only enrolled Tribal member from a Tribe in my state in a high school of
    2,068 students. There is little knowledge of tribal culture at my school.  I stand
    out as a Native student.

8.  If I will be one of few Native Americans in my college, it may make it harder to
    relate to other students, and they may lack authentic knowledge of my
    background.  Hopefully I will have a more diverse college experience, one where
    I don't stand out as the only Native American Tribal member.

9.  Harvard University is in my application plans for college. I am interested in
    receiving financial aid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April __28__ , 2015.

_____R. S_____

R.S.

Case: 15-1823    Document: 00116883548    Page: 248    Date Filed: 09/02/2015    Entry ID: 5934391

# EXHIBIT 1.10

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendants. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF SARAH COLE

Sarah Cole, pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is Sarah Cole, and I am at least 18 years of age and fully competent to make this Declaration.

2. I am a full-time undergraduate student at Harvard College. I am in my junior year and am pursuing a Special Concentration in Education and American Society.

3. I describe my race and/or ethnicity as Black or African American.

4. I currently experience academic and/or personal benefits from attending Harvard as part of a racially diverse student body, and I desire to learn alongside students who are each a part of a critical mass of their race/ethnicity.

5. I believe my background enables me to offer unique perspectives and cultural experiences in my academic and campus activities.

6.  I believe my education would be harmed if Harvard stopped considering race in its admissions policy.  The current policy facilitates the admission of strong African-American students, which improves my educational experience by allowing me to learn alongside a greater number of African American students so that I do not feel singled out as a spokesperson for my ethnicity.  The policy likewise facilitates the admission of strong underrepresented minority students with racial or ethnic backgrounds different from my own and from whom I feel I learn both inside and outside the classroom.

7.  I believe the benefits of racial or ethnic diversity play an important role in a number of academic and campus activities that affect my undergraduate experience, including lectures, sections, house life, student government, communities of faith, extracurricular activities such as the debate team, mock trial, and Model UN, and community service programs through the Phillips Brooks House Association.

8.  I would like to see an increase in the number and diversity of underrepresented racial groups admitted to Harvard.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 28 , 2015.

_____
Sarah Cole

# EXHIBIT 1.11

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendants. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF FADHAL MOORE

Fadhal Moore, pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is Fadhal Moore, and I am at least 18 years of age and fully competent to make this Declaration.

2. I am a full-time undergraduate student at Harvard College. I am in my senior year and am majoring in government.

3. I describe my race and/or ethnicity as African American.

4. I currently experience academic and/or personal benefits from attending Harvard as part of a racially diverse student body, and I desire to learn alongside students who are each a part of a critical mass of their race/ethnicity.

5. I believe my background enables me to offer unique perspectives and cultural experiences in my academic and campus activities.

6. I believe my education would be harmed if Harvard stopped considering race in its admissions policy. The current policy facilitates the admission of strong African-American students, which improves my educational experience by allowing me to learn alongside a greater number of African-American students so that I do not feel singled out as a spokesperson for my ethnicity. The policy likewise facilitates the admission of strong underrepresented minority students with racial or ethnic backgrounds different from my own and from whom I feel I learn both inside and outside the classroom.

7. I believe the benefits of racial or ethnic diversity play an important role in a number of academic and campus activities that affect my undergraduate experience, including lectures, sections, and community service. Similarly, the presence of cultural affinity groups helps students from underrepresented racial minority groups, including myself, to understand the cultural cues of the "culture of power" and ease their and my transition to the campus.

8. I would like to see an increase in the number and diversity of underrepresented racial groups admitted to Harvard.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April _28_ , 2015.

_____
Fadhal Moore

# EXHIBIT 1.12

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendants. | Civil Action No. 1:14-cv-14176-DJC |

**DECLARATION OF ARJINI KUMARI NAWAL**

Arjini Kumari Nawal, pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is Arjini Kumari Nawal, and I am at least 18 years of age and fully competent to make this Declaration.

2. I am a full-time undergraduate student at Harvard College. I am in my freshman year and am planning on majoring in History and Literature.

3. I describe my race and/or ethnicity as Asian American of Sri Lankan Descent.

4. I currently experience academic and/or personal benefits from attending Harvard as part of a racially diverse student body, and I desire to learn alongside students who are each a part of a critical mass of their race/ethnicity.

5. I believe my background enables me to offer unique perspectives and cultural experiences in my academic and campus activities.

6. I believe my education would be harmed if Harvard stopped considering race in its admissions policy.

7. I believe the benefits of racial or ethnic diversity play an important role in a number of academic and campus activities. I am involved in Harvard Model Congress and the radio station, both of which benefit enormously from racial diversity and in the membership of people with different backgrounds.

8. I would like to see an increase in the number and diversity of underrepresented racial groups admitted to Harvard. In addition, I serve on the Student Advisory Board to the Dean of Humanities, where, as the only member of color, I have brought up the lack of diversity in the humanities program at Harvard.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 27 , 2015.

_____
Arjini Kumari Nawal

# EXHIBIT 1.13

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br>      Plaintiff, <br><br>      v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br>      Defendants. | Civil Action No. 1:14-cv-14176-DJC |

**DECLARATION OF ITZEL LIBERTAD VASQUEZ-RODRIGUEZ**

Itzel Libertad Vasquez-Rodriguez, pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is Itzel Libertad Vasquez-Rodriguez, and I am at least 18 years of age and fully competent to make this Declaration.

2. I am a full-time undergraduate student at Harvard College. I am in my sophomore year and am majoring in Sociology.

3. I describe my race and/or ethnicity as Native American and Latina of Mexican Ancestry.

4. I currently experience academic and/or personal benefits from attending Harvard as part of a racially diverse student body, and I desire to learn alongside students who are each a part of a critical mass of their race/ethnicity.

5. I believe my background enables me to offer unique perspectives and cultural experiences in my academic and campus activities.

6.  I believe my education would be harmed if Harvard stopped considering race in its admissions policy.  The current policy facilitates the admission of strong Native American and Latino students, which improves my educational experience by allowing me to learn alongside a greater number of both Native American and Latino students so that I do not feel singled out as a spokesperson for my ethnicity.  The policy likewise facilitates the admission of strong underrepresented minority students with racial or ethnic backgrounds different from my own and from whom I feel I learn both inside and outside the classroom.

7.  I believe the benefits of racial or ethnic diversity play an important role in a number of academic and campus activities that affect my undergraduate experience, including varsity sports teams, class lecture, class section, Phillips Brooks House Association (PBHA) programs, Undergraduate Council, pre-professional programs, Finals Clubs, sororities, fraternities, The Crimson, and most student organizations.

8.  An increased presence of underrepresented racial minority groups would allow, for example, students involved in public service programs with PBHA to more deeply understand and be able to help the communities they serve.  Increased racial and ethnic diversity would improve class lectures and sections by bringing nuances to class discussions and offering unique perspectives in class conversations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 28 , 2015.

_____
Itzel Libertad Vasquez-Rodriguez

# EXHIBIT 1.14

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT COURT OF MASSACHUSETTS**
**BOSTON DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br>              Plaintiff, <br><br>        v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br>              Defendants. | Civil Action No. 1:14-cv-14176-DJC |

DECLARATION OF KEYANNA WIGGLESWORTH

Keyanna Wigglesworth, pursuant to 28 U.S.C. Section 1746, declares the following:

1. My name is Keyanna Wigglesworth, and I am at least 18 years of age and fully competent to make this Declaration.

2. I am a full-time undergraduate student at Harvard College. I am in my junior year and am majoring in Latin American Studies and Romance Languages and Literature.

3. I describe my race and/or ethnicity as Black American.

4. I currently experience academic and/or personal benefits from attending Harvard as part of a racially diverse student body, and I desire to learn alongside students who are each a part of a critical mass of their race/ethnicity.

5. I believe my background enables me to offer unique perspectives and cultural experiences in my academic and campus activities.

6. I believe my education would be harmed if Harvard stopped considering race in its admissions policy.

7. I believe the benefits of racial or ethnic diversity play an important role in a number of academic and campus activities, including all student organizations, Undergraduate Council, College Events Board, Harvard College Women's Center, and the Institute of Politics.

8. I would like to see an increase in the number and diversity of underrepresented racial groups admitted to Harvard.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April __27__ , 2015.

_____
Keyanna Wigglesworth

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through

the ECF system on April 29, 2015 will be sent electronically to the registered participants as

identified on the Notice of Electronic Filing.

<u>/s/ Rahsaan D. Hall</u>
Rahsaan D. Hall, BBO # 645369
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND ECONOMIC JUSTICE
294 Washington St., Suite 443
Boston, MA 02108
Tel: (617) 988-0608
rhall@lawyerscom.org

ATTORNEY FOR PROPOSED DEFENDANT-
INTERVENORS

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT COURT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br>        Plaintiff, <br><br>        v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br>        Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## PROPOSED ANSWER OF PROPOSED DEFENDANT-INTERVENORS

Proposed Defendant-Intervenors, M.B., K.C., Y.D., G.E., A.G., I.G., R.H., J.L., R.S., Sarah Cole, Fadhal Moore, Arjini Kumari Nawal, Itzel Vasquez-Rodriguez, and Keyanna Wigglesworth  (collectively, "Defendant-Intervenors"), by their undersigned attorneys, hereby answer the Complaint filed by the Plaintiff in the above-styled action as follows:

### I.    RESPONSES TO THE COMPLAINT

Defendant-Intervenors deny each and every averment of the Complaint except as specifically admitted in the following responses to the enumerated paragraphs of the Complaint.

1. Paragraph 1 states conclusions of law and Plaintiff's characterization of its claims, to which no response is necessary.

2. Paragraph 2 states conclusions of law, to which no response is necessary.  To the extent a response is deemed necessary, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2

and therefore deny those allegations.

3.    Defendant-Intervenors deny the allegations in paragraph 3, except to the extent they contain conclusions of law, which require no response.

4.    Defendant-Intervenors deny the allegations in paragraph 4, except to the extent they contain conclusions of law, which require no response.

5.    Defendant-Intervenors deny the allegations in paragraph 5, except to the extent they contain conclusions of law, which require no response.

6.    Defendant-Intervenors deny the allegations in paragraph 6, except to the extent they contain conclusions of law, which require no response. With regard to the enrollment statistics discussed in paragraph 6, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations and therefore deny those allegations. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may be primarily the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process.

7.    Defendant-Intervenors deny the allegations in paragraph 7, except to the extent they contain conclusions of law, which require no response.

8.    Defendant-Intervenors deny the allegations in paragraph 8, except to the extent they contain conclusions of law, which require no response.

9.    Defendant-Intervenors deny the allegations in paragraph 9, except to the extent they contain conclusions of law, which require no response.

10.   Defendant-Intervenors admit that Plaintiff brought this action under 42 U.S.C. § 2000d

*et seq.* and that 28 U.S.C. §§ 1331 and 1343 authorize the Court's subject-matter jurisdiction over such actions. Defendant-Intervenors deny that the Court possesses subject-matter jurisdiction over this case, however.

11.    Defendant-Intervenors admit that venue is proper.

12.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12 and therefore deny those allegations.

13.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 and therefore deny those allegations.

14.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 and therefore deny those allegations.

15.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15 and therefore deny those allegations.

16.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 and therefore deny those allegations.

17.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17 and therefore deny those allegations.

18.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18 and therefore deny those allegations.

19.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 and therefore deny those allegations.

20.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 20 and therefore deny those allegations.

21.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

JA 264

the truth of the allegations in paragraph 21 and therefore deny those allegations.

22.     Defendant-Intervenors deny the allegations in paragraph 22.

23.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 and therefore deny those allegations.

24.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 and therefore deny those allegations.

25.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 and therefore deny those allegations.

26.     Defendant-Intervenors deny the allegations in paragraph 26.

27.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 27 and therefore deny those allegations.

28.     Defendant-Intervenors deny the allegations in paragraph 28.

29.     Defendant-Intervenors admit on information and belief that the Harvard Corporation is Harvard University's senior governing board.  Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 29 and therefore deny those allegations.

30.     Defendant-Intervenors admit on information and belief that Harvard University is a private educational institution with its legal address in Cambridge, Massachusetts.

31.     Defendant-Intervenors admit on information and belief that Harvard College is a component of Harvard University that offers undergraduate education.  Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about

the truth of the remaining allegations in paragraph 31 and therefore deny those allegations.

32.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 and therefore deny those allegations.

33.     Defendant-Intervenors admit upon information and belief that Harvard College enrolls a number of students who receive federal financial aid.

34.     Paragraph 34 states a conclusion of law, which requires no response.

35.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 35 and therefore deny those allegations.

36.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 and therefore deny those allegations.

37.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 37 and therefore deny those allegations.

38.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 and therefore deny those allegations.

39.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 and therefore deny those allegations.

40.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 and therefore deny those allegations.

41.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 and therefore deny those allegations.

42.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42 and therefore deny those allegations.

JA 266

43.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 and therefore deny those allegations.

44.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 and therefore deny those allegations.

45.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 and therefore deny those allegations.

46.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46 and therefore deny those allegations.

47.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 47 and therefore deny those allegations.

48.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48 and therefore deny those allegations.

49.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 49 and therefore deny those allegations.

50.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 50 and therefore deny those allegations.

51.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 51 and therefore deny those allegations.

52.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52 and therefore deny those allegations.

53.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 53 and therefore deny those allegations.

54.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 54 and therefore deny those allegations.

55.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 55 and therefore deny those allegations.

56.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 56 and therefore deny those allegations.

57.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 57 and therefore deny those allegations.

58.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 58 and therefore deny those allegations.

59.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 59 and therefore deny those allegations.

60.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 60 and therefore deny those allegations.

61.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61 and therefore deny those allegations.

62.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 62 and therefore deny those allegations.

63.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 63 and therefore deny those allegations.

64.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 64 and therefore deny those allegations.

65.     Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 65 and therefore deny those allegations.

JA 268

66.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 66 and therefore deny those allegations.

67.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 67 and therefore deny those allegations.

68.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 68 and therefore deny those allegations.

69.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 69 and therefore deny those allegations.

70.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 70 and therefore deny those allegations.

71.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 71 and therefore deny those allegations.

72.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 72 and therefore deny those allegations.

73.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 73 and therefore deny those allegations.

74.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 74 and therefore deny those allegations.

75.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 75 and therefore deny those allegations.

76.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 76 and therefore deny those allegations.

77.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 77 and therefore deny those allegations.

78.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 78 and therefore deny those allegations.

79.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 79 and therefore deny those allegations.

80.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 80 and therefore deny those allegations.

81.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 81 and therefore deny those allegations.

82.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 82 and therefore deny those allegations.

83.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 83 and therefore deny those allegations.

84.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 84 and therefore deny those allegations.

85.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 85 and therefore deny those allegations.

86.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 86 and therefore deny those allegations.

87.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 87 and therefore deny those allegations.

88.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 88 and therefore deny those allegations.

JA 270

89.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 89 and therefore deny those allegations.

90.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 90 and therefore deny those allegations.

91.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 91 and therefore deny those allegations.

92.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 92 and therefore deny those allegations.

93.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 93 and therefore deny those allegations.

94.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 94 and therefore deny those allegations.

95.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 95 and therefore deny those allegations.

96.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 96 and therefore deny those allegations.

97.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 97 and therefore deny those allegations.

98.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 98 and therefore deny those allegations.

99.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 99 and therefore deny those allegations.

100.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

JA 271

the truth of the allegations in paragraph 100 and therefore deny those allegations, except to the extent they state conclusions of law, which require no response.

101.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 101 and therefore deny those allegations.

102.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 102 and therefore deny those allegations.

103.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 103 and therefore deny those allegations.

104.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 104 and therefore deny those allegations.

105.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 105 and therefore deny those allegations.

106.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 106 and therefore deny those allegations.

107.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 107 and therefore deny those allegations.

108.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 108 and therefore deny those allegations.

109.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 109 and therefore deny those allegations.

110.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 110 and therefore deny those allegations.

111.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

JA 272

the truth of the allegations in paragraph 111 and therefore deny those allegations.

112. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 112 and therefore deny those allegations.

113. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 113 and therefore deny those allegations.

114. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 114 and therefore deny those allegations.

115. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 115 and therefore deny those allegations.

116. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 116 and therefore deny those allegations.

117. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 117 and therefore deny those allegations.

118. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 118 and therefore deny those allegations.

119. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 119 and therefore deny those allegations.

120. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 120 and therefore deny those allegations.

121. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 121 and therefore deny those allegations.

122. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 122 and therefore deny those allegations.

JA 273

123.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 123 and therefore deny those allegations.

124.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 124 and therefore deny those allegations.

125.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 125 and therefore deny those allegations.

126.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 126 and therefore deny those allegations.

127.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 127 and therefore deny those allegations.

128.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 128 and therefore deny those allegations.

129.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 129 and therefore deny those allegations.

130.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 130 and therefore deny those allegations.

131.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 131 and therefore deny those allegations.

132.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 132 and therefore deny those allegations.

133.   Defendant-Intervenors admit on information and belief the allegations of paragraph 133.

134.   Defendant-Intervenors state that to the extent the allegations set forth in paragraph 134 are from a written document, the document speaks for itself and, to the extent the

JA 274

allegations of paragraph 134 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 134. To the extent that paragraph 134 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 134 and therefore deny those allegations.

135. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 135 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 135 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 135. To the extent that paragraph 135 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 135 and therefore deny those allegations.

136. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 136 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 136 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 136. To the extent that paragraph 136 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 136 and therefore deny those allegations.

137. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 137

JA 275

are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 137 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 137. To the extent that paragraph 137 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 137 and therefore deny those allegations.

138.   Defendant-Intervenors state that to the extent the allegations set forth in paragraph 138 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 138 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 138. To the extent that paragraph 138 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 138 and therefore deny those allegations.

139.   Defendant-Intervenors admit on information and belief the allegations of paragraph 139.

140.   Defendant-Intervenors state that to the extent the allegations set forth in paragraph 140 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 140 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 140. To the extent that paragraph 140 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 140 and therefore deny those

allegations.

141.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 141 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 141 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 141. To the extent that paragraph 141 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 141 and therefore deny those allegations.

142.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 142 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 142 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 142. To the extent that paragraph 142 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 142 and therefore deny those allegations.

143.    Defendant-Intervenors admit on information and belief the allegations of paragraph 143.

144.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 144 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 144 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 144. To the extent that paragraph 144 contains allegations neither set forth in a written document nor inconsistent with such a

JA 277

document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 144 and therefore deny those allegations.

145.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 145 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 145 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 145. To the extent that paragraph 145 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 145 and therefore deny those allegations.

146.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 146 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 146 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 146. To the extent that paragraph 146 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 146 and therefore deny those allegations.

147.    Defendant-Intervenors admit upon information and belief that Harvard's admissions committee considers each applicant's background and personal characteristics, including—where relevant—the applicant's race or ethnicity as it bears on the holistic review, as one among many factors that it evaluates holistically in determining

-17-

whether to make an offer of admission.  Defendant-Intervenors otherwise deny the allegations in paragraph 147.

148.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 148 and therefore deny those allegations.

149.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 149 and therefore deny those allegations.

150.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 150 and therefore deny those allegations.

151.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 151 and therefore deny those allegations.

152.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 152 and therefore deny those allegations.

153.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 153 and therefore deny those allegations.

154.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 154 and therefore deny those allegations.

155.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 155 and therefore deny those allegations.

156.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 156 and therefore deny those allegations.

157.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 157 and therefore deny those allegations.

158.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 158 and therefore deny those allegations.

159.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 159 and therefore deny those allegations.

160.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 160 and therefore deny those allegations.

161.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 161 and therefore deny those allegations.

162.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 162 and therefore deny those allegations.

163.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 163 and therefore deny those allegations.

164.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 164 and therefore deny those allegations.

165.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 165 and therefore deny those allegations.

166.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 166 and therefore deny those allegations.

167.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 167 and therefore deny those allegations.

168.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 168 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 168 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 168. To the extent that paragraph 168

JA 280

contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 168 and therefore deny those allegations.

169. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 169 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 169 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 169. To the extent that paragraph 169 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 169 and therefore deny those allegations.

170. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 170 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 170 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 170. To the extent that paragraph 170 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 170 and therefore deny those allegations.

171. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 171 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 171 are inconsistent with any such document, Defendant-

Intervenors deny the allegations in paragraph 171.  To the extent that paragraph 171 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 171 and  therefore deny those allegations.

172.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 172 are from a written document, the document speaks for itself and, to the extent the allegations of  paragraph 172 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 172.  To the extent that paragraph 172 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 172 and  therefore deny those allegations.

173.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 173 are from a written document, the document speaks for itself and, to the extent the allegations of  paragraph 173 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 173.  To the extent that paragraph 173 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 173 and  therefore deny those allegations.

174.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 174 are from a written document, the document speaks for itself and, to the extent the

allegations of paragraph 174 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 174. To the extent that paragraph 174 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 174 and therefore deny those allegations.

175. Defendant-Intervenors admit the allegations in paragraph 175 to the extent that they list the materials required to apply to Harvard College. With regard to the process by which the Harvard Admissions Committee reviews such admissions material, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 175 and therefore deny those allegations.

176. Defendant-Intervenors admit that applicants, on the Common Application, may choose to provide information about their race or ethnicity. Defendant-Intervenors otherwise deny the allegations in paragraph 176.

177. Defendant-Intervenors admit that applicants, on the Common Application, may choose to provide information about their race or ethnicity.

178. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 178 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 178 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 178. To the extent that paragraph 178 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 178 and therefore deny those

JA 283

allegations.

179.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 179 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 179 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 179.  To the extent that paragraph 179 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 179 and therefore deny those allegations.

180.    Defendant-Intervenors admit that applicants, on the Common Application, may choose to provide information about their race or ethnicity.

181.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 181 are from a written document, the document speaks for itself and, to the extent the allegations of paragraph 181 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 181.  To the extent that paragraph 181 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 181 and therefore deny those allegations.

182.    Defendant-Intervenors state that to the extent the allegations set forth in paragraph 182 purport to characterize a written document, the document speaks for itself and, to the extent the allegations of paragraph 182 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 182.  To the extent that

-23-

paragraph 182 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 182 and therefore deny those allegations.

183. Defendant-Intervenors state that to the extent the allegations set forth in paragraph 183 purport to characterize a written document, the document speaks for itself and, to the extent the allegations of paragraph 183 are inconsistent with any such document, Defendant-Intervenors deny the allegations in paragraph 183. To the extent that paragraph 183 contains allegations neither set forth in a written document nor inconsistent with such a document, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 183 and therefore deny those allegations.

184. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 184 and therefore deny those allegations.

185. Defendant-Intervenors admit on information and belief that the Harvard College admissions office considers for transfer admission students who have completed at least one continuous academic year in a full-time degree program at one college. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 185 and therefore deny those allegations.

186. Defendant-Intervenors admit upon information and belief that the Harvard College admissions office considers applicants for transfer admission in a holistic manner and that, as with applicants for early or regular admission, it considers each applicant's

background and personal characteristics, including—where relevant—the applicant's
race or ethnicity as it bears on the holistic review, as one among many factors that it
evaluates holistically in determining whether to make an offer of admission. Defendant-
Intervenors otherwise deny the allegations in paragraph 186.

187.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 187 and therefore deny those allegations.

188.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 188 and therefore deny those allegations.

189.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 189 and therefore deny those allegations.

190.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 190 and therefore deny those allegations.

191.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 191 and therefore deny those allegations.

192.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 192 and therefore deny those allegations.

193.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 193 and therefore deny those allegations.

194.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 194 and therefore deny those allegations.

195.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about
the truth of such allegations in paragraph 195 and therefore deny those allegations.

196.  Defendant-Intervenors admit that the admissions committee considers each applicant's

JA 286

background and personal characteristics, including—where relevant—the applicant's race or ethnicity as it bears on the holistic review, as one among many factors that it evaluates holistically in determining whether to make an offer of admission. Defendant-Intervenors otherwise deny the allegations in paragraph 196.

197. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 197 and therefore deny those allegations.

198. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 198 and therefore deny those allegations.

199. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 199 and therefore deny those allegations.

200. With regard to the references in paragraph 200 to statistical studies, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations asserted and therefore deny those allegations. Defendant-Intervenors otherwise deny the allegations in paragraph 200, except to the extent they contain conclusions of law, which require no response.

201. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 201 and therefore deny those allegations.

202. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 202 and therefore deny those allegations.

203. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 203 and therefore deny those allegations.

204. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 204 and therefore deny those allegations.

JA 287

205. With regard to the references in paragraph 205 to statistical studies, Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations and therefore deny those allegations. Defendant-Intervenors otherwise deny the allegations in paragraph 205, except to the extent they contain conclusions of law, which require no response.

206. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 206 and therefore deny those allegations.

207. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 207 and therefore deny those allegations.

208. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 208 and therefore deny those allegations.

209. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 209 and therefore deny those allegations.

210. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 210 and therefore deny those allegations.

211. Defendant-Intervenors deny the last sentence of paragraph 211, except to the extent it contains conclusions of law which require no response. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 211 and therefore deny those allegations.

212. Defendant-Intervenors deny the last sentence of paragraph 212, except to the extent it contains conclusions of law which require no response. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 212 and therefore deny those allegations.

JA 288

213.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 213 and therefore deny those allegations.

214.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 214 and therefore deny those allegations.

215.   Defendant-Intervenors deny the allegations set forth in paragraph 215, except to the extent they contain conclusions of law, which require no response.

216.   Defendant-Intervenors deny the last sentence of paragraph 216, except to the extent it contains conclusions of law which require no response. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 216 and therefore deny those allegations.

217.   Defendant-Intervenors deny the allegations set forth in paragraph 217, except to the extent it contains conclusions of law, which require no response.

218.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 218 and therefore deny those allegations.

219.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 219 and therefore deny those allegations.

220.   Defendant-Intervenors deny the last sentence of paragraph 220, except to the extent they contain conclusions of law which require no response. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 220 and therefore deny those allegations.

221.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 221 and therefore deny those allegations.

222.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of such allegations in paragraph 222 and therefore deny those allegations. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process.

223.    Defendant-Intervenors deny the allegations of paragraph 223, except to the extent they contain conclusions of law, which require no response.

224.    Defendant-Intervenors deny the last sentence of paragraph 224, except to the extent they contain conclusions of law which require no response. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 224 and therefore deny those allegations.

225.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 225 and therefore deny those allegations.

226.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 226 and therefore deny those allegations.

227.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 227 and therefore deny those allegations.

228.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 228 and therefore deny those allegations.

229.    Defendant-Intervenors deny the allegations in paragraph 229, except to the extent they contain conclusions of law, which require no response.

230.    Defendant-Intervenors lack knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 230 and therefore deny those allegations.

231.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 231 and therefore deny those allegations.

232.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 232 and therefore deny those allegations.

233.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 233 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

234.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 234 and therefore deny those allegations.

235.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 235 and therefore deny those allegations.

236.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 236 and therefore deny those allegations.

237.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 237 and therefore deny those allegations.

JA 291

238.   Defendant-Intervenors deny the allegations in paragraph 238, except to the extent they contain conclusions of law, which require no response.

239.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 239 and therefore deny those allegations,

240.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 240 and therefore deny those allegations,

241.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 241 and therefore deny those allegations.

242.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 242 and therefore deny those allegations.

243.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 243 and therefore deny those allegations.

244.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 244 and therefore deny those allegations.

245.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 245 and therefore deny those allegations.

JA 292

246.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 246 and therefore deny those allegations.

247.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 247 and therefore deny those allegations.

248.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 248 and therefore deny those allegations.

249.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 249 and therefore deny those allegations.

250.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 250 and therefore deny those allegations.

251.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 251 and therefore deny those allegations.

252.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 252 and therefore deny those allegations.

253.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 253 and therefore deny those

allegations.

254.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 254 and therefore deny those allegations.

255.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 255 and therefore deny those allegations.

256.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 256 and therefore deny those allegations.

257.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 257 and therefore deny those allegations.

258.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 258 and therefore deny those allegations.

259.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 259 and therefore deny those allegations.

260.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 260 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

261.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 261 and therefore deny those allegations.

262.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 262 and therefore deny those allegations.

263.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

JA 294

the truth of such allegations in paragraph 263 and therefore deny those allegations

264.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 264 and therefore deny those allegations

265.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 265 and therefore deny those allegations

266.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 266 and therefore deny those allegations.

267.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 267 and therefore deny those allegations.

268.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 268 and therefore deny those allegations

269.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 269 and therefore deny those allegations.

270.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 270 and therefore deny those allegations.

271.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 271 and therefore deny those allegations. Defendant-Intervenors further rejct the implication in paragraph 271 that SAT scores are a reliable indicator of merit or accurately predict student achievement in college.

272.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 272 and therefore deny those allegations.

273.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 273 and therefore deny those allegations.

JA 295

274. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 274 and therefore deny those allegations.

275. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 275 and therefore deny those allegations.

276. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 276 and therefore deny those allegations. Defendant-Intervenors further reject the implication in paragraph 276 that SAT scores are a reliable indicator of merit or accurately predict student achievement in college.

277. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 277 and therefore deny those allegations.

278. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 278 and therefore deny those allegations.

279. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 279 and therefore deny those allegations.

280. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 280 and therefore deny those allegations.

281. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 281 and therefore deny those allegations.

282. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 282 and therefore deny those allegations.

283. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 283 and therefore deny those allegations. Defendant-Intervenors further rejct the implication in paragraph 283 that SAT scores are

JA 296

a reliable indicator of merit or accurately predict student achievement in college.

284. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 284 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

285. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 285 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

286. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 286 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

287. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 287 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

288. Defendant-Intervenors deny the allegations of paragraph 288, except to the extent they contain conclusions of law, which require no response.

289. Defendant-Intervenors deny the allegations of paragraph 289, except to the extent they contain conclusions of law, which require no response.

290. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 290 and therefore deny those allegations. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race

-36-

in the admissions process.

291.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 291 and therefore deny those allegations. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process.

292.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 292 and therefore deny those allegations. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process.

293.  Defendant-Intervenors deny the allegations in paragraph 293 to the extent they suggest Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 293 and therefore deny

JA 298

those allegations.

294. Defendant-Intervenors deny the allegations in paragraph 294 to the extent they suggest Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 294 and therefore deny those allegations.

295. Defendant-Intervenors deny the allegations in paragraph 295 to the extent they suggest Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 295 and therefore deny those allegations.

296. Defendant-Intervenors deny the allegations in paragraph 296 to the extent they suggest Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative

consistency of the demographics of the applicant pool from year to year. It does not

demonstrate that Harvard is unconstitutionally considering race in the admissions

process. Defendant-Intervenors otherwise lack knowledge or information sufficient to

form a belief about the truth of such allegations in paragraph 296 and therefore deny

those allegations.

297.    Defendant-Intervenors deny the allegations in paragraph 297 to the extent they suggest

Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further

state that even if it were found that the racial demographics of Harvard's entering class

remained relatively stable over the years, this may primarily be the result of the relative

consistency of the demographics of the applicant pool from year to year. It does not

demonstrate that Harvard is unconstitutionally considering race in the admissions

process. Defendant-Intervenors otherwise lack knowledge or information sufficient to

form a belief about the truth of such allegations in paragraph 297 and therefore deny

those allegations.

298.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of such allegations in paragraph 298 and therefore deny those allegations.

299.    Defendant-Intervenors deny the allegations in paragraph 299 to the extent they suggest

Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further

state that even if it were found that the racial demographics of Harvard's entering class

remained relatively stable over the years, this may primarily be the result of the relative

consistency of the demographics of the applicant pool from year to year. It does not

demonstrate that Harvard is unconstitutionally considering race in the admissions

process. Defendant-Intervenors otherwise lack knowledge or information sufficient to

JA 300

form a belief about the truth of such allegations in paragraph 299 and therefore deny those allegations.

300.    Defendant-Intervenors deny the allegations in paragraph 300 to the extent they suggest Harvard is engaging in unconsitutional racial balancing. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 300 and therefore deny those allegations.

301.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 301 and therefore deny those allegations.

302.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of such allegations in paragraph 302 and therefore deny those allegations.

303.    Defendant-Intervenors deny the allegations in paragraph 303. Defendant-Intervenors further state that even if it were found that the racial demographics of Harvard's entering class remained relatively stable over the years, this may primarily be the result of the relative consistency of the demographics of the applicant pool from year to year. It does not demonstrate that Harvard is unconstitutionally considering race in the admissions process.

304.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 304 and therefore deny those

allegations.

305. Defendant-Intervenors admit on information and belief that particular admissions policies, such as legacy preferences, have a disparate negative impact on racial minority applicants, but Defendant-Intervenors otherwise deny the allegations in paragraph 305.

306. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 306 and therefore deny those allegations, except to the extent they contain conclusions of law which require no response.

307. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 307 and therefore deny those allegations.

308. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 308 and therefore deny those allegations.

309. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 309 and therefore deny those allegations.

310. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 310 and therefore deny those allegations.

311. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 311 and therefore deny those allegations.

312. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 312 and therefore deny those allegations.

313. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 313 and therefore deny those allegations.

314. Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 314 and therefore deny those allegations.

315.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 315 and therefore deny those allegations.

316.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 316 and therefore deny those allegations.

317.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 317 and therefore deny those allegations.

318.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 318 and therefore deny those allegations.

319.    Defendant-Intervenors admit on information and belief that students at Harvard receive Pell Grants, but Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 319 and therefore deny those allegations.

320.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 320 and therefore deny those allegations.

321.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 321 and therefore deny those allegations.

322.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 322 and therefore deny those allegations.

323.    Paragraph 323 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 323.

324.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about

JA 303

the truth of the allegations in the first two sentences of paragraph 324.  The allegations in the third sentence of paragraph 324 state conclusions of law, which require no response.  To the extent a response is required, Defendant-Intervenors deny the allegations in the third sentence of paragraph 324.

325.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 325 and therefore deny those allegations.

326.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 326 and therefore deny those allegations.

327.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 327 and therefore deny those allegations.

328.    Paragraph 328 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant-Intervenors deny the allegations in the third sentence of paragraph 328.

329.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 329 and therefore deny those allegations.

330.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 330 and therefore deny those allegations.

331.    Defendant-Intervenors lack knowledge or information sufficient to form a belief

JA 304

about the truth of the allegations in paragraph 331 and therefore deny those allegations.

332.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 332 and therefore deny those allegations.

333.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 333 and therefore deny those allegations.

334.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 334 and therefore deny those allegations.

335.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 335 and therefore deny those allegations.

336.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 336 and therefore deny those allegations.

337.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 337 and therefore deny those allegations.

338.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 338 and therefore deny those allegations.

339.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 339 and therefore deny those allegations.

340.   Paragraph 340 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 340.

341.   Defendant-Intervenors admit on information and belief that particular admissions

policies, such as legacy preferences, have a disparate negative impact on racial minority applicants, but Defendant-Intervenors otherwise deny the allegations in paragraph 341.

342.    Defendant-Intervenors admit on information and belief the allegations of paragraph 342.

343.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 343 and therefore deny those allegations.

344.    Defendant-Intervenors admit on information and belief the allegations of paragraph 344.

345.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 345 and therefore deny those allegations, except to the extent they contain conclusions of law which require no response.

346.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 346 and therefore deny those allegations

347.    Paragraph 347 states a conclusion of law, which requires no response.  To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 347.

348.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 348 and therefore deny those allegations, except to the extent they contain conclusions of law which require no response.

349.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 349 and therefore deny those allegations.

350.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 350 and therefore deny those allegations.

351.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the

JA 306

truth of the allegations in paragraph 351 and therefore deny those allegations. Defendant-Intervenors further reject the implication in paragraph 351 that SAT scores are a reliable indicator of merit or accurately predict student achievement in college.

352. Defendant-Intervenors admit on information and belief the allegations of paragraph 352.

353. Defendant-Intervenors admit on information and belief that particular admissions policies, such as preferences for legacies and children of wealthy donors, have a disparate negative impact on racial minority applicants, but Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 353 and therefore deny those allegations.

354. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 354 and therefore deny those allegations.

355. Paragraph 355 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 355.

356. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 356 and therefore deny those allegations

357. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 357 and therefore deny those allegations

358. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 358 and therefore deny those allegations

359. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 359 and therefore deny those allegations

360. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 360 and therefore deny those allegations

361.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 361 and therefore deny those allegations

362.    Paragraph 362 states a conclusion of law, which requires no response.  To the

extent a response is required, Defendant-Intervenors deny the allegations in

paragraph 362.

363.    Defendant-Intervenors admit that Harvard accepts some students earlier in the year

than other students, but otherwise lacks knowledge or information sufficient to form

a belief about the truth of the allegations in paragraph 363 and therefore deny those

allegations.

364.    Defendant-Intervenors admit on information and belief the allegations of paragraph 364.

365.    Defendant-Intervenors admit on information and belief the allegations of paragraph 365.

366.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 366 and therefore deny those allegations

367.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 367 and therefore deny those allegations

368.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 368 and therefore deny those allegations.

369.    Paragraph 369 states a conclusion of law, which requires no response.  To the

extent a response is required, Defendant-Intervenors deny the allegations in

paragraph 369.

370.    The first sentence of paragraph 370 states a conclusion of law, which requires no

response.  To the extent a response is required, Defendant-Intervenors deny the

allegations in the first sentence of paragraph 370. Defendant-Intervenors deny the allegations in the second sentence of paragraph 370.

371.    Paragraph 371 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 371.

372.    Paragraph 372 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 372.

373.    Defendant-Intervenors deny the allegations in paragraph 373, except to the extent they contain conclusions of law, which require no response.

374.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 374 and therefore deny those allegations.

375.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 375 and therefore deny those allegations.

376.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 376 and therefore deny those allegations.

377.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 377 and therefore deny those allegations.

378.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 378 and therefore deny those allegations.

379.    Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 379 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

380.    Defendant-Intervenors deny the allegations in paragraph 380. Contrary to Plaintiff's claim that Harvard's holistic consideration of race—where relevant—stigmatizes and produces a

"devastating [physcological] effect" for the policy's supposed beneficiaries, Defendant-Intervenors assert that Harvard's current policy of racial preferencing does not harm Native American, African American, and Latino students but rather produces critical benefits for such students, including: providing a learning environment that is more hospitable and reduces isolation for Native American, African American, and Latino students and, furthermore, by producing a more productive educational environment due to the benefits that flow from a diverse student body to all students, including Defendant-Intervenors, including: increased cross-racial understanding and dialogue,  increased capacity to break down racial stereotypes, and better preparation to meet the challenges of an increasingly diverse workforce and society.

381.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 381 and therefore deny those allegations.

382.  Defendant-Intervenors deny the allegations in paragraph 382, except to the extent they contain conclusions of law, which require no response.

383.  Defendant-Intervenors deny the allegations in paragraph 383. Defendant-Intervenors further reject all allegations that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard.

384.  Defendant-Intervenors deny the allegations in paragraph 384 to the extent they suggest

that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 384 and therefore deny those allegations.

385.    Defendant-Intervenors deny the allegations in paragraph 385 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 385 and therefore deny those allegations.

386.    Defendant-Intervenors deny the allegations in paragraph 386 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits

JA 311

that flow from a diverse student body. Defendant-Intervenors further state upon

information and belief that Harvard College applies rigorous admissions standards to all

applicants; and that all admitted students are fully qualified to succeed at Harvard.

Defendant-Intervenors otherwise lack knowledge or information sufficient to form a

belief about the truth of the allegations in paragraph 386 and therefore deny those

allegations.

387.    Defendant-Intervenors deny the allegations in paragraph 387 to the extent they suggest

that "mismatch effect" explains or accounts for the academic achievement of any student

admitted under Harvard's current admissions policy which allows for the consideration of

an applicant's race to further the compelling interest of achieving the educational benefits

that flow from a diverse student body. Defendant-Intervenors further state upon

information and belief that Harvard College applies rigorous admissions standards to all

applicants; and that all admitted students are fully qualified to succeed at Harvard.

Defendant-Intervenors otherwise lack knowledge or information sufficient to form a

belief about the truth of the allegations in paragraph 387 and therefore deny those

allegations.

388.    Defendant-Intervenors deny the allegations in paragraph 388 to the extent they suggest

that "mismatch effect" explains or accounts for the academic achievement of any student

admitted under Harvard's current admissions policy which allows for the consideration of

an applicant's race to further the compelling interest of achieving the educational benefits

that flow from a diverse student body. Defendant-Intervenors further state upon

information and belief that Harvard College applies rigorous admissions standards to all

applicants; and that all admitted students are fully qualified to succeed at Harvard.

JA 312

Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 388 and therefore deny those allegations.

389.    Defendant-Intervenors deny the allegations in paragraph 389 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 389 and therefore deny those allegations.

390.    Defendant-Intervenors deny the allegations in paragraph 390 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 390 and therefore deny those allegations.

JA 313

391.    Defendant-Intervenors deny the allegations in paragraph 391 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 391 and therefore deny those allegations.

392.    Defendant-Intervenors deny the allegations in paragraph 392 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 392 and therefore deny those allegations.

393.    Defendant-Intervenors deny the allegations in paragraph 393 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration

of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 393 and therefore deny those allegations.

394. Defendant-Intervenors deny the allegations in paragraph 394 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 394 and therefore deny those allegations.

395. Defendant-Intervenors deny the allegations in paragraph 395 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all

JA 315

applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 395 and therefore deny those allegations.

396.   Defendant-Intervenors deny the allegations in paragraph 396 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 396 and therefore deny those allegations.

397.   Defendant-Intervenors deny the allegations in paragraph 397 to the extent they suggest that "mismatch effect" explains or accounts for the academic achievement of any student admitted under Harvard's current admissions policy which allows for the consideration of an applicant's race to further the compelling interest of achieving the educational benefits that flow from a diverse student body. Defendant-Intervenors further state upon information and belief that Harvard College applies rigorous admissions standards to all applicants; and that all admitted students are fully qualified to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 397 and therefore deny those

JA 316

allegations.

398.    Defendant-Intervenors deny the allegations of paragraph 398 to the extent they suggest

that African American and Histpanic students are harmed because of any "admissions

preference." Defendant-Intervenors further deny the allegations in paragraph 398 to the

extent they suggest that "mismatch effect" explains or accounts for the academic

achievement of any student admitted under Harvard's current admissions policy which

allows for the consideration of an applicant's race to further the compelling interest of

achieving the educational benefits that flow from a diverse student body. Defendant-

Intervenors state upon information and belief that Harvard College applies rigorous

admissions standards to all applicants; and that all admitted students are fully qualified

to succeed at Harvard. Defendant-Intervenors otherwise lack knowledge or information

sufficient to form a belief about the truth of the allegations in paragraph 388 and

399.    Defendant-Intervenors deny the allegations in paragraph 399, except to the extent they

contain conclusions of law, which require no response.

400.    Paragraph 400 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 400.

401.    Paragraph 401 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 401.

402.    Paragraph 402 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 402.

403.    Paragraph 403 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 403.

404.    Paragraph 404 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 404.

405.    Paragraph 405 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 405.

406.    Paragraph 406 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 406.

407.    Paragraph 407 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 407.

408.    Paragraph 408 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 408.

409.    Paragraph 409 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 409.

410.    Paragraph 410 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 410.

411.    Paragraph 411 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 411.

412.    Paragraph 412 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 412.

413.    Paragraph 413 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 413.

414.    Paragraph 414 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 414.

415.    Paragraph 415 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 415.

JA 318

416.   Paragraph 416 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 416.

417.   Paragraph 417 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 417.

418.   Paragraph 418 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 418.

419.   Paragraph 419 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 419.

420.   Paragraph 420 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 420.

421.   Paragraph 421 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 421.

422.   Paragraph 422 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 422

423.   Paragraph 423 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 423.

424.   Paragraph 424 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 424

425.   Paragraph 425 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 425.

426.   Paragraph 426 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 426.

427.   Defendant-Intervenors deny the allegations in paragraph 427, deny that Harvard has

JA 319

violated Title VI, and deny that Plaintiff is entitled to any relief whatsoever.

## COUNT I

428.  Defendant-Intervenors incorporate its responses to paragraphs 1-427 of the Complaint.

429.  Defendant-Intervenors deny the allegations in paragraph 429.

430.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 430 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response. Defendant-Intervenors otherwise deny the allegations in paragraph 430.

431.  Paragraph 431 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 431.

432.  Paragraph 432 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 432.

433.  Paragraph 433 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 433.

434.  Defendant-Intervenors deny the allegations in paragraph 434.

435.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 435 and therefore deny those allegations.

436.  Defendant-Intervenors deny the allegations in paragraph 436.

437.  Defendant-Intervenors deny the allegations in paragraph 437.

438.  Defendant-Intervenors deny the allegations in paragraph 438.

439.  Defendant-Intervenors deny the allegations in paragraph 439.

440.  Defendant-Intervenors deny the allegations in paragraph 440.

JA 320

441.  Defendant-Intervenors deny that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

442.  Defendant-Intervenors deny that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## COUNT II

443.  Defendant-Intervenors incorporate its responses to paragraphs 1-442 of the Complaint.

444.  Defendant-Intervenors deny the allegations in paragraph 444.

445.  Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 445 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response. Defendant-Intervenors otherwise deny the allegations in paragraph 445.

446.  Paragraph 446 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 446.

447.  Paragraph 447 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 447.

448.  Paragraph 448 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 448.

449.  Defendant-Intervenors deny the allegations in paragraph 449.

450.  Defendant-Intervenors deny the allegations in paragraph 450.

451.  Defendant-Intervenors deny the allegations in paragraph 451.

452.  Defendant-Intervenors deny the allegations in paragraph 452.

453.  Defendant-Intervenors deny the allegations in paragraph 453.

454.  Defendant-Intervenors deny that Plaintiff is entitled to a declaratory   judgment, a

permanent injunction, or any other relief whatsoever.

455. Defendant-Intervenors deny that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## COUNT III

456. Defendant-Intervenors incorporate its responses to paragraphs 1-455 of the Complaint.

457. Defendant-Intervenors deny the allegations in paragraph 457.

458. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 458 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response. Defendant-Intervenors otherwise deny the allegations in paragraph 458.

459. Paragraph 459 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 459.

460. Paragraph 460 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 460.

461. Defendant-Intervenors deny the allegations in paragraph 461.

462. Defendant-Intervenors deny the allegations in paragraph 462.

463. Defendant-Intervenors deny the allegations in paragraph 463.

464. Defendant-Intervenors deny that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

465. Defendant-Intervenors deny that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## COUNT IV

466. Defendant-Intervenors incorporate its responses to paragraphs 1-465 of the Complaint.

JA 322

467.   Defendant-Intervenors deny the allegations in paragraph 467.

468.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 468 and therefore deny those allegations,

except to the extent they contain conclusions of law, which require no response.

Defendant-Intervenors otherwise deny the allegations in paragraph 468.

469.   Paragraph 469 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 469.

470.   Paragraph 470 states a conclusion of law, which requires no response. To the extent a

response is required, Defendant-Intervenors deny the allegations in paragraph 470.

471.   Defendant-Intervenors deny the allegations in paragraph 471.

472.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about

the truth of the allegations in paragraph 472 and therefore deny those allegations,

except to the extent they contain conclusions of law which require no response.

473.   Defendant-Intervenors deny the allegations in paragraph 473.

474.   Defendant-Intervenors deny the allegations in paragraph 474.

475.   Defendant-Intervenors deny that Plaintiff is entitled to a declaratory judgment, a

permanent injunction, or any other relief whatsoever.

476.   Defendant-Intervenors deny that Plaintiff is entitled to attorneys' fees, costs, or any

other relief whatsoever.

## COUNT V

477.   Defendant-Intervenors t incorporates its responses to paragraphs 1-476 of the Complaint.

478.   Defendant-Intervenors deny the allegations in paragraph 478.

479.   Defendant-Intervenors lack knowledge or information sufficient to form a belief about

JA 323

the truth of the allegations in paragraph 479 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response. Defendant-Intervenors otherwise deny the allegations in paragraph 479.

480. Paragraph 480 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 480.

481. Paragraph 481 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 481.

482. Paragraph 482 states conclusions of law, which require no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 482.

483. Defendant-Intervenors deny the allegations in paragraph 483.

484. Defendant-Intervenors deny the allegations in paragraph 484.

485.  Defendant-Intervenors deny the allegations in paragraph 485.

486. Defendant-Intervenors deny the allegations in paragraph 486.

487. Defendant-Intervenors deny that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

488. Defendant-Intervenors deny that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

## <u>COUNT VI</u>

489. Defendant-Intervenors incorporates its responses to paragraphs 1-488 of the Complaint.

490. Defendant-Intervenors deny the allegations in paragraph 490.

491. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 491 and therefore deny those allegations, except to the extent they contain conclusions of law, which require no response.

JA 324

Defendant-Intervenors otherwise deny the allegations in paragraph 491.

492. Paragraph 492 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 492.

493. Paragraph 493 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 493.

494. Paragraph 494 states conclusions of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 494.

495. Paragraph 495 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 495.

496. The first sentence of paragraph 496 states a conclusion of law, which requires no response. Defendant-Intervenors lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 496 and therefore deny those allegations. Defendant- Intervenors deny the remaining allegations in paragraph 496.

497. Defendant-Intervenors deny the allegations in paragraph 497.

498. Paragraph 498 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations as to Defendant-Intervenors and otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 498 and therefore deny those allegations.

499. Paragraph 499 states a conclusion of law, which requires no response. To the extent a response is required, Defendant-Intervenors deny the allegations as to Defendant-Intervenors and otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 499 and therefore deny those allegations.

JA 325

500.    Defendant-Intervenors deny the allegations in paragraph 500, except to the extent they state conclusions of law, which require no response.

501.    Defendant-Intervenors deny the allegations in paragraph 501, except to the extent they state conclusions of law, which require no response.

502.    Defendant-Intervenors deny the allegations in paragraph 502, except to the extent they state conclusions of law, which require no response.

503.    Defendant-Intervenors deny the allegations in paragraph 503.

504.    Defendant-Intervenors deny that Plaintiff is entitled to a declaratory judgment, a permanent injunction, or any other relief whatsoever.

505.    Defendant-Intervenors deny that Plaintiff is entitled to attorneys' fees, costs, or any other relief whatsoever.

<b><u>RELIEF SOUGHT</u></b>

506.    Plaintiff is not entitled to any form of relief.

<b><u>DEMAND FOR JURY TRIAL</u></b>

507.    Plaintiff is not entitled to a jury trial.

## II.    AFFIRMATIVE DEFENSES

Defendant-Intervenors assert the following affirmative defenses on the basis of its current knowledge and information, reserving the right to withdraw any of these defenses or to assert additional defenses as further information becomes available.

1.    The Court lacks subject-matter jurisdiction over this action.

2.    Plaintiff fails to state a claim upon which relief can be granted.

3.    Plaintiff fails to allege irreparable harm or any other basis upon which injunctive relief

JA 326

would be available.

4.  Plaintiff's claims for injunctive relief are barred by the doctrine of mootness.

5.  The President and Fellows of Harvard College (Harvard Corporation) are permitted under the Fourteenth Amendment to the United States Constitution, Title VI, and prior legal precedent to use race as one of many factors in its flexible and individualized review of applicants in order to achieve its compelling interest in obtaining the benefits that flow from achieving a diverse student body, which include but are not limited to: promoting cross-racial understanding and classroom dialogue, reducing racial isolation, helping to break down stereotypes, and better preparing students to meet the challenges of an increasingly diverse workforce and society.

         **WHEREFORE**, Defendant-Intervenors respectfully request that the Court enter judgment in its favor and award it the costs of this action, together with attorneys' fees, expert fees, and such other relief as the Court may deem just and proper.


DATED: April 29, 2015                Respectfully Submitted,

                                   /s/ Rahsaan D. Hall
                                   Rahsaan D. Hall, BBO # 645369
                                   LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                   AND ECONOMIC JUSTICE
                                   294 Washington St., Suite 443
                                   Boston, MA 02108
                                   Tel: (617) 988-0608
                                   rhall@lawyerscom.org

                                   /s/ Jon M. Greenbaum
                                   Jon M. Greenbaum, DC Bar # 489887
                                   LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                   UNDER LAW
                                   1401 New York Avenue, NW, Suite 400
                                   Washington, DC 20005

Tel: (202) 662-8600
jgreenbaum@lawyerscommittee.org

ATTORNEYS FOR PROPOSED DEFENDANT-
INTERVENORS

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through

the ECF system on April 29, 2015 will be sent electronically to the registered participants as

identified on the Notice of Electronic Filing.

/s/ Rahsaan D. Hall
Rahsaan D. Hall

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. | * * * | |
| Plaintiff, | * * | |
| v. | * * | 14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION) | * * * * | |
| Defendant. | * * | |

## SCHEDULING ORDER

BURROUGHS, D.J.

This Scheduling Order is intended to provide a reasonable timetable for discovery in order to help ensure a fair and just resolution of this matter without undue expense or delay. Pursuant to Rule 16(b) of the Federal Rules of Civil Procedure and Local Rule 16.1(F), it is hereby ORDERED as follows.

1.    The parties shall serve Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure ("FRCP") by <u>April 27, 2015</u>.

2.    All motions to amend the pleadings pursuant to FRCP 15, 19, and 20 shall be filed by <u>September 25, 2015</u>.

3.    All fact discovery shall be completed by <u>April 1, 2016</u>.

4.    Plaintiff's experts shall be designated and the information required by Fed. R. Civ. P. 26(a)(2) shall be disclosed by <u>May 16, 2016</u>.

5.    Defendant's experts shall be designated and the information required by Fed. R. Civ. P. 26(a)(2) shall be disclosed by <u>June 30, 2016</u>.

1

6.      All expert discovery, including expert depositions, shall be completed by <u>August 29, 2016.</u>

7.      Any dispositive motions, including motions for summary judgment, shall be filed by <u>October 13, 2016</u>. Opposition briefs shall be filed 21 days after service of the dispositive motion, in accordance with Local Rule 56.1. Reply briefs shall be filed within 14 days of service of opposition briefs, in accordance with Local Rule 56.1.

8.      A further Status Conference before the Court will be scheduled for <u>July 9, 2015,</u> at 2:00pm.

**SO ORDERED.**

Dated: May 4, 2015

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
DISTRICT JUDGE

2

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT COURT OF MASSACHUSETTS
## BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),<br><br>　　　　　Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## NOTICE OF APPEAL

Notice is hereby given that Proposed Defendant-Intervenors, M.B., K.C., Y.D., G.E., A.G., I.G., R.H., J.L., R.S., Sarah Cole, Fadhal Moore, Arjini Kumari Nawal, Itzel Vasquez-Rodriguez, and Keyanna Wigglesworth (collectively, "Defendant-Intervenors"), by their undersigned attorneys, hereby appeal to the United States Court of Appeals for the First Circuit from the Order denying Proposed Defendant-Intervenors' Motion to Intervene entered in this action on June 15, 2015.

Dated: July 13, 2015　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　/s/ Rahsaan D. Hall
　　　　　　　　　　　　　　　　　　Rahsaan D. Hall, BBO # 645369

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND ECONOMIC JUSTICE
294 Washington St. Suite 443
Boston, MA 02108
Tel: (617) 988-0608
rhall@lawyerscom.org

Jon M. Greenbaum, First Circuit # 95913
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Tel: (202) 662-8600

Lawrence E. Culleen
Steven L. Mayer
Nancy L. Perkins
ARNOLD & PORTER, LLP
555 12th Street, NW
Washington, D.C. 20004
Tel: (202) 942-5000

ATTORNEYS FOR PROPOSED DEFENDANT-
INTERVENORS

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through

the ECF system on July 13, 2015 will be sent electronically to the registered participants as

identified on the Notice of Electronic Filing.

/s/ Rahsaan D. Hall
Rahsaan D. Hall

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB <br><br> Leave to File Granted July 21, 2015 (Dkt. 77) |

**REPLY MEMORANDUM
IN SUPPORT OF HARVARD'S MOTION TO STAY**

In an opposition laden with more invective than analysis, Plaintiff Students for Fair Admissions, Inc. ("SFFA") portrays as radical the common-sense notion that before the parties undertake a year's worth of costly and intrusive discovery, they should wait for the Supreme Court's imminent clarification of the law—a clarification invited by SFFA's own counsel, in a suit backed by its President.  In addition to misstating this Court's substantial discretion to manage its docket, SFFA overstates the prejudice its members would purportedly suffer from a temporary stay and sharply understates the relevance of *Fisher II*.  By entering a stay pending the Supreme Court's resolution of that case, this Court would not be licensing "the obstructive tactics once employed to continue racial discrimination" during the Civil Rights era (Opp. 16); it would be exercising its discretion in the manner most consistent with fairness, efficiency, and judicial prudence.

**I.      SFFA Misstates The Law Governing Stays**

"It is beyond cavil that, absent a statute or rule to the contrary, federal district courts possess the inherent power to stay pending litigation when the efficacious management of court

1

dockets reasonably requires such intervention." *Marquis v. FDIC*, 965 F.2d 1148, 1154 (1st Cir. 1992).  Harvard does not dispute that the power to stay litigation requires "'the exercise of judgment, which must weigh competing interests[.]'"  *New Balance Athletic Shoe, Inc. v. Converse, Inc.*, No. 14-cv-14715, 2015 WL 685070, at *1 (D. Mass. Feb. 18, 2015) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-255 (1936)).

SFFA errs, however, in suggesting that any potential prejudice to its members (which, as explained below, SFFA significantly overstates) is the *only* factor that should weigh in the Court's discretionary judgment.  As SFFA's own cases establish, prejudice to the non-movant is just one factor that bears on the appropriateness of a stay.  In *Alves v. Prospect Mortgage, LLC*, No. 13-cv-10985, 2013 WL 5755465, at *2 (D. Mass. Oct. 22, 2013), for example, this Court identified three factors affecting whether to stay litigation pending the outcome of related proceedings: "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party without a stay; and, (3) judicial economy" (internal quotation marks omitted).  And in *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248 (D. Mass. 1999), the Court identified six factors that courts weigh "in determining whether to grant a stay because of parallel litigation in a foreign forum," of which prejudice to a party is just one.  *Id.* at 252-253. Notably, although SFFA cites *Goldhammer* for the proposition that the power to grant a stay should be exercised sparingly, the Court in that case *granted* a stay (*id.* at 253), despite finding that doing so would cause some prejudice to the non-moving parties (*id.* at 255).[1]

SFFA's suggestion that prejudice to the non-movant is at least the preponderant factor relies on the Supreme Court's statement that "the suppliant for a stay must make out a clear case

---

[1]    *See also Consol. Edison Co. of New York v. United States*, 30 F. Supp. 2d 385, 389 (S.D.N.Y. 1998) (identifying "five factors courts consider in deciding whether to grant a stay" pending overseas litigation).

2

of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255.  But that statement does not imply that where granting a stay would prejudice the non-movant and denying it would prejudice the movant, the former harm should outweigh the latter.  It addresses only the fact that a movant—who bears the burden of justifying the stay—must carry that burden to demonstrate that these competing harms weigh in favor of a stay.  Moreover, the Supreme Court clarified that "[c]onsiderations such as these … are counsels of moderation rather than limitations upon power."  *Id.*  Here, the balancing of the applicable factors weighs in favor of a delineated stay, and this Court's discretion to manage its docket authorizes it to take that action.[2]

Finally, SFFA argues (at 2) that "a stay 'is rarely appropriate' when the parallel litigation 'will not dispose of the entire case.'"  But the case from which SFFA quotes—*Chavous v. D.C. Financial Responsibility & Management Assistance Authority*, 201 F.R.D. 1 (D.D.C. 2001)— says nothing of the sort.  It says that "a stay of discovery pending determination of *a motion to dismiss* is rarely appropriate when *the pending motion* will not dispose of the entire case[.]"  *Id.* at 3 (internal quotation marks omitted) (emphasis added).  On the question that is actually before this Court—whether to stay this case pending related litigation—the First Circuit has said quite the opposite, holding that a district court may stay a given action "pending resolution of another" even if the other action would "'not dispose of all the questions involved,'" as long as it would "narrow the issues in the pending cas[e] and assist in the determination of the questions of law

---

[2]    SFFA also argues (at 3) that "a stay is especially difficult to secure in cases where the plaintiff has 'alleged … continuing harm and sought … injunctive or declaratory relief.'"  But the language that SFFA quotes from *Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir. 2005), says no such thing; it simply mentions that a prior case declined mandamus to disturb a stay in part because the plaintiff was seeking only damages.

JA 335

involved.'" *Taunton Gardens Co. v. Hills*, 557 F.2d 877, 879 (1st Cir. 1977) (quoting *Landis*,

299 U.S. at 253).

## II.    SFFA Overstates The Prejudice That A Stay Would Cause

SFFA also overstates the degree of prejudice that would actually result from a temporary

stay pending the resolution of *Fisher II*.[3]   There are two principal problems with SFFA's

argument.

*First*, even an eleven-month delay in this litigation (from the current date to the last

possible date for resolution of *Fisher II* in June 2016) would not be particularly significant, in

light of the fact that (1) more than a quarter-century has elapsed since the Department of

Education examined (and exonerated) Harvard's race-conscious admissions practices against

essentially the same challenge SFFA now brings; (2) SFFA has taken the position that discovery

in this case should extend well into 2016 in any event; and (3) this delay is the direct result of

parallel litigation (in three courts at once) brought by SFFA's counsel and backed by its

President.

*Second*, at most a small handful of SFFA's purported members[4]—and quite possibly

none—would be affected by that delay.  Although SFFA suggests (at 3) that "the 2016-2017

cycle" is "the first admissions cycle in which a judgment in SFFA's favor likely would take

effect" absent a stay, that is unlikely.  Summary judgment motions are not due until mid-October

---

[3]    Because this is not a class action, the only prejudice alleged by SFFA that could possibly
be relevant to the Court's consideration of a stay is the prejudice that a stay would cause to
SFFA's own members.

[4]    Harvard refers to SFFA's purported members as "members" for purposes of this motion,
but reserves the right to argue that SFFA lacks standing to pursue this litigation because its
purported members lack any genuine membership relationship with the organization, and further
reserves the right to argue that the only members whose individual standing can be attributed to
SFFA are those who joined prior to the filing of this action.

2016, with briefing through late November 2016.  Even if the Court were to rule quickly on the motions, any judgment in SFFA's favor would be unlikely to issue before Harvard was already well into its regular admissions cycle for 2016-2017.  Thus, the earliest admissions cycle to which any judgment in SFFA's favor could apply would be 2017-2018.

The proposed stay would therefore not affect any of SFFA's rejected-applicant members ████████████████████████████████████████████████ (*see* Declaration of Felicia H. Ellsworth ("Ellsworth Decl."), Ex. B), as those members would by that point be ineligible to apply for transfer admission.[5]  And it would not affect the ability of all but three of SFFA's future-applicant members to apply for freshman admission.  The only three members who intend to apply for admission in 2017-2018 or subsequent cycles plan to apply in three different years (████████████████████████, *see* Ellsworth Decl., Ex. B), so a temporary stay of no more than a year could affect at most a single one of them.

Moreover, Harvard would have ample grounds to seek a stay pending appeal of any adverse judgment—and given the typical timeline of proceedings in the First Circuit and the Supreme Court, it is far likelier that the first admissions cycle affected by any decision would be 2019-2020, an admissions cycle in which SFFA has identified no member who plans to apply.  See *id.* (identifying future-applicant members who plan to apply in ████████████████ ████████████████).  Since the ████████ applicant would not be adversely affected by delaying the effect of an adverse judgment from 2019 to 2020, the likeliest scenario is that *not one* of SFFA's members would be harmed by a stay.

---

[5]    *See* Harvard College Admissions & Financial Aid, Transfer Eligibility, https://college.harvard.edu/admissions/application-process/transferring-harvard-college/transfer-eligibility (last visited July 20, 2015).

SFFA thus substantially overstates the likelihood that a stay in this matter would cause any prejudice.  Such a stay might well have zero effect on any of SFFA's purported members.  At most, a stay could conceivably affect *one* of SFFA's three members who claim that they plan to apply for freshman admission during the ██████████████████████████ admissions cycles.

The likelihood of prejudice to a non-movant is, as noted above, just one among the factors that a district court must balance in determining whether to enter a stay.  Here, the speculative possibility of an adverse effect on a single hypothetical applicant does not justify allowing eleven months' worth of costly and burdensome discovery, much of which implicates serious individual privacy considerations, to proceed against a non-profit educational institution while—at the behest of SFFA's own counsel—the Supreme Court clarifies the governing law.[6]

## III.    SFFA Understates The Relevance Of *Fisher II*

SFFA seriously understates the connection between this case and *Fisher II*.  ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████.  Ellsworth Decl., Ex. A.  SFFA's President, who has also been heavily involved in the *Fisher* litigation, has explained publicly that he sees that case and this one as parts of an integrated litigation strategy.[7]  Even aside from the fact that *Fisher II* will provide just

---

[6]    SFFA has even less basis to suggest (at 5) that a temporary stay could result in the destruction of evidence.

[7]    *See* Houston Chinese Alliance, *Edward Blum Speaks About The Legal Battle Against Harvard University*, YouTube (Apr. 26, 2015), https://www.youtube.com/watch?v=VVVuhD0KelQ ("When we filed [*Fisher*], we didn't ask the Court to [end the use of race and ethnicity in higher education], because we felt that it would take a couple of cases to develop our theories and find the right set of facts to do it.  But if we

JA 338

the fifth occasion in the past four decades for the Supreme Court to address the permissible consideration of race in university admissions, it strains credulity for SFFA to contend that *Fisher II* bears only marginal relevance to this case.

As Harvard's opening Memorandum explains, the petition for certiorari in *Fisher II* asks the Supreme Court to resolve a number of questions that lie at the very heart of SFFA's theory of this litigation.  It asserts, for example, that a university's decision to consider race in admissions must be measured against the reasons that the university expressed at the time of making that decision, as opposed to those that the university asserts in litigation.  Petition for Certiorari, *Fisher v. University of Texas at Austin* (U.S. Feb. 10, 2015) (No. 14-981) ("*Fisher II* Pet.") 14-19.  It asserts (at 19-25) that a university must measure its attainment of diversity in a quantitative, not qualitative, manner.  And it asserts (at 25-29) that a university may consider race only in filling the last few places in a class.

In its opposition, SFFA now claims (at 12) that these issues have all been so clearly settled that *Fisher II* cannot clarify the law.  But the Fifth Circuit obviously did not regard them as settled, or SFFA's lawyers would not be asking the Supreme Court for relief.  And while SFFA claims that certain of the issues are not even before the Court in *Fisher II*, that assertion is impossible to square with the petition for certiorari.[8]  Despite SFFA's effort to paint the grant of

---

win again at the Supreme Court, we think the hurdle that they articulated the first time in 2013, that hurdle will be raised, it will be more fully fleshed out, and at least for the next two or three years while the Harvard lawsuit is being pursued and the UNC lawsuit is being pursued, it will be harder for universities to use race and ethnicity[.]").

[8]     *Compare* Opp. 13 (arguing that *Fisher II* does not "raise the question whether 'a university's decision to consider race in admissions must be measured against the reasons that the university expressed at the time of making that decision') *and id.* ("SFFA alleges that Harvard is using race neither as a 'plus' factor in accordance with *Grutter* nor to fill the 'last few places' in the freshman class in accordance with [*Bakke*].  *Fisher II* raises none of these issues." (citations omitted)) *with Fisher II* Pet. 15 (criticizing the Fifth Circuit for having been "'persuaded' by UT's … post hoc rationalizations for its decision to reintroduce racial

---

7

certiorari in *Fisher II* as a drama-less and irrelevant affair, SFFA's own President has stated that he expects the Supreme Court's resolution of *Fisher II* to "flesh[] out" the law governing the consideration of race in admissions and to "continue[] to narrow the use of race."[9]

SFFA accuses Harvard of insufficient specificity in addressing how the Supreme Court's resolution of *Fisher II* will affect discovery in this case.  It is, of course, difficult to be precise in addressing the effect of an opinion without knowing its contents.  But Harvard *has* identified the issues on which *Fisher II* could well shape the law, and any clarification of the law on those issues surely would affect not only the scope of permissible fact and expert discovery, but also the parties' discovery and litigation strategies, which naturally operate under the Supreme Court's guidance on the governing standards for the use of race in university admissions.  As this Court is already aware (*see* SFFA's Motion to Compel, Doc. 64), the parties disagree about whether SFFA is entitled to discovery of the massive scope it seeks.  The balance the Court will need to strike on this and other disputes regarding the scope of permissible discovery will undoubtedly be influenced by the contours of the governing law.[10]

---

preferences") *and id.* at 27 ("*Bakke* never contemplated the wholesale use of race in the scoring of all applicants.").

[9]    *See supra* note 7; Tamar Lewin & Richard Pérez-Peña, *Colleges Brace for Uncertainty as Court Reviews Race in Admissions*, N.Y. Times, July 1, 2015, at A14 ("'Like most Americans, I hope this case presents the court the opportunity to end racial classifications in higher education, in total,' said Edward Blum, the president of the Project on Fair Representation, which provided counsel to Ms. Fisher ….  'But if the court just continues to narrow the use of race, we would see that as a great victory, too.'").

[10]    SFFA also derides as "absurd" (Opp. 7) the notion that *Fisher II* might cause Harvard to reexamine its admissions practices, causing this litigation to become moot and wasting the intrusion and expense of a year's worth of discovery.  But SFFA's suggestion that this case would *not* be mooted by a change to Harvard's admissions practices depends on the notion that it would fall within the voluntary-cessation exception to mootness.  Opp. 7 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  That exception does not apply where it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" (*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000)), as

8

\*        \*        \*

For the foregoing reasons and those expressed in Harvard's opening Memorandum, Harvard respectfully requests that the Court enter a temporary stay of this litigation pending the Supreme Court's forthcoming decision in *Fisher II*.[11]

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth (BBO #665232)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street

---

would surely be true if the Supreme Court's ruling in *Fisher II* led Harvard to substantially revise, and perhaps abandon altogether, a practice it considers essential to its educational mission.

[11]    SFFA asks (at 16 n.4) that the Court "issue a written explanation" of any decision granting the requested stay, so as "to aid the First Circuit and potentially the Supreme Court in reviewing that decision." Of course, whether or not accompanied by written reasoning, a temporary stay of litigation is not ordinarily appealable. *See, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 10 n.11 (1983) ("[A] stay is not ordinarily a final decision for purposes of § 1291, since most stays do not put the plaintiff 'effectively out of court.'").

9

New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Dated:  July 23, 2015

*Counsel for Defendant President and
Fellows of Harvard College*

JA 342

**<u>CERTIFICATE OF SERVICE</u>**

 I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on July 23, 2015.

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth

JA 343